**Joyce YAMAGIWA, Trustee of the Trust Created Under Trust Agreement Dated January 30, 1980 by Charles J. Keenan, III and Anne Marie Kennan, for the Benefit of Charles J. Keenan IV, as to an Undivided 50% Interest, and Trustee of the Trust Created Under Trust Agreement Dated January 30, 1980, by Charles J. Keenan III and Anne Marie Keenan for the Benefit of Ann Marie Keenan, as to an Undivided 50% Interest, Plaintiff,**

v.

**CITY OF HALF MOON BAY, Coastside County Water District and Does 1–50, Defendants.**

**No. C 05–4149 VRW.**

United States District Court, N.D. California.

Nov. 28, 2007.

Anne Evelyn Mudge, Cox, Castle & Nicholson LLP, San Francisco, CA, Edward G. Burg, Kathrin Andrea Wanner, Kisu Lam, Manatt, Phelps & Phillips, Los Angeles, CA, for Plaintiff.

David S. Skinner, Adam Uriah Lindgren, Amrit Satish Kulkarni, Edward Grutzmacher, Meyers Nave Riback Silver & Wilson, Rick W. Jarvis, Benjamin P. Fay, Jarvis & Fay & Doporto, LLP, Leah Castella, McDonough Holland & Allen PC, Oakland, CA, for Defendants.

## FINDINGS OF FACT CONCLUSIONS OF LAW

VAUGHN R. WALKER, Chief Judge.

Joyce Yamagiwa ("Yamagiwa"), brought this action alleging that defendant City of Half Moon Bay ("City") damaged certain real property that she holds in trust. Doc. # 1–2. The property, known as the Beachwood Property, is located in the City of Half Moon Bay at Assessor's Parcel No. 048–280–020. *Id.* Yamagiwa brought a federal claim for inverse condemnation and pendent state claims for inverse condemnation, nuisance, trespass and recovery of amounts paid to finance public improvements. *Id.*

This case was tried before the court without a jury on June 6, 7 and July 2, 3, 5, 6, 9, 11 and 12. Doc. ## 173–175, 177, 179, 181, 186–188. The court heard testimony from 22 witnesses, including seven expert witnesses, and received into evidence nearly 300 exhibits. The court now makes its findings of fact and conclusions of law:

### FINDINGS OF FACT

#### The Beachwood Property

1. This case involves a 24.7–acre undeveloped parcel of property located in the City of Half Moon Bay, known as Beachwood ("Beachwood," or "the Property"). (Ex. 556.) Both sides agree that there are substantial wetlands on the Property. The principle disputed issue is what caused the wetlands to develop and, more specifically, whether a public project constructed by the City was a substantial cause of the development of Beachwood's wetlands.

2. Beachwood is located on the east (i e, inland) side of Highway 1, north of Highway 92.[1] The Property is roughly rectangular in shape. Its northern border is 1837 feet long, and its western frontage along Highway 1 is 576 feet. (Ex. 75, at 9900122.)

3. To the north of Beachwood lies an undeveloped parcel of property known as Glencree. To the north of Glencree lies a partially developed subdivision known as Grandview Terrace ("Grandview"). (Ex. 425.)

4. To the south of Beachwood lies residentially developed property known as the Newport Terrace/Highland Park subdivision ("Highland Park"). Highland Park contains three streets running east/west: Terrace Avenue is the northernmost street; Silver Avenue is the middle street; and Highland Avenue is the southernmost street. Golden Gate Avenue runs north/south and connects Terrace, Silver and Highland. It starts at Highland and dead-ends at Beachwood's southern border. (Ex. 425.)

5. Beginning in 1983, as discussed in detail below, the City of Half Moon Bay constructed a public improvement on and nearby the Property. The project was known as the Terrace Avenue Assessment District ("TAAD").

#### Pre–TAAD Topography of Beachwood

6. The pre-TAAD topography on Beachwood is depicted on Exs. 122 and 426 (the latter being a copy of Ex. 122 with the topographic lines shown in alternating colors for emphasis). Ex. 559 is another topographic map depicting Beachwood and surrounding properties in the pre-TAAD condition.

7. Each of these pre-TAAD topographic maps display 1–foot contour intervals on Beachwood as of October 1976. (White,

---

1. Because "true north" is on a diagonal on the Beachwood property, for ease of directions the parties have adopted the convention of referring to Highway 1 as running north/south on the west side of the property. The court likewise adopts this convention herein.

394:8–13.) A 1–foot contour interval topographic map is a very detailed map, showing all points of equal elevation at one foot intervals. (Weirich, 806:16–24; Huffman, 1510:6–14; Coats, 1325:14–23.) A 1–foot contour interval topographic map is a design-level map that allows an engineer to design the subdivision and calculate quantities of dirt that need to be cut or filled on the property. (White, 324:24–325:12; 392:8–15.)

8. Topographic maps indicate mounds or depressions on the land by closed-loop polygons. Such closed-loop polygons show that the land inside the loop is either higher than the polygon border (hence, a mound) or lower than the polygon border (hence, a depression). When a closed-loop polygon has hachures or tick-marks on the inside of the polygon, this means that the area inside the closed loop is a depression. (White, 394:4–7; Weirich, 861:8–22.) This rule of topographic mapping is sometimes called "The Rule of O's." (Huffman, 1509:17–1510:5.)

9. The detailed pre-TAAD topographic map of Beachwood reflects no closed-loop depressions on the Beachwood Property. (Ex. 122; White, 394:4–19; Weirich, 862:3–5.) The pre-TAAD topographic map does, however, indicate a closed-loop depression on the Glencree property to the north of Beachwood. (Ex. 122, White, 393:15–394:7.) The absence of closed-loop depressions on Beachwood shows that the pre-TAAD topography of the Property lacked any such depressions.

10. Instead, the pre-TAAD topography of Beachwood reflected a gently sloping property, with its highest point (elevation approximately 100 feet above sea level) on the eastern border. The eastern slope of the Property—covering roughly the easterly ⅙th of the land area—descended from the 100′ elevation down to approximately 60′. From that point, the elevation descended more gradually to approximately 47′. The lowest point on the Beachwood Property was along its northern boundary with the Glencree property, and the topography on Glencree continued to descend from that point to a low point along Glencree's northern boundary with Grandview, as indicated on Ex. 426. To the west of the low point on Beachwood is a small ridge rising to approximately 50′; and to the west of that ridge, the Property descends to Highway 1 at its eastern border. (Exs. 122, 426, 559; Weirich, 806:13–807:22.)

11. Using the foregoing 1–foot contour topographic maps, Dr. Frank Weirich, plaintiff's expert hydrologist, prepared a digitized, color topographic map of Beachwood in its pre-TAAD condition (Ex. 836). Dr. Weirich also prepared a digitized topographic map depicting the low point along the northern boundary of Beachwood (Exs. 837, 838).

### Pre–TAAD Surface Flows Onto and Off of Beachwood

12. Before the TAAD project was built, there were four areas that contributed surface flows onto and off of Beachwood. The first area was direct rainfall that fell onto the Property. (Weirich, 826:12–16; Coats, 1285:1–13.)

13. The other three areas were off-site drainages, or watersheds, located upslope from Beachwood in the hills to the east, that contributed surface run-off to Beachwood in heavy storms. (Weirich, 826:17–827:18; Ex. 828.)

14. The first off-site contributing area was a 132–acre drainage basin located south and southeast of Beachwood. This area was designated Drainage Area A by Dr. Weirich. (Ex. 828, Weirich, 828:18–22.) The second off-site contributing area was a 92–acre drainage basin located southeast of Beachwood. This area was designated Drainage Area B by Dr. Weirich. (Ex. 828, Weirich, 830:4–10.) The

third off-site contributing area was a small 7–acre drainage basin located northeast of Beachwood. Dr. Weirich designated this area as Drainage Area C. (Ex. 828, Weirich, 830:11–21.)

15. While there were many disagreements between the experts in this case, there was substantial agreement regarding the pre-TAAD watersheds and the amount of stormwater delivered to Beachwood from the contributing areas. The pre-TAAD drainages mapped by Dr. Weirich (Ex. 828) do not differ materially from those mapped by David Freyer, the City's expert (Ex. 1358). And the average estimated annual water input from direct rainfall and the off-site drainages pre-TAAD did not differ materially as between Dr. Weirich and Dr. Robert Coats, the City's expert hydrologist. (Ex. 1352.)

16. Not all the stormwater that fell on the off-site drainages flowed to Beachwood. The amount of off-site run-off actually delivered to Beachwood pre-TAAD was determined by the amount of rainfall as well as the soil characteristics, vegetation and slope of the drainages. (Weirich, 831:8–832:8.) Pre–TAAD, surface run-off from Drainage Area B that was able to reach Beachwood entered the Property at its southeast corner, where it flowed westerly in a creek along Beachwood's southern boundary. (Weirich, 830:6–10.) Slightly east of the mid-point of Beachwood's southern boundary, run-off from Drainage Area B was joined by surface run-off that was able to reach Beachwood from Drainage Area A, which flowed from the hills to the east and then curved northerly across what is now the Highland Park subdivision. (Weirich, 829:18–830:3; 830:22–831:3.) From the confluence point, the surface run-off from Drainages B and A that was able to reach Beachwood then flowed northwesterly across Beachwood toward its low point on the Beachwood/Glencree border, and then continued to flow northwesterly off the Beachwood Property to the Glencree property. (Ex. 828; Weirich, 831:18–24.)

17. Pre–TAAD, surface run-off from Drainage Area C entered Beachwood near its northeast corner, where it flowed in an undefined path, ultimately working its way to the low point on the Beachwood/Glencree border, and flowing northwesterly off of Beachwood in the same manner as described above. (Weirich, 830:13–21.)

18. Pre–TAAD, the vast majority of the direct rainfall on Beachwood and the run-off from Drainage Areas A, B and C flowed toward the low point on Beachwood, where it exited the Property and then continued to flow northwesterly onto and across Glencree, to Grandview. There were no barriers to flow preventing the surface flows on Beachwood from reaching the low point and continuing off the Property. (Weirich, 816:2–21; 841:4–8.) The exception to this flow was the direct rainfall that fell on the west side of the small ridge at elevation 50. The surface flow from such direct rainfall flowed westerly toward a ditch along the east side of Highway 1, where it was collected and directed northerly toward Grandview. (Weirich, 816:22–817:12.)

19. Rainfall on Beachwood and surrounding properties was and is extremely variable. Annual rainfall since 1940 (measured on a Water Year basis, which begins on October 1 of the preceding calendar year and ends on September 30 of the Water Year) varied by a factor of four, from a low of 13″ in Water Year 1972 to a high of 52.6″ in Water Year 1983 (excluding years with substantial missing rainfall data). (Ex. 763; Weirich, 836:11–839:18.)

20. The rainfall totals give a gross sense of annual rainfall, but they are not sufficient to calculate accurately run-off that would have reached the Beachwood Property pre-TAAD. Run-off is more ac-

curately determined on a per-storm basis, for which rainfall data of short duration—typically 5—to 15–minute intervals—is needed. The most detailed rainfall data available for Half Moon Bay are daily totals. (Ex. 760.) The daily totals give a sense of the total rainfall that fell that day but, again, do not provide sufficient data to calculate off-site run-off to Beachwood from individual storms accurately. (Weirich, 841:19–842:17.)

21. The lack of adequate data to calculate total run-off on a per-storm basis accurately is not critical. What is more important is the path of the surface run-off that did reach Beachwood in the pre-TAAD era, that being across and off of the Property. Most critically, there were no closed-loop depressions on Beachwood in its pre-TAAD topographic condition that would collect and store water; and there was a clear exit path along Beachwood's northern border, at its low point, which allowed surface flows to exit the property and continue the northwesterly route across Glencree and to Grandview.

22. Two witnesses with percipient knowledge of pre-TAAD surface flows across Beachwood testified to this pattern. Gary Whelen, who lived on Terrace Avenue just south of Beachwood for 10 years *before* construction of the TAAD project, traced the pre-TAAD flow of water that he observed onto and off of Beachwood on Ex. 9, a September 11, 1978 aerial photograph. (Ex. 9; Whelen, 44:11–46:8.) Ben White, who was the project engineer for TAAD and had done drainage studies in the areas before TAAD, traced a similar pre-TAAD flow onto and off of Beachwood on Ex. 70, a drainage study map that was prepared by his firm, MacKay & Somps. (Ex. 70; White, 212:14–213:3.) White further testified to the sheet flow of surface water off the Beachwood Property before TAAD was built. (White, 217:6–218:8; 353:1–9.)

23. The pre-TAAD flow path is further supported by periodic flooding at "the end of the line," in the Grandview subdivision, in the years before TAAD was constructed. (Ex. 429 at 1; White, 297:2–10; 304:14–16; Weirich, 839:19–840:9.) The surface run-off that caused flooding in Grandview pre-TAAD was run-off from the hills to the east, through the various off-site drainages, that joined direct rainfall on Beachwood and then flowed off of Beachwood, across Glencree, and to Grandview. (White, 202:11–203:6; Weirich, 840:25–841:8.)

24. There is no percipient witness testimony of pre-TAAD long-term ponding of water on the Beachwood Property. Before TAAD, the Beachwood property was unfenced and was used by neighbors to hike and walk their dogs. Whelen was on the Beachwood Property an average of once a month for the 10 years he lived on Terrace Avenue before the TAAD construction, from 1973 to 1983. He never saw ponding of water on Beachwood pre-TAAD. (Whelen, 45:6–47:3.) White, the project engineer, was on Beachwood about a dozen times before TAAD, at different times of the year; he also never observed ponding on Beachwood. (White, 214:21–215:13; 291:9–21.) In extremely heavy storms—such as during the 1982 *El Nino* storms—stormwater may have occasionally ponded on Beachwood. (Muller, 1243:18–23; Weirich, 841:9–18.) This was the exception, not the rule.

25. The City's evidence of frequent or long-term ponding on Beachwood before TAAD is insubstantial and implausible. The City presented no testimony by any witness who could recount frequent or long-term ponding on Beachwood before TAAD. Clearly, this was not for lack of effort, as the City presented testimony by two long-time farmers in the City. Albert Adreveno has resided in Half Moon Bay

since 1954. He never observed ponded water on Beachwood and, indeed, was never on the Property and made no observations of the Property. (Adreveno, 1235:20–1237:13.) John Muller, Mr. Adreveno's son-in-law and a member of the Half Moon Bay City Council, farmed the Scopesi property across Highway 1 from Beachwood. Other than recollection of occasional ponding on the westerly 50–100 feet of the Property—it being unclear whether such ponding was pre-TAAD or post-TAAD—Mr Muller never observed frequent or long-term ponding on Beachwood pre-TAAD. (Muller, 1241:24–1242:23; 1244:20–1245:7; 1246:23–1247:16.) If there truly had been such ponding on Beachwood pre-TAAD, it seems likely that the City could have located witnesses to the ponding and produced them at trial. The factual testimony of Messrs Adreveno and Muller added nothing of consequence to the case, and certainly did not support frequent or long-term ponding on Beachwood before the TAAD project was constructed. And Mr Muller's objectivity might well be questioned, given his role in City government.

26. Further, the City's expert witnesses were uninformed, and their opinions regarding pre-TAAD topography and drainage are rejected as baseless. The City had three technical experts in the case, Dr. Robert Coats (hydrology), David Freyer (civil engineering) and Dr. Terry Huffman (wetlands). None of these expert witnesses had ever seen the pre-TAAD 1–foot contour interval topographic map of Beachwood before they formed their opinions in this case. (Coats, 1327:4–1328:12; Freyer, 1378:8–21; Huffman, 1511:20–1512:5.) Typical is Mr Freyer. The most detailed topographic map that he saw of Beachwood in its pre-TAAD condition had only a single topographic line running through the Property (but for the hilly area on the Property's eastern edge) from which no supportable conclusions about pre-TAAD topography or flows could be made. (Freyer 1392:18–1393:18.) Dr. Coats tried to testify about Ex. 122, the 1–foot contour interval pre-TAAD topographic map, but he did not see or rely on that map when he formed his opinions. (Coats, 1287:12–1288:9.) Dr. Coats then testified that the post-TAAD 1990 topographic map reflected pre-TAAD topography as well (Coats, 1293:2–15)—but he had no basis to draw such a conclusion, as he had not seen the detailed pre-TAAD topography. In fact, the detailed pre-TAAD topography bears no resemblance to the post-TAAD topography Dr. Coats relied on, as discussed in further detail below. Dr. Huffman also testified that the earliest 1–foot contour topographic map he saw was the post-TAAD (August 22, 1990) topographic map by Brian Kangas Foulk ("BKF"). (Ex. 556; Huffman 1511:20–1512:5.) On direct examination, Dr. Huffman testified that Sheet 19 of the TAAD plans (Ex. 21) reflected pre-TAAD topography of Beachwood, and he testified in some detail how he purportedly relied on Sheet 19 as showing the pre-TAAD topography of Beachwood. (Huffman, 1442:9–1443:13.) On cross-examination, however, it was revealed that Sheet 19 of the TAAD plans did not even depict the Beachwood Property; instead, it depicted the Highland Park property to the south of Beachwood. (Huffman, 1513:12–1514:17.) In sum, none of the City's experts had sufficient information to compare or opine about pre-TAAD versus post-TAAD topography, because none of them had seen the pre-TAAD detailed topography necessary to make such conclusions. The opinions of the City's experts regarding pre-TAAD topography and flow paths are therefore rejected as baseless.

27. The City's experts also tried to rely on secondary pre-TAAD reports to support their views about pre-TAAD topography and drainage. Drs. Huffman and

Coats relied on Ex. 1384, an unsigned June 1974 Preliminary Soil Investigation Report by Harlan Engineers. (Coats, 1303:17–1304:5; Huffman, 1434:13–21.) The author of the Harlan Engineers Report wrote that water "apparently" ponded in a depressed area in the center of the site. (Ex. 1384, p. 1384-4.) There is no evidence that the Report's author ever *actually* observed any pre-TAAD ponding on Beachwood. The author's visit to the site was presumably sometime between May 23, 1974 (the date of the work order [Ex. 1384-3]) and June 19, 1974 (the date of the report [Ex. 1384-3]), not during the rainy season.

28. Dr. Huffman also relied on the September 1975 Initial Study Concerning the Possibility of Environmental Impacts by Jones–Tillson & Associates. (Ex. 1114; Huffman, 1441:6–12.) The statement in the Jones–Tillson report that echoes the Harlan Engineers report—that " '[u]nder natural conditions, drainage was apparently ponded on the site,' " (Ex. 1114 at COHMB 0099072)—is a quote from a different report by Burkland and Associates that was not produced at trial. Again, there is no basis to conclude that the authors of the Jones–Tillson Initial Study ever saw ponding on Beachwood; they merely quoted from someone else's report.

29. In sum, there is no plausible evidence of frequent or long-term ponding on the Beachwood Property before TAAD. The topography does not support such ponding, nor does the eyewitness testimony. The opinions presented by the City's experts are baseless, as none of them knew the pre-TAAD topography, and the secondary sources they relied on are inconclusive and vague. The evidence establishes that there was no frequent or long-term ponding of stormwater on Beachwood before the TAAD project was constructed by the City.

*The TAAD project*

30. On March 16, 1982, the City Council adopted a Resolution of Intention to form the Terrace Avenue Assessment District ("TAAD"), Res No. 22–82. (Ex. 14.) The resolution included a general description of the TAAD project, but cautioned that the project plans would be controlling as to the correct and detailed description of the project. (Ex. 14, ¶ 12.) The TAAD project was planned and approved pursuant to the Municipal Improvement Act of 1913 (Cal. Streets & Hwys Code §§ 10000 *et seq*). (Ex. 14, at 601 ¶ 18; Ex. 17, at HM209807 [2nd "whereas" clause]; Ex. 20, at HM209357, ¶ 10.) The TAAD project was financed by assessments on real property within the assessment district, with bonds issued under the Municipal Improvement Bond Act of 1915. (Ex. 14, ¶ 15.)[2]

31. Beachwood was one of the properties included within the assessment district, and was one of the properties on which work was performed pursuant to the TAAD project. (Ex. 21; White, 196:25–197:2.)

32. On September 21, 1982, by Res No. 103–82, the City accepted easement interests from the then-owner of Beachwood over, *inter alia*, portions of the Beachwood Property for construction of the TAAD project. (Ex. 75.) The last three pages of Ex. 75 (at 9900120 to 9900122) contain the relevant storm drain easements conveyed by The William Lyon Company (then Beachwood's owner) to the City, and a map of the storm drain easements appears on the last page of Ex. 75 (at 9900122). Parcel 1 of the storm drain easement included a strip of land 15' wide and 1837.65' long, running along the entire northern border of Beachwood, and also included a

2. The 1913 Act does not have its own provision for the issuance of bonds, but it allows

bond financing under the 1915 Act. (Cal. Streets & Hwys Code § 10600.)

small protruding area (55′ long and 20′ wide), near the low spot on Beachwood's northern border. Parcel 1 also included a strip of land 30′ wide and 576.34′ long, along Beachwood's western border, at its frontage with Highway 1. Parcel 2 of the easement consisted of a strip of land 15′ wide along Beachwood's southern border, starting at the western end of Golden Gate Avenue, and proceeding 1060.89 feet easterly to Beachwood's southeast corner. (White, 235:12–237:13.)

33. On March 12, 1982, the City entered into a contract with MacKay & Somps, a civil engineering firm ("M & S"), under which M & S agreed to provide engineering consulting services to the City for the TAAD project. (Ex. 69.) Ben White was the engineer at H & S who oversaw the project. (White, 193:23–194:3.) Richard Braden was another engineer at H & S who worked on the TAAD project under white's supervision. (Braden, 397:2–22.)

34. On June 21, 1983, the City Council adopted Res No. 53–83, ordering the work of public improvement called for by the TAAD project. (Ex. 17.)

35. On August 18, 1983, the City entered into a contract with Bay Cities Paving & Grading, Inc under which Bay Cities agreed to act as the City's contractor in constructing the TAAD project. (Ex. 20; Whelen, 54:2–8.) The contract attached Bay Cities' bid, which referenced Sheets 1 thru 19 of the TAAD plans. (Ex. 20, at HH209359.)

36. On August 3, 1983, the City's then-Director of Public Works and City Engineer, Ronald G Young, signed an Extract of Public Works Contract Award, notifying the California Department of Industrial Relations that the TAAD contract constituted a contract to perform public works under Cal. Labor Code § 1777.5. (Ex. 638; Whelen, 55:21–56:5.)

37. The TAAD plans, prepared under White's supervision and signed by him, are Ex. 21. (White, 197:3–17.) The TAAD plans were also approved by the City's then-Public Works Director, Felix J Karpain. (Ex. 21.) The TAAD plans reflect substantial work that was planned for, and constructed on, the Beachwood Property. (Ex. 21, Sheets 6, 7, 8, and 14.)

38. Sheets 7 and 8 of the TAAD plans (Ex. 21) depict work on the north side of Beachwood. Along the entire 1836–foot northerly border of Beachwood, the City constructed a reinforced concrete underground storm drain pipe ("the Northern Drain"). For approximately the easterly 336 feet, the storm drain pipe was 15″ in diameter; for the approximately 1500 remaining feet (to the northwest corner of Beachwood), the storm drain pipe was 30″ in diameter. The Northern Drain was placed within the 15′—wide easement strip along Beachwood's northern border that was included within Parcel 1 of the September 21, 1982 easement granted to the City.

39. The top portions of Sheets 7 and 8 contain a plan view of the Northern Drain, while the bottom portions contain a profile view. (White, 216:21–217:2.) The profile view contains a series of station numbers, which indicate 100 feet of distance from the starting point (Station 0) at Highway 1. (White, 217:6–11.) Thus, the downstream 1100 feet of the Northern Drain are depicted on Sheet 7 (from Stations 0 to 11) and the upstream 848 feet of the Northern Drain are depicted on Sheet 8 (from Stations 11 to 18+48). The Northern Drain actually extended slightly east of the northeast corner of Beachwood, where an inlet was constructed. (Ex. 21, Sheet 8.) The profile view also contains elevations on the vertical access. (White, 217:3–5.)

40. The pre-existing ground surface (i e, the pre-TAAD topography) along the

area of the Northern Drain is depicted by the dashed lines on Sheets 7 and 8 of the TAAD plans. (Whelen, 59:24–60:2; White, 217:12–14.) The topographic low point of the pre-TAAD topography is indicated at Station 6 (i e, approximately 600 feet east of the northwest corner of Beachwood). (White, 217:15–19.)

41. In order to place the Northern Drain, the City's contractor dug a trench from the pre-existing ground surface down to at least the bottom elevation of the storm drain pipe. (Whelen, 62:16–24.) The dirt that was taken out of the trench was placed on the northern side of the trench. After the trench was dug, the 30″ storm drain pipe was constructed by a cast-in-place procedure by which the pipe was actually created in the trench. A ready-mix concrete truck drove along the north side of the trench, "feeding" the cast-in-place machine which was in the trench and creating the storm drain pipe as it moved along the trench. (Whelen, 62:25–65:4.)

42. After the Northern Drain storm drain pipe was placed, a series of seven vertical manhole shafts were constructed from the storm drain pipe to the elevation of the rim of the manholes. (Whelen, 68:6–16; 70:2–6.) Each manhole had a separate rim elevation, which is set forth on the profile view of the plans. For example, the manhole at Station 6 + 43 had a rim at elevation 47.2 feet, which was about 1.2 feet *higher* than the pre-existing ground surface at that location. (Ex. 21, Sheet 7; Weirich, 849:11–16.)

43. After the manhole shafts were constructed by the City's contractor, the dirt that had been taken out of the trench was returned to the trench and compacted, a process that reduces the pore space between the dirt and makes it less permeable to water. (Whelen, 65:15–17; Weirich, 850:4–851:12; Josselyn, 1035:24–1036:8; Coats, 1341:12–17.) Not all of the dirt that

had been removed was placed back in the trench, because the 30″ pipe took up substantial space in the trench that had previously been filled with dirt. The unreturned dirt was left on the north side of the trench, which created a lip or levee after the trench was backfilled. (Whelen, 66:1–16; Weirich, 852:6–13.) The trench was filled up to the manhole rims. (Whelen, 70:11–13.) Because some of the manhole rims were higher than pre-existing ground surfaces, the top of the trench was higher than the pre-existing ground in those locations, including near the low point through which surface water had previously flowed northwesterly off of Beachwood and onto Glencree. (Weirich, 848:11–850:3.)

44. Finally, a series of horizontal storm stubs were connected to the vertical manhole shafts. The storm stubs were 5′ in length and 12 or 15″ in diameter and provided connection points where future storm drains on the Beachwood subdivision would tie into the primary 30″ storm drain line. (Whelen, 71:1–72:17.) The elevation of the bottom, or "invert," of each storm stub is reflected by the notation "Inv." on the profile view on the plans, as is the elevation of the invert of the main 30″ pipe. (Whelen, 74:22–77:23.) Thus, for example, at Station 6 + 43, the invert of the main 30″ storm drain pipe was at elevation 39.40′; the storm stubs that connected to the manhole shaft had inverts at elevation 42.57′; and the rim of the manhole was at elevation 47.2′. Thus, the bottom of the storm stubs at this location was 4.63 feet below the finished ground surface (i e, 47.2 minus 42.57), but 3.17 feet above the bottom of the larger 30″ pipe (i e, 42.57 minus 39.40). Altogether, the backfilled compacted trench at this location would have been 7.8 feet deep (47.2 minus 39.40).

45. When constructed as called for in the plans, the Northern Drain was placed

in a compacted trench 1837 feet long and of varying depths ranging from approximately 6 to 11 feet deep. The top of the trench at the pre-existing low spot was filled about 1.2' higher than the pre-existing ground level, thereby restricting the flow of stormwater at the point where it had previously exited the Beachwood property on its pre-TAAD northwesterly flow path. (Weirich, 848:11–850:3.)

46. Sheet 7 contains a detail for a Redwood Box Inlet Box, a temporary drainage inlet shown as connecting to the 12″ RCP (reinforced concrete pipe) storm stubs. Had the redwood box inlets been constructed at the storm stubs, they would have facilitated pre-development storm flow into the Northern Drain. But the plans do not note a specific location for the redwood box inlets (although the detail shows them connecting to 12″ RCP pipes, and the only 12″ RCP pipes were the storm stubs). White was not certain where the redwood box inlets were to be installed. (White, 218:12–23.) In any case, no such redwood box inlets were ever constructed. (Whelen, 80:18–21; White, 218:24–219:2.)

47. Along the entire length of Beachwood's western boundary/ the Western Drain was installed in a similar manner to the Northern Drain. The Western Drain was placed within the 30' wide storm drain easement that was granted to the City on September 21, 1982. (Ex. 75.) A trench was dug; the dirt was placed on the eastern (i e, Beachwood) side of the trench; the storm drain pipe was cast-in-place in the trench; the trench was backfilled with compacted soil to the rim of the manholes; and the remaining dirt that was not returned to the trench was left on the east side of the storm drain. (Whelen, 81:20–82:23.) The rims of the manholes were also higher than pre-existing ground along the Western Drain. (Weirich, 853:20–23.) The construction of the Western Drain

also impacted the flows of stormwater run-off in the small area west of the ridge on Beachwood, which prior to TAAD had flowed to the ditch just east of Highway 1. The storm drain compacted trench and the remaining dirt from the trench were both placed to the east of the highway ditch, so surface run-off that had flowed westerly into the storm drain ditch pre-TAAD was prevented from reaching the ditch post-TAAD by the unreturned dirt and the compacted trench built to a higher elevation than the pre-existing ground. (Weirich, 852:25–854:6.)

48. The Southern Drain, constructed along a portion of Beachwood's southern border, is depicted on Sheet 14 of the TAAD plans. Ex. 21. (Whelen, 85:4–13.) On Sheet 14, the profile of the Southern Drain appears on the upper part of the page, above the plan view; the lower part of Sheet 14 depicts the pipes that were constructed beneath Terrace Avenue, to the south of Beachwood.

49. The Southern Drain was constructed to collect run-off from the large uphill drainage (denominated Drainage Area B by Dr. Weirich) that entered Beachwood at its southeast corner. The inlet to the Southern Drain was not constructed directly at Beachwood's southeast corner, but at a location approximately 100 to 200 feet west of the southeast corner, within the City's easement. (White, 236:14–237:13.) The Southern Drain was a large 48″—diameter underground storm drain pipe with a 48″ vertical inlet. On top of the inlet was placed a cylindrical metal debris rack cage, 4 feet in height, with metal bars around the outside of the cylinder and across the top of the debris rack. (Whelen, 85:14–86:5; White, 219:7–221:10.) The debris rack cage was designed to intercept leaves, branches and other debris that washed through the channel to the inlet, straining such debris to keep it out of

the storm drain system, while allowing stormwater to flow into the inlet and be conveyed away through the underground pipes. (Whelen, 89:17–19; Braden, 415:15–17.)

50. The inlet to the 48″ drain was placed along the flow line of the existing creek that, pre-TAAD, had continued to flow along Beachwood's southern border in the manner described above. (White, 220:1–21; Braden, 408:8–14.) Downstream of the inlet, the pre-existing creek was filled in, except for a small basin area around the debris rack cage itself. No work was conducted upstream of the inlet. (Ex. 1163; Braden, 406:16–407:7; 408:15–20.) In this manner, the creek itself was incorporated into the City's storm drain system. (White, 222:11–20.)

51. The Southern Drain was placed within the 15′ wide strip of land that was conveyed as an easement to the City on September 21, 1982. (Ex. 75.) The 15′-wide strip also continued upstream from the location of the inlet approximately 100 to 200 feet to Beachwood's southeast corner. (White, 237:10–13; Braden, 443:2–16.) The City's easement thus included the natural area of the creek that had been incorporated into the storm drain system, 100 to 200 feet upstream of the inlet.

52. Gary Whelen, coincidentally a long-time Terrace Avenue resident, was the City's inspector during construction of the TAAD project. He visited the site daily, kept a daily construction log (Exs. 22, 23, and 24) and occasionally photographed the construction. He was the City's "eyes and ears" on the project. (Whelen, 48:18–49:7.)

53. Construction on the TAAD project commenced on September 14, 1983. (Whelen, 42:18–25; 52:5–7.) One of the earlier items constructed was the Northern Drain, along Beachwood's northern border. (Whelen, 93:20–23.) By January 1984, work had progressed to the Southern Drain, along Beachwood's southern border. (Whelen, 93:24–94:20.) The Western Drain was installed by March 1984. (Whelen, 95:10–20.)

54. An aerial photograph taken March 28, 1984 shows the progress of construction of the TAAD project. (Ex. 493.) By that time, the Northern, Western and Southern Drains had been completed on Beachwood. (Whelen, 95:10–23.) Equipment had obviously traveled back and forth between Beachwood and the Highland Park subdivision to the south. A large stockpile of dirt was placed on the Beachwood Property, southwest of the low point on the Beachwood/Glencree border. (Whelen, 81:5–19; 95:24–96:13.) This stockpile area is also depicted on Sheet 7 of the TAAD plans. (Ex. 21.)

55. With the exception of the redwood box inlet noted above, City Inspector Whelen was satisfied that the storm drain system constructed by the City on Beachwood as part of the TAAD project was constructed in accordance with the City's plans. (Whelen, 80:25–81:4; 82:20–23; 89:20–23.)

56. Also on March 28, 1984 (the date of the aerial photograph, Ex. 493), Pestana, a subcontractor for Bay Cities, was laying water pipes in the Highland Park area. (Whelen, 96:14–97:20.) The water pipes required a minimum cover over them, meaning they could not be placed any closer to the surface than the required minimum cover depth. (White, 261:17–262:1.)

*The Dirt Shortage and the Borrowing of Dirt From Beachwood*

57. The TAAD project included the grading of streets and lots on the Highland Park property by the City's contractor, Bay Cities. (Whelen, 90:25–91:16.) The street and lot grading was included on Sheet 19 of the TAAD plans (Ex. 21), was included as separate line-items on Bay Cities' bid and was included as part of the

City's contract with Bay Cities. (Ex. 20, at HM209360, Items 2 and 3 under "Streets.") The City itself described the TAAD project in its CDP application to the Coastal Commission as including "street and lot grading." (Ex. 80, at 1103626, Section II(2).)

58. The street and lot grading work on the Highland Park property was designed to be a balanced cut/fill project. (White, 230:14–15.) This means that the dirt from areas that needed to be cut, or lowered, was to be used as fill for the areas that needed to be filled, or raised, during the grading process. (White, 230:8–25.) A balanced project is desirable and less costly because no excess dirt needs to be off-hauled, and no dirt needs to be imported to the site; hauling dirt can be very expensive. (White, 231:1–6.)

59. The Earthwork Summary prepared by M & S, contained on Sheet 19 of the TAAD plans (Ex. 21) indicated a total of 56,165 cubic yards of cut and 56,165 cubic yards of fill—a balanced project. (White, 232:2–5.) But quantities in the field typically vary from calculated quantities. For this reason, the notes on the Rough Grading specified that the quantities were estimates only, and it remained the contractor's responsibility "to determine for himself the quantity of earthmoving that will be required to rough grade this job." (Ex. 21, Sheet 19, Note 2; White, 232:12–14.)

60. In the event of a shortage of dirt during construction, the TAAD plans contained a series of adjustments to be followed, in a specified order, that would create more dirt from the project and thereby alleviate the shortage. Specifically, the plans called for a three-stage series of adjustments: first, Silver Avenue and the associated lots on Silver Avenue were to be lowered by 1/2 foot; second, Highland Avenue and the associated lots on Highland Avenue were to be lowered by 1/2 foot; and third, Golden Gate Avenue was to be lowered by 1/2 foot. (Ex. 21, Sheet 19, "Earthwork Adjustment Note;" White, 232:25–234:4.) Following this three-step lowering process would create more dirt on-site and thereby solve any dirt shortages.

61. Early in summer 1984, a dirt shortage arose on the TAAD project. One reason was a project change order. In September 1983, the City decided to revise the connection between Silver Avenue and Highway 1. As originally planned, the connection between Silver Avenue and Highway 1 was offset from the remainder of Silver Avenue to the east. (Ex. 21, Sheet 19.) As revised, a new Silver Avenue ramp was to be constructed so that Silver Avenue itself would have a direct connection to Highway 1 at its western end. (Ex. 82, at HM209718; Whelen, 99:19–101:1.) The revised Silver Avenue ramp required the placement of up to seven feet of roadway embankment. (Ex. 82, at HM209717; white, 257:16–258:8.) This plan revision required substantial additional fill above and beyond what had been originally calculated on Sheet 19 of the TAAD plans, Ex. 21. In a June 7, 1984 letter to Bay Cities, then-City Engineer Ronald Young noted that there would not be sufficient fill material to construct the realigned Silver Avenue ramp as part of TAAD. (Ex. 39.)

62. Although the TAAD plans contained the Earthwork Adjustment Note described above, the Earthwork Adjustment procedure could not be followed when the dirt shortage arose in summer 1984. The reason for this was that Bay Cities, the City's contractor, had already placed the water lines and other utilities below the streets in Highland Park; and this, in turn, meant that the streets and lots could not be lowered to create more dirt because of the minimum cover re-

quirement over the utility lines. (White, 261:5–262:5.)

63. The original recommendation by White and Braden, the City's engineers for the TAAD project, was for Bay Cities to "import the necessary fill at no expense to the assessment district." (Ex. 608, at 843.) If a timing problem arose in acquiring such fill, Braden agreed to contact The William Lyon Company about borrowing fill from Beachwood on a short-term basis. (Ex. 608, at 843.)

64. On June 28, 1984, White wrote to then-City Engineer Young about the dirt shortage, explaining that the shortage was due to the unorthodox construction procedure followed by Bay Cities:

> "The contractor by his selected method of operation; i.e., installing sewer and water prior to grading, precluded the opportunity to .adjust grades as REQUIRED by the plans to assure an earthwork balance." (Ex. 41.)

Placing the underground utilities before rough grading is not the standard order of construction. (White, 263:13–22; 266:5–13.) In White's view, the entire dirt shortage arose from two causes: (1) the City's revision of the Silver Avenue alignment, which created the need for more dirt; and (2) the City's contractor's construction methods, by which underground utilities were placed *before* rough grading was completed, thereby precluding the adjustment of the the rough grading to create more dirt. (White, 267:13–268:9.)

65. Then–City Engineer Young proposed a resolution of the dirt shortage in his July 16, 1984 memorandum to then-City Manager W. Fred Mortensen. (Ex. 43.) By that time, it had been determined that 13,000 cubic yards of fill would be needed to complete the TAAD project, including the grading of lots and the revised Silver Avenue alignment. A contract change order was proposed to the City's contract with Bay Cities, under which Bay Cities would be paid $2 per cubic yard for the needed fill. City Engineer Young determined that 5,000 cubic yards were needed for the Silver Avenue realigned ramp, and 8,000 cubic yards were needed for the lower William Lyon lots; he determined that Lyon would pay for 8,000 of the additional 13,000 cubic yards of fill needed. (Ex. 43, at 862.) Lyon apparently paid for the 8,000 cubic yards, although White did not think Lyon should have. (White, 336:11–17.)

66. Then–City Engineer Young was faced with the need to resolve the dirt shortage dispute between M & S, the City's engineer, and Bay Cities, the City's contractor, so that the City's TAAD project could be completed. Regardless whether the dirt shortage arose from the City's own revision to Silver Avenue, or Bay Cities' unorthodox construction practices which prevented the earthwork adjustments called for by the TAAD plans, or even due to calculation errors by M & S, the City is responsible for all these possibilities: the dirt shortage arose either because of its own project change or because of errors by its contractor or its engineer. Who paid for the resolution of the dirt shortage is not relevant; what is relevant is that the dirt shortage arose on the City's public project, by a combination of factors all controlled by the City.

67. On July 17, 1984, the City Council, by Res. No. 48–84, approved Change Order No. 2 to the City's contract with Bay Cities for the TAAD project, authorizing Bay Cities to borrow the needed 13,000 cubic yards of fill from Beachwood, at $2 per cubic yard. (Ex. 596.)

68. The very next day, July 18, 1984, Bay Cities began removing dirt from Beachwood in order to complete the TAAD project. (Whelen, 108:21–110:18.) The dirt was removed by Bay Cities from the areas where streets were then planned to

go, pursuant to the 97–lot tentative map that had been approved by the City in 1976 (Ex. 121), and the 1983 rough grading plan for the Beachwood Property (Ex. 122). (Whelen, 110:6–18.) The street depressions from which dirt was removed from Beachwood by Bay Cities were approximately 50–60 feet wide and 3 to 4 feet deep. (Whelen, 113:9–13.) The dirt was removed by Bay Cities, the City's contractor. (Whelen, 110:17–18.) The areas from which dirt was removed from Beachwood are clearly visible in the April 23, 1985 aerial photo, Ex. 498. (White, 269:2–13.) This is the earliest post-borrow aerial photograph in evidence. By contrast, the pre-borrow condition of Beachwood is depicted on Ex. 493, the March 28, 1984 aerial, the latest pre-borrow aerial photograph in evidence.

69. The street depressions that were dug by the City's contractor collected stormwater when the winter rains came later in 1984. Following heavy rain on October 16, 1984, Whelen noted standing water in the depressions on Beachwood that had been dug just a few months earlier by Bay Cities. (Whelen, 115:19–116:20; Ex. 57.) He photographed one of the depressions filled with stormwater on October 23, 1984. (Ex. 58, at HM204375 [upper right photo].) Whelen, by that time an 11–year resident of Terrace Avenue, had never seen standing water like that on Beachwood before. (Whelen, 118:4–9.)

70. Whelen wanted the contractor to provide drains from the street depressions to the storm stubs at the Northern Drain to alleviate the standing water problem. (Whelen, 121:20–122:3.) On October 25, 1984, Whelen asked Charlie Raysor, the Bay Cities superintendent, to drain the standing water from the street depressions on Beachwood, but Raysor told Whelen "he didn't give a rat's ass about it and wouldn't be responsible for the water."

(Whelen, 120:5–121:18; Ex. 24 at HM205488.)

71. After Burt Myers took over as City Engineer on November 1, 1984, the standing water problem persisted. Whelen voiced his concern to Myers and, ultimately, the City sent a backhoe to Beachwood and cut ditches to direct some of the standing water into the Northern Drain. (Whelen, 123:10–124:5.) This work was done at some point before July 2, 1985. (Whelen, 128:6–9.) The City-cut ditches did alleviate a lot of the standing water in the street depressions, but some remained. (Whelen, 126:10–23.) In addition, because the storm stubs were approximately 4 feet below the ground surface, the process of exposing the storm stubs required the digging of a hole just south of the Northern Drain. (Ex. 21, Sheets 7 and 8.)

72. Vegetation quickly grew in the City-cut ditches, reducing their ability to drain the standing water. (Whelen, 125:21–126:2.) Although for a few years the City removed weeds from the ditches it had dug, at some point the City stopped doing so. Whelen observed standing stormwater that could not get into the storm stubs because weeds had plugged the entrances. (Whelen, 133:13–135:5.) The entrances to the 5–foot long storm stubs were within the City's 15–foot wide easement for the Northern Drain. (Ex. 21, Sheets 7 and 8.)

73. Years later, in 2000 when the City denied the CDP for the Beachwood subdivision, Joan Lamphier, the City's contract planner, referenced the City's initial cleaning of the ditches in her draft staff report for the March 21, 2000 City Council meeting. But Lamphier's reference was crossed out by the City's then-Planning Director Ken Curtis, and Lamphier's final staff report did not include the history of the City's own aborted efforts to keep the City-dug ditches clear and functioning.

(Ex. 176 at HM211540; Lamphier, 622:9–624:19.)

### Post–TAAD Beachwood Topography and Surface Flows on Beachwood

74. The TAAD project totally altered the topography of Beachwood and consequently affected the flow of surface water onto and off of the Property. (Weirich, 845:12–21.)

75. Initially, when the Northern Drain was installed, the low spot (i e, the pre-TAAD exit location for surface waters to flow northwesterly off of Beachwood and on to Glencree) was filled in because the trench was filled to the top of the manhole covers, and the manhole cover at the low spot is 1.2′ above the pre-existing ground surface. (Weirich, 847:25–849:16; Ex. 21, Sheet 7.) Construction of the Northern Drain also left in place an underground wall, 6 to 11 feet deep, because the trench for the storm drain pipe was filled with compacted dirt. (Weirich, 850:4–23.)

76. The construction of the Western Drain, in the same trench and backfill procedure, prevented surface flows from reaching the ditch adjacent to Highway 1, which was the pre-TAAD method of collecting and removing run-off from direct rainfall that fell in the area west of the small ridge about 300′ from Highway 1. (Weirich, 852:17–854:6.)

77. The stockpiling of dirt southeast of Beachwood's low spot on its border with Glencree also changed the topography in this area. It disrupted the gentle pre-TAAD slope on the east side of the small ridge, which directed surface run-off to the low (i e, exit) point. (Ex. 21, at Sheet 7; Ex. 493 [showing location of stockpiled dirt]; Whelen, 81:5–19; 95:24–96:13.)

78. The borrowing of dirt from Beachwood created other topographic changes. The borrow areas are depicted on the April 23, 1985 post-borrow aerial (Ex. 498) and are clearly shown on the 1990 post-TAAD 1–foot contour topographic map.

(Ex. 556.) The borrowing of dirt created preferential collection points for stormwater; stormwater flowing into them was trapped and could not flow out. (Weirich, 857:9–14.) Bayview Drive along Beachwood's northern border became both a compacted storage facility and a barrier that prevented stormwater from flowing northwesterly off the Property as it had done pre-TAAD. (Weirich, 857:15–24.) Dr. Weirich's cross-sections illustrate the substantial changes to the topography along Bayview Drive due to the TAAD project. (Exs. 675, 676; Weirich, 878:5–882:13.)

79. Dr. Weirich also prepared digitized color maps of the post-TAAD topography, using Ex. 556 as the source of the topographic data. (Weirich, 859:2–12.) Dr. Weirich's post-TAAD digitized maps are Exs. 844, 845 and 846. The comparisons between the pre-TAAD topography (Exs. 836, 837, 838) and the post-TAAD topography (Exs. 844, 845, 846) show a landscape thoroughly transformed by the TAAD project. (Weirich, 859:13–860:1.) Not only were the street sections excavated, but closed-loop depressions (especially in the center of Beachwood) appear on the 1990 topography that did not exist in the pre-TAAD topography. (Weirich, 860:21–862:5.) These same topographic changes can be derived by comparing the pre-TAAD (Exs. 122, 426) and post-TAAD 1–foot contour interval topographic maps (Ex. 556).

80. The TAAD project completely changed the topography and the surface flow patterns on Beachwood. The consequences of those changes are discussed further below.

### No City Maintenance Plan for the TAAD Improvements on Beachwood

81. Tony Moorhouse has been the City's Maintenance Supervisor since 1983, when construction of the TAAD project

commenced. He supervises seven maintenance workers, who constitute the City's Maintenance Department. (Moorhouse, 179:12–180:17.) Moorhouse supervises and delegates the work of the Maintenance Department. (Moorhouse, 180:18–23.) One of the tasks performed by the Maintenance Department is the removal of debris from the top of catch basins in the City. (Moorhouse, 180:24–181:2.) The City keeps no records of the cleaning of its storm drains, and the only inventory of City storm drains is a list that Moorhouse keeps on his office computer. (Moorhouse, 181:12–182:25; Ex. 747.)

82. Moorhouse does not know whether or not there is a storm drain system on Beachwood. He has never been on the Beachwood Property and does not know that the City has an easement interest over the areas where the Northern, Western and Southern Drains are located, as well as the area upstream of the Southern Drain. (Moorhouse, 182:19–183:25; Ex. 75.) He is unaware of (1) the 48″ inlet near the southeast corner of Beachwood or the debris rack cage atop the inlet; (2) the Northern Drain; (3) the Southern Drain; (4) the City-dug trenches to the storm stubs at the Northern Drain; or (5) any creeks or channels on Beachwood. (Moorhouse, 184:1–14; 184:21–23.) Nothing on the Beachwood Property is on Moorhouse's list of the catch basins that the Maintenance Department cleans. (Moorhouse, 184:18–20; Ex. 747.)

83. In general, the City's maintenance plan for storm drains in the City is "fix it when it breaks." Moorhouse is unaware of any plan of maintenance that the City has for any storm drain system located on Beachwood; and he is not aware of any maintenance the City has ever done to any storm drain system on Beachwood. (Moorhouse, 187:8–19.)

84. Paul Nagengast, the City's Deputy City Manager who also runs the Public Works Department, is also unaware of any plan of maintenance for the portion of the storm drain system located on Beachwood. (Nagengast, 553:24–554:2.)

85. In order to function as designed, the 48″ inlet near Beachwood's southeast corner required a plan of maintenance to remove debris that would collect around the debris rack cage atop the inlet. The debris rack cage needed to be cleaned after each storm and before anticipated heavy storms. without such a maintenance plan, the inlet would silt up with debris, reducing and ultimately eliminating its intake capacity. (White, 285:3–24.)

86. The City knew long before the TAAD project was built that maintenance of drainage systems was necessary. As its then-City Engineer wrote in an October 31, 1973 memorandum to the City Council: "Drainage systems, in order to effectively fulfill their function, must not only be competently designed and properly constructed. They must also be adequately maintained so that they can continue to perform as intended." (Ex. 429, at HM306230.)

87. The clear lack of such a plan of maintenance by the City for its storm drain facilities on Beachwood did in fact cause the inlet area to become obstructed by debris that washed down out of the channel. Numerous photographs in evidence show the 4-foot high debris rack cage buried or nearly buried to the top by accumulated debris. (e g, Exs. 801–2, at 1200997 [March 2, 2000]; 84 [February 26, 2003]; 809–35, at 9901201 [March 11, 2004]; 810–6, at 9901235 [February 28, 2005].) As stated above, the 48″ drain, was designed to drain a 92–acre watershed from the hills above Beachwood. (Weirich, 903:8–22.) It could not function as designed when debris restricted or eliminated its intake capacity.

88. Two eyewitnesses testified that they observed stormwater that was unable to flow into the inlet, and that instead flowed out onto Beachwood. Whelen, the City's Inspector, observed the inlet in late January or early February 1999, when he had bars that had fallen off rewelded onto the debris rack cage. (Whelen, 136:11–138:9.) At that time, Whelen observed that water flowing down the creek was unable to get into the inlet and was instead flowing northwesterly onto Beachwood. (Whelen, 139:19–140:5.)

89. On February 12, 2000, Crowell went to the Beachwood Property after dark during a heavy rainstorm. He observed and photographed stormwater flowing past the inlet and out onto the Beachwood property. (Crowell, 725:8–727:3; Ex. 795–12 at 1413376 [bottom photo].)

90. Water did not need to overtop the debris rack cage in order to flow onto Beachwood. The elevation of the top of the debris rack cage was surveyed to be 65.51'. (Ex. 566; Weirich, 904:11–905:24.) No surveyed points downstream of the inlet were higher than 65.51', meaning that water could escape the basin before it would flow into the top of the debris rack cage. (Weirich, 905:25–906:6.) One of the City's own experts agreed that if debris had been deposited on top of the debris rack cage (as depicted in Ex. 84), water would have escaped the basin and flowed out onto Beachwood. (Freyer, 1389:4–1390:23.) And another of the City's experts, Dr. Huffman, believed water was bypassing the inlet at the time he made his visit to the Property on February 28, 1999. (Huffman, 1537:10–24.)

91. The condition of the debris rack near Beachwood's southeast corner is very different from the condition of the debris rack located east of the eastern end of Highland Avenue, also built as part of the TAAD project. The latter debris rack was designed to protect the homes in Highland Park. Its photographed condition on the same day as the Beachwood debris rack on several different days shows that the Highland Park debris rack was maintained and kept clear of debris. (Exs. 808–2 at 9901076 [Highland Park debris rack—February 26, 2003]; 808–15 at 9901099 [Beachwood debris rack—February 26, 2003]; 809–14 at 9901162 [Highland Park debris rack—March 11, 2004]; 809–35 at 9901201 [Beachwood debris rack—March 11, 2004]; 810–4 at 9901230 [Highland Park debris rack—February 26, 2005]; 810–6 at 9901234 [Beachwood debris rack—February 26, 2005]; Weirich 963:14–965:20.)

92. In addition to the condition at the inlet which prevented the City's Southern Drain from functioning as designed, there was also debris in the creek within the City's easement, approximately 75 feet upstream from the inlet. (Braden, 410:1–21; Ex. 1163 at 1412858; Ex. 566.) Concrete rubble had been dumped in the creek channel some years prior to 1999, and a log had fallen across the creek just upstream of the concrete rubble. The condition of the debris rack and channel upstream of the inlet in 1999 stood in stark contrast to its condition at the conclusion of the TAAD construction in 1985. Braden, an M & S engineer, observed the condition of the area of the inlet upon completion of construction. At that time, the ditch at the area of the inlet was 5 feet deep and 22 feet wide between the banks. The channel was clear and well-defined and all water was able to reach the inlet. (Ex. 1163 at 1412858.) By 1999, the log and the concrete rubble diverted some of the stormwater out of the channel and onto Beachwood, instead of flowing downstream to the inlet. (Braden, 413:1–414:17; Weirich, 893:9–894:20.) Even the City's expert was "a little surprised" to see concrete rubble in the channel; he conceded it was an obstruction to flow but did not quantify it. (Freyer, 1390:25–1391:11.)

93. Crowell observed water being diverted out of the channel by the concrete rubble upstream of the inlet. (Crowell, 722:9–723:3.) Dr. Weirich observed the escape channel by which stormwater flowed out onto Beachwood before ever reaching the inlet. (Weirich, 898:14–900:16.) Photographs in evidence support Dr. Weirich's view of stormwater escaping the channel and flowing onto Beachwood. (Exs. 789–7, at 1413188 [top and bottom photos]; 789–8 at 1413189 [top and bottom photos]; Weirich, 900:17–902:13.) Braden also described and drew the path of higher flows out of the hills that could not reach the inlet. (Braden, 413:20–414:17; Ex. 143.) The testimony of the City's expert Dr. Coats that the concrete rubble in the channel was some sort of design feature "to prevent the upstream migration of a gully head cut," is implausible and speculative, as conceded even by Dr. Coats. (Coats, 1338:25–1339:20.)

94. The exact identity of who dumped the concrete rubble in the channel or when it was dumped there is unknown. Based on all the evidence, and the substantial construction that was ongoing in the Highland Park subdivision between 1984 and 2000 (compare aerial photographs of March 28, 1984 [Ex. 493] with aerial photograph of February 17, 2000 [Ex. 425]), a reasonable inference may be drawn that the rubble was dumped in the creek upstream of the inlet by someone looking for a way to discard construction debris. Regardless how or when the concrete debris was dumped in the creek channel, what is clear is that it was dumped within the area of the City's easement, which extended upstream of the inlet all the way to the southeast corner of Beachwood, in the creek that was incorporated into the City's

storm drain system. (Exs. 75, 566; White, 237:4–13; Braden, 443:2–12.) It was never removed by the City, as the City had no plan to maintain the storm drain system.

95. Based on all of the evidence, it is reasonable to conclude that, due to the absence of any plan of maintenance by the City, at least 50% of the flow that entered Beachwood at its southeast corner either did not reach the inlet or could not enter the inlet if it did reach it. (Weirich, 911:3–19.)

### 1990 Approval of the Beachwood Vesting Tentative Map

96. On December 26, 1989, Pilarcitos Valley Associates ("PVA"), an entity controlled by William Crowell, acquired Beachwood in a tax-free exchange. (Crowell, 658:13–18; 659:15–660:18; Exs. 649, 742.) Crowell was an experienced and successful developer in Half Moon Bay. (Crowell, 663:4–665:20.) PVA also acquired 93 water connections from The William Lyon Company to serve the Beachwood subdivision. (Exs. 83, 683; Crowell, 667:13–668:9.) [3]

97. Days after PVA's acquisition, on December 29, 1989, the Army Corps of Engineers disclaimed jurisdiction over any wetlands on Beachwood because no fill was proposed to be placed in the existing channel in the southeast corner. (Ex. 1032.)

98. On July 3, 1990, by Res. No. 31–90, the City Council approved a vesting tentative map ("VTM") for PVA to develop 83 residential lots on Beachwood. (Ex. 141.) The VTM itself, showing the approved locations of lots and streets on Beachwood, is Ex. 147. The only lots not approved for development were Lots 19A, B, and C of Block 3 in Beachwood's southeast corner

---

**3.** Crowell operated though a development company known as Inwood Corporation (Crowell, 666:12–15), and most of PVA's correspondence related to Beachwood is on In-wood Corporation letterhead. PVA was the record owner, however, so the court refers to PVA.

(where the creek, the inlet to the Southern Drain and an old abandoned stock pond were located) and Lots 1A and 1B of Block 3 located on the east side of the planned extension of Golden Gate Avenue onto Beachwood, at Beachwood's southern border. (Ex. 147; Gustin, 464:14–465:15; White, 274:1–4.)

99. Then–Planning Director Christopher Gustin supervised the processing of the 1990 VTM through the City Council. His Staff Report to the City Council is Ex. 187. Gustin's Staff Report, in part, provides:

"Access to the site is to be from a new signalized intersection at Highway 1 and the proposed Bayview Drive. Bayview Drive will connect to the proposed Foothill Boulevard at the eastern boundary of the site." (Ex. 187, at 1402127.)

"*A key component of this project is the construction of Bayview Drive, connecting Highway 1 and Foothill Boulevard.*" (Ex. 187, at 1402129, emphasis added.)

Bayview Drive was to be located along Beachwood's northern boundary. It was a street that the City wanted built, because it would provide a bypass around the center of town, including the congested intersection of Highway 1 (the City's main north/south thoroughfare) and Highway 92 (the City's main east/west thoroughfare). Indeed, the Coastal Commission required the City to construct the Bayview/Foothill bypass to better serve visitors to the City who desired coastal access. (Gustin, 459:11–460:19.)

100. The street locations approved by the City when it approved the 1990 83–lot VTM (Ex. 147) differed from the street locations that had been approved by the City when it had approved the earlier 97–lot tentative map for Beachwood in 1976 (Ex. 121.) The reason for the change in street locations was the City's desire to have Bayview Drive connect to Foothill Boulevard, which was not included in the earlier tentative map. (White, 253:7–20; 274:5–275:3.) The street locations depicted on the 1983 Rough Grading (Ex. 122)— which was used to provide the locations from which Bay Cities Paving & Grading, the City's contractor, had borrowed dirt from Beachwood in July 1984—was based on the 1976 approved tentative map. Thus, the street depressions that had been dug by Bay Cities in 1984 did not match up with the 1990 approved street locations. (Exs. 830, 831, 832; Weirich, 855:10–856:21.) The street depressions dug in 1984 thus provided no benefit to PVA or subsequent owners of Beachwood, as the areas from which fill was removed in 1984 would need to be filled due to the new street lay-out.

101. The City Council also approved a set of standard conditions to be satisfied before a final subdivision map could be recorded. (Gustin, 460:20–461:2; Exs. 141, 1345.) Among the conditions imposed on the Beachwood subdivision was the requirement that PVA obtain any permits required by the Coastal Commission (i e, a Coastal Development Permit ["CDP"]) prior to the issuance of Building Permits. (Ex. 1345, at 1980, ¶ 42.)

## The Sewer Moratorium Halts Development of Beachwood

102. After obtaining the VTM from the City, PVA proceeded to apply to the Coastal Commission for a CDP. (Crowell, 675:16–20; Ex. 611.)

103. On March 28, 1991, by Res. No. C–8–91, the City Council adopted an Urgency Ordinance Imposing a Moratorium on Issuance of Building Permits for New Structures That Require Issuance of a New Sewer Permit. (Ex. 270.) The so-called "sewer moratorium" was adopted due to a shortage of treatment capacity at the local sewage treatment plant. (Gustin, 471:12–21.)

104. The sewer moratorium had an immediate impact on PVA's ability to process its CDP application with the Coastal Commission. The City's policy was to not issue sewer connections until the building permits were issued. (Ex. 345; Crowell, 676:12–677:25.) Because the City would not reserve sewer connections for Beachwood, the Coastal Commission took the position that it could not process the CDP application without proof from the City and Sewer Authority Mid–Coastside ("SAM") that sufficient sewer capacity was available.[4] (Ex. 192; Gustin, 472:2–11.) In other words, the City would not issue building permits without a CDP (Ex. 1345, at 1980, ¶ 42), but PVA could not get a CDP without building permits, because only then could it obtain proof of sewer availability (Ex. 345). This prevented the Beachwood subdivision from going forward.

105. The situation created a Catch–22 of the City's making. The City had the power to end the bureaucratic loop. The City's decision to reserve sewer connections only at the building permit stage was a policy choice that it could have changed at any time. Indeed, a City Planner had previously urged the Planning Commission to abandon the policy. In his March 9, 1989 Staff Report concerning Beachwood, then-City Assistant Planner C. Todd Graff presciently wrote:

"Currently, the City's policy is to collect sewer connection fees at the time of issuance of a building permit for a residence. Limited Phase I sewer capacity is available at this time (approximately 600 connections) until expansion of the sewage treatment plant is completed (best case is late 1992)."

"By approving a subdivision, the City is acknowledging that the land will be developed. By failing to reserve sewer capacity for the approved development, the City could be creating a problem. Staff would urge the Planning Commission to consider a policy change for the method of collection of sewer service connection fees to ensure that these fees are collected prior to approval of a final subdivision map." (Ex. 138, at HM306323, emphasis added.)

Although the City had the ability to change its sewer reservation policy, it did not. The Coastal Commission's response to the City's refusal to reserve sewer connections prevented PVA from obtaining a CDP for the Beachwood subdivision.

106. Crowell attempted to find a way around the City's sewer moratorium by proposing construction of a package treatment plant that would treat only Beachwood's sewage until the treatment plant expansion was complete. (Crowell, 680:21–681:12; Gustin, 473:22–474:14.) The concept of a package treatment plant was presented to the City Council at its March 17, 1992 meeting, and the City Council decided it was "not comfortable" with the concept of a package treatment plant to serve Beachwood only. (Ex. 617, at 2658.) Thus, Crowell's effort to avoid the impact of the City's sewer moratorium was thwarted by the City.

107. As originally adopted, the sewer moratorium was to last only four months, from March 28, 1991 to August 6, 1991. (Ex. 270, § 3(C) at 00033.) On the day the moratorium was set to expire, it was extended for another four months, to December 3, 1991. (Ex. 312, § 2 at 00041.) Thus began a period of *over seven years,*

4. SAM is a joint powers authority among the City of Half Moon Bay, the Granada Sanitary District, and the Montara Sanitary District. But SAM directors from the City have twice as many votes as SAM directors from the other participating agencies. (Ex. 334, SE III(F)(1), at HM212337; Nagengast, 560:5–561:13.)

during which the sewer moratorium was extended *a total of 11 times.* (Exs. 313 [extension through June 2, 1992]; 314 [extension through December 1, 1992]; 316 [extension through March 2, 1993]; 317 [extension through September 24, 1993]; 319 [extension through March 1, 1994]; 320[extension through September 30, 1994]; 323 [extension through March 30, 1995]; 324 [extension through March 31, 1996]; 326 [extension through March 31, 1997]; 329 [extension through March 31, 1998]; Nagengast, 554:25–559:16.) The City's repeated extensions of the sewer moratorium, combined with its refusal to reserve sewer connections until the building permit stage, disabled Beachwood's owners from obtaining a CDP and building the subdivision.

108. Not only did the City extend its sewer moratorium multiple times, it likewise extended its planned completion date for the sewer treatment plant expansion project. The project to expand the sewage treatment plant was approved by the SAM Board on February 27, 1989. (Ex. 341.) In early 1990, the City initially anticipated that construction of the plant expansion would occur during the summer of 1991. (Ex. 343, at HM203775.) Later in 1990, the City revised its estimate of the plant expansion completion date to spring of 1994. (Ex. 345, at 2208.) Not only was construction not *completed* by spring of 1994, it hadn't even started. The California Regional Water Quality Control Board ultimately issued an order requiring construction of the plant expansion to *commence* by September 1, 1996. (Ex. 869 Att. 1, p. 2, ¶ II(B)(5).) The sewage treatment plant expansion was not completed until November 22, 1999—*more than 10 years after the project had been approved in February 1989.* (Ex. 351.) The City offered no explanation for the massive delay in the project.

109. Notwithstanding the repeatedly extended sewer moratorium, Crowell and PVA continued to process the Beachwood subdivision so that it would be in a position to proceed to construction once the sewer moratorium was lifted. PVA submitted its Improvement Plans and Final Hap to the City Engineer for review, comments and approval. Then–City Engineer William G Smith approved the Beachwood Improvement Plans and Final Map on July 17, 1992. (Ex. 198; Crowell, 686:7–17; 687:22–688:5; Gustin, 478:7–480:23.)

110. When the Coastal Commission returned PVA's CDP application due to the City's refusal to reserve sewer permits, the Commission listed three conditions that would need to be satisfied before the application could be resubmitted. The first condition was for PVA to obtain written evidence from the City and SAM of available sewer capacity. The second condition was for PVA to obtain an encroachment permit from Caltrans for the Bayview Drive/Highway 1 connection. The third condition was City approval for access improvements at Bayview Drive and a final access easement. (Ex. 192.) Crowell was able to satisfy the second condition (Ex. 618) and the third condition (Exs. 647, 628), but not the sewer capacity condition. (Crowell, 684:24–685:10.) PVA was not able to obtain a CDP from the Coastal Commission, although the Commission reviewed the application extensively (Bartlett, 1618:6–9), because the City refused to reserve sewer connections for the project. The lack of reserved sewer capacity was the major impediment to proceeding with the Beachwood subdivision. (Crowell, 686:3–6.)

111. Crowell was unable to outlast the City's continuously extended sewer moratorium. On June 7, 1993, PVA lost the property in foreclosure to the Peppers, who held a junior deed of trust on the

Property. (Ex. 745; Crowell, 660:23–661:11.)

112. Plaintiff Yamagiwa, in her role as trustee of the Keenan Family Trusts, acquired the senior note on the Beachwood Property in June 1993. She then foreclosed on the Peppers and became the owner of Beachwood on December 10, 1993. (Ex. 567; Yamagiwa, 1183:19–1184:10.) Crowell was a long-time friend of Charles J Keenan, one of the trustors of the Keenan Family Trusts. Crowell recommended Beachwood to Keenan because he felt that, once the sewer capacity shortage was resolved, Beachwood would be a favorable development opportunity. Upon acquiring Beachwood, Yamagiwa waited for resolution of the sewer capacity shortage. She continued to use Crowell as the lead point person in obtaining the entitlements for Beachwood. (Crowell, 657:18–658:12/711:2–15; Yamagiwa, 1186:16–23.)

113. To pay for expansion of the sewage treatment plant, the City placed a lien on the Beachwood Property on August 5, 1994 in the principal amount of $962,987.76. (Ex. 446.) Yamagiwa viewed the lien positively, as it indicated the sewer treatment plant expansion would ultimately be built, thereby resolving the sewer capacity shortage and allowing the Beachwood development to proceed. (Yamagiwa, 1188:22–1189:8.) Yamagiwa's optimism, however, ultimately proved misplaced.

*The City Discovers New wetlands on Beachwood*

114. In spring 1996, the City's entire Local Coastal Program was approved and certified by the Coastal Commission. This transferred the authority to issue CDPs from the Coastal Commission to the City.

(Ex. 204; Gustin, 483:15–485:7; 487:6–11.)[5]

115. Accordingly, with the completion of the sewage treatment plant expansion within site, on February 12, 1998 Yamagiwa submitted an application to the City for the Beachwood subdivision CDP. (Ex. 731; Yamagiwa, 1197:17–24.) Included with the CDP application was a December 23, 1997 letter from the local water company confirming the availability of 83 Phase I water connections to serve Beachwood (Ex. 624) and a December 16, 1997 letter from SAM, stating that the anticipated completion date of the sewer treatment plant expansion was January 31, 1999 (Ex. 663). (Ex. 731, at 1400231, SHE 9, 10.)

116. The City hired a contract planner, Joan Lamphier, to handle the Beachwood CDP application. (Lamphier, 577:21–578:7.) Yamagiwa paid at least $44,000 for Lamphier's services. (Yamagiwa, 1200:24–1202:11.)

117. Water year 1998 (from October 1, 1997 through September 30, 1998) was the second highest rainfall year on record in Half Moon Bay. A total of 50.2 inches of rainfall was recorded. (Ex. 763.)

118. In January 1999, the City sent Melanie Mayer Gideon to Beachwood for a preliminary determination whether there were potential wetlands on the Property that might prevent development of the 83-lot subdivision pursuant to the VTM the City had approved in July 1990. Gideon visited Beachwood and produced a letter report to Lamphier on January 13, 1999. (Ex. 99.) She found evidence of potential wetlands in only two locations on Beachwood—in the southeast corner (where no development was allowed under the 1990 VTM) and in a "horseshoe-shaped region"

5. Previously, the City had its Local Coastal Program Land Use Plan certified by the Coastal Commission in 1985. (Ex. 136, at HM000648.) The 1985-certified Land Use Plan also served as the City's General Plan. (Ex. 141 [3rd "Whereas" clause].)

that coincided with one of the street depressions that had been dug by the City's contractor during the TAAD construction 15 years earlier. (Ex. 99, at 8200140; Gideon, 506:6–21.) Gideon reported that "[w]ater was impounded in one area of the horseshoe site in natural or man modified channels." (Ex. 99, at 8200140.)

119. Gideon attached a map of the potential wetlands in the horseshoe-shaped area on Beachwood (Ex. 99, at 8200142), and Gideon's potential wetlands were subsequently mapped by Dr. Josselyn, using the August 1990 Brian Kangas Foulk topographic map as a base. (Ex. 861.) Gideon did not find any potential wetlands in the area of Bayview Drive, the street along Beachwood's northern border that the City had identified as a "key component" of the Beachwood development. (Ex. 187, at 1402129.)

120. Gideon concluded by recommending further investigation (Ex. 99, at 8200141), but no one from the City ever asked Gideon to do any further investigation. (Gideon, 514:4–19.)

121. Instead, the City retained Dr. Terry Huffman in January 1999 to perform a second preliminary review of potential wetlands on Beachwood. Dr. Huffman prepared a March 11, 1999 letter report to Lamphier (Ex. 91), which is reviewed in further detail below. (Lamphier, 583:7–24.) Dr. Huffman prepared his own map of potential wetlands on Beachwood, which was far more extensive than the map of potential wetlands prepared by Gideon just two months earlier. (Ex. 91, at HM003298.) Like Gideon, Dr. Huffman recommended further investigation—more specifically, that *he* be retained to prepare a "detailed wetland delineation" and technical report. (Ex. 91, at HH003296.) Unlike Gideon's map, Dr. Huffman's map depicted extensive potential wetlands in the area of Bayview Drive.

122. Dr. Josselyn later mapped Dr. Huffman's 1999 potential wetlands using the August 1990 Brian Kangas Foulk topographic map as a base. (Ex. 862.)

123. Lamphier noticed the vast discrepancy between Gideon's preliminary map of wetlands and Dr. Huffman's preliminary map of wetlands. She concluded that Dr. Huffman had more experience than Gideon, even though his study was also inconclusive. (Lamphier, 585:16–586:11.)

124. Notwithstanding Lamphier's favorable view of Dr. Huffman, the City did not retain Dr. Huffman to do the detailed wetland delineation that he had recommended. (A detailed wetland delineation by Dr. Huffman might have derailed the construction of Bayview Drive, where Dr. Huffman had preliminarily found potential wetlands.) Instead, the City retained yet a third wetlands consultant to study wetlands on Beachwood. According to Lamphier, the City hired the third wetlands consultant because "we felt that we needed a very clear delineation of what was going on." (Lamphier, 591:10–24.)

125. The City's third wetlands consultant was Steve Foreman of LSA Associates. LSA produced its own map of wetlands on Beachwood, which is Ex. 174. Foreman's map includes the 100–foot buffers around wetlands which the City required. (Foreman, 530:13–16.) (A clearer copy of LSA's wetlands map is Ex. 152, although the base map used is the 1990 VTM, which does not show the location of the 1984 street depressions dug by the City's contractor during construction of the TAAD project.) Foreman found more wetlands on Beachwood than Gideon had preliminarily found, but fewer than Dr. Huffman had preliminarily found. (Exs. 99, at 8200142 [Gideon]; 91, at HM003298 [Huffman]; 174 [Foreman]; Lamphier, 592:21–593:4.)

126. Ultimately, Foreman prepared a final report in which he concluded that there were nine new areas on Beachwood that met the definition of wetlands contained in the City's certified LCP. (Ex. 151, at 7931.) When the City rejected Yamagiwa's CDP application due to the presence of wetlands on Beachwood, the City Council accepted Foreman's wetlands map. (Ex. 179, at 9281 ["The City finds that the conclusions of Messrs Foreman and Lohmann as to the extent of wetlands on the project site are accurate, and bases its decision herein on the information provided to the City by LSA."].)

127. Significantly, Foreman found no wetlands that would interfere with the ability to construct Bayview Drive on the north side of Beachwood, the street the City wanted built for traffic circulation purposes. Foreman wrote a January 21, 2000 letter to then-City Manager Blair King in which he analyzed the potential presence of wetlands on Beachwood within Bayview Drive. (Ex. 172.) In the map attached to his letter, Foreman drew a line extending 100 feet down from Bayview Drive, as any wetlands within this zone—along with the City-required 100–foot buffer—would threaten the ability to construct Bayview Drive. (Ex. 172, at 6124.) Foreman did map one potential wetland within 100 feet of Bayview Drive, and he wrote that "[a]dditional observations will be needed to assess its status." (Ex. 172, at 6122.) Foreman's final wetlands map deleted the one potential wetland that was within 100 feet of Bayview Drive. (Compare Ex. 172, at 6124 with Ex. 174.) Thus, Foreman's final wetlands map would have prevented significant development of homes on the lots previously approved by the City's 1990 VTM, but would have *preserved* the ability to construct Bayview Drive and the downtown bypass favored by the City.

128. Foreman opined that wetlands on Beachwood "may be present in small pockets in the various depressions on the site, or stringers along swales and beds of the old excavated roadways on the property." (Ex. 172, at 6121.) Foreman did not know who had dug the excavated roadways on Beachwood, nor did he investigate it because his work focused on whether there were wetlands on Beachwood, not what had caused them. (Foreman, 537:7–538:6.) In another letter, Foreman referred to "drainage ditches or wetlands *created as a result of construction activities such as appear to occur on site.*" (Ex. 166, at 5387, emphasis added.) Foreman explained that several of the areas that he had found to be wetlands appeared to be roadcuts, but he did not know who had made the road cuts, when they were made, or whether they were made by Bay Cities, the City's contractor. (Foreman, 532:11–533:20.) Similarly, Lamphier did not know that the grading on Beachwood had been done by Bay Cities Paving & Grading; she believed (erroneously) that the grading had been done by a prior applicant. (Lamphier, 588:20–589:24.)

129. The location of the wetlands mapped by Foreman were re-mapped by Dr. Josselyn on a clear copy of the 1990 BKF topographic map, which shows their correspondence with the street depressions dug by the City's contractor during construction of the TAAD project in 1984. (Ex. 604.) Dr. Josselyn later mapped Foreman's wetlands, along with the 100–foot buffer areas, on the 1990 BKF map. (Ex. 863.)

### The City Denies the CDP Based on the Presence of New Wetlands on Beachwood

130. Lamphier received the first two maps of potential wetlands on Beachwood (i e, Gideon's and Dr. Huffman's 1999 maps) before the March 11, 1999 Planning

Commission hearing. Lamphier had previously authored a Staff Report to the Planning Commission in which she explained the need to re-delineate wetlands on Beachwood because the last delineation by the Army Corps of Engineers had been performed in 1989. (Exs. 153, at 5015; 1032.) Lamphier described what might happen, depending on whether the Army Corps found new wetlands on Beachwood when it conducted a new delineation. (Ex. 153, at 5015–5016.)

131. Lamphier continued to describe scenarios—that hinged on Army Corps of Engineers findings—in her March 11, 1999 Staff Report to the Planning Commission. (Ex. 162, at 5121.) Lamphier's Staff Report reflects her then-view that the delineation of wetlands on Beachwood would be done pursuant to the Army Corps of Engineer's definition of wetlands. (Ex. 162, at 5116.)

132. At its March 11, 1999 hearing, the Planning Commission noted "potential wetlands" on Beachwood but concluded it lacked sufficient information to decide whether there were actual new wetlands on Beachwood. Because the deadline for the Planning Commission to act under the Permit Streamlining Act was March 12, 1999, the Planning Commission denied the Beachwood CDP application without prejudice. (Ex. 163, Res. No. P–5–99.)

133. The minutes of the Planning Commission indicate its view that the decision whether there were new wetlands on Beachwood would be made *by the Army Corps of Engineers*, (Ex. 729, at 1400090 ["4) That the Corps of Engineers will delineate the extent of wetlands on the site."]. Thus, the City's view as of March 1999 was that the delineation of wetlands on Beachwood would be performed *by* the Army Corps, and pursuant to the Army Corps' definition of wetlands.

134. Nine months later, in January 2000, the Army Corps did complete its updated re-delineation of wetlands on Beachwood, using the Army Corps' definition of wetlands. It found no wetlands on Beachwood outside the southeast corner, the area that was already off-limits to development under the approved VTM. (Ex. 168.) Lamphier recognized that the Army Corps' new delineation was a significant document. (Lamphier, 606:7–607:6.) Faced with this result, the City did not accept the Army Corps' determination, and instead switched gears to analyze wetlands under the City's LCP definition of wetlands. (Lamphier, 610:7–16.)

135. This conduct is noteworthy because it calls into question the trustworthiness of the opinions and conclusions presented by the City at trial regarding the location and cause of wetlands on Beachwood. Having exhibited a pattern of shifting consultants and shifting definitions, the City comes to trial with impaired credibility on the key wetlands issues in the case.

136. The City Council considered the Beachwood CDP application at its March 21, 2000 meeting. Lamphier, who prepared the Staff Report for the meeting, wrote:

> "Based on the expert reports provided by experts evaluating the site, it has been determined that the area of wetlands at the Beachwood project (as defined under the California Coastal Act and under the Local Coastal Program) is now more extensive than when the Vesting Tentative Map was approved in 1990." (Ex. 177, at 6316.)

The definition of wetlands under the Coastal Act did not change between 1990 and 2000. (Huffman, 1577:25–1578:22.) The City's LCP definition of wetlands did not change between 1990 and 2000 either—the same definition of wetlands was contained in its certified 1985 Land Use Plan. (Lamphier, 616:20–617:25.) What changed was not the regulatory definitions,

but the extent of wetlands on Beachwood. (Lamphier, 613:10–614:2.)

137. The City Council voted to deny the Beachwood CDP at its March 21, 2000 meeting. Thereafter, it took six weeks for the City Council to adopt a written resolution containing the reasons for its denial. On May 2, 2000, then-Planning Director Curtis submitted the proposed resolution to the City Council, with the recommendation that the City Council "review the resolution and determine if it adequately and completely reflects the conclusions of the Council reached after the close of the public hearing on March 21, 2000." (Ex. 131, at 1409142.) Lamphier prepared the resolution, with input from others. (Lamphier, 625:15–16.) She knew it was important that the resolution be accurate; in fact, she knew that litigation would likely follow the City's CDP denial. (Lamphier, 626:20–25.) It is obvious from the circumstances (as well as the six weeks spent on the task) that the City carefully considered the wording and contents of its lengthy resolution denying the Beachwood CDP.

138. The City Council adopted Res. No. C–26–00, denying the Beachwood CDP, on May 2, 2000. (Ex. 179.) The City Council began by recounting the relevant past history thusly:

> "The owners of a 24.7 acre parcel of land generally known as the Beachwood subdivision sought and obtained approval of a vesting tentative map ('VTM' herein) from the City of Half Moon Bay in 1990. That tentative map approved certain conditions which if satisfied would allow for the subdivision of the parcel into 83 buildable lots. *At the time the VTM was approved, it was determined that wetlands covered a portion of the site, and the map was approved so as to prevent development of that area.*" (Ex. 179, at 9274, emphasis added.)

The only areas of the 1990 vesting tentative map for which development was pre-vented were Lots 19A, B and C and Lots 1A and B of Block 3, as noted above. (White, 274:1–4.)

139. The City Council went on to describe the issue in 2000 as "whether the site has seen an increase in the presence of wetlands since the 1990 approval of the VTM." (Ex. 179, at 9276.) The City Council further found that "the extent of wetlands on the site is greater than was determined at the time the VTM was approved" and that there were "nine new wetlands areas" on Beachwood. (Ex. 179, at 9282.) The City Council also found that further environmental review was necessary because "although a negative declaration was adopted by the City in 1990 at the time of the approval of the VTM, on the basis of substantial evidence in the light of the whole record new information of substantial importance, *which was not known and could not have been known with the exercise of reasonable diligence at the time the negative declaration was adopted.*" (Ex. 179, at 9283, emphasis added.)

140. The obvious thrust of the City Council's 2000 resolution was that *new wetlands had developed on Beachwood after it had approved the VTM in 1990.* At trial, the City tried to suggest that the 1999 decision in *Bolsa Chica Land Trust v. Superior Court,* 71 Cal.App.4th 493, 83 Cal.Rptr.2d 850 (1999) was the determinative factor in the City's 2000 denial of the Beachwood CDP. If that were true, one would expect to find the 1999 case mentioned prominently in the City's 2000 resolution which was carefully drafted over a six week period. But it is nowhere mentioned in the City's resolution. And there is nothing in the resolution which supports the idea that the City's decision was based on, or dictated by, a supposed *change in the law* since 1990, as opposed to a *change in the facts* since 1990—the development of new wetlands on Beachwood. The

City's attempt to conjure up a change in the law as the basis for its 2000 decision is not credible based on the evidence, and the court rejects it.

141. What remains hard to fathom is why, in 1999 and 2000 when the City was in the course of documenting new wetlands on Beachwood, no one involved in the task acknowledged that it was *the City itself* (or, more accurately, the City's contractor) that had dug the street depressions on Beachwood. Lamphier didn't note it (Lamphier, 588:20–589:24); Foreman didn't note it (Foreman, 537:7–538:6); Huffman didn't note it (Huffman, 1519:11–25; 1520:18–21); Gideon didn't note it (Gideon, 508:4–19). Whelen, the City's "eyes and ears" on the TAAD project—its employee who had been on the job observing construction every day—was still employed by the City in 2000. (Whelen, 39:16–23; 48:18–49:7.) Lamphier and others needed only to walk down the hall to determine the history and origin of the street depressions on Beachwood. But Lamphier never talked to Whelen about it. (Lamphier, 638:11–23.) Indeed, when Whelen first heard the idea raised in 1999 or 2000 that wetlands had formed on Beachwood, he tried to inform others at the City of the relevant history of construction of the TAAD project, but no one was interested in listening to him. (Whelen, 141:8–12; 142:7–14; 144:18–145:10.)

### Wetlands on Beachwood

142. A wetland is an area in which the land becomes waterlogged and unique plants develop on the land and unique characteristics of the soil develop. This waterlogging condition causes physical changes to the soil because oxygen is absent. Three parameters are used to identify wetlands in the field: wetland hydrology, hydric soils and hydrophytic vegetation. (Josselyn, 974:20–975:18.)

143. For wetland hydrology to be present, the soil needs to be saturated within the upper one foot for at least 18 consecutive days in more than 50% of the years of record. (Josselyn, 975:19–977:13.)

144. Hydric soils are soils that are formed under saturated, or anaerobic, conditions. Because the soils must be "formed" under anaerobic conditions, hydric soils take time to form—years or decades. (Josselyn, 977:21–978:13.)[6] In order to identify hydric soils, a field investigation is required to examine the color patterns and mottling (i e, iron mobility) of the soil. (Josselyn, 978:14–979:15.)

145. Hydrophytic vegetation are plants that tend to be found in wetlands. The United States Fish & Wildlife Service has developed lists of hydrophytic vegetation. These lists place species of plants into five categories: (1) obligate wetland plants (found in wetlands 99% of the time); (2) facultative wetland plants (found in wetlands between 66% and 99% of the time); (3) facultative plants (found equally in wetlands as in non-wetland [or upland] areas); (4) facultative upland plants (found 33% of the time in wetlands, but more frequently in upland areas); and (5) upland plants (found 99% of the time in uplands). (Josselyn, 979:16–981:16.) To meet the test for hydrophytic vegetation, there must be predominance of hydrophytic plants within a sample area approximately 10 feet in diameter. The wetland scientist must analyze all plant species in the sample area; determine which ones cover at least 20% of the ground in the sample area; and then determine whether hydrophytic vegetation

---

**6.** According to the Army Corps of Engineers' 1987 Wetlands Delineation Manual: "Hydric soils require long periods (hundreds of years) for development of wetness characteristics, and most man-induced wetlands have not been in existence for a sufficient period to allow development of hydric soils characteristics." (Ex. 1383, at p. 82.)

predominates in the sample area. (Josselyn, 981:17–983:2.)

146. Different regulatory agencies use different definitions of wetlands. The United States Army Corps of Engineers typically requires all three parameters— wetland hydrology, hydric soils and hydrophytic vegetation—for an area to be delineated a wetland. There are certain exceptions to the Army Corps' requirement that all three factors be present. (Josselyn, 983:3–18.)

147. The California Coastal Commission requires evidence of only one of the parameters—typically hydric soils or hydrophytic vegetation—for an area to qualify as a wetland. (Huffman, 1434:6–10.)

148. The City of Half Moon Bay has its own definition of wetlands which has been in effect since its Land Use Plan was certified by the Coastal Commission in 1985. (Lamphier, 616:20–617:25; Gustin, 455:24–456:5.) That definition provides, in relevant part:

> "Wetland is an area where the water table is at, near, or above the land surface long enough to bring about the formation of hydric soils or to support the growth of plants which normally are found to grow in water or wet ground. Such wetlands can include mudflats (barren of vegetation), marshes, and swamps. Such wetlands can be either fresh or saltwater, along streams (riparian), in tidally influenced areas (near the ocean and usually below extreme high water of spring tides), marginal to lakes, ponds, and man-made impoundments. *Wetlands do not include* areas which in normal rainfall years are permanently

submerged (streams, lakes, ponds and impoundments), nor marine or estuarine areas below extreme low water of spring tides, nor *vernally wet* areas *where the soils are not hydric.*" (Ex. 136, at HM000905, emphasis added.)

A legal dispute arose between Yamagiwa and the City over the proper interpretation of the City's definition of wetlands. While the first sentence states that either hydric soils or hydrophytic vegetation is enough to constitute a wetland, the last sentence appears to except from the definition "vernally wet areas where the soils are not hydric." The last clause was thus susceptible to the interpretation that, at least in "vernally wet areas," hydrophytic vegetation is not enough—hydric soils must also be present. This dispute led to prior litigation between the parties. The City took the former position—that *either* hydric soils *or* hydrophytic vegetation was sufficient; while Yamagiwa focused on the "vernally wet exception" and took the position that hydric soils were necessary in vernally wet areas for the area to be a wetland.

149. Dr. Josselyn, a certified Professional Wetlands Scientist, was originally retained by plaintiff Yamagiwa in 1999 to delineate wetlands on Beachwood under both the Army Corps of Engineers definition as well as the City's LCP definition of wetlands.[7] (Josselyn, 985:15–25.)

150. Dr. Josselyn identified a series of 18 Study Areas on the Beachwood Property where hydrophytic vegetation predominated. The Study Areas are mapped on Figure 11 to Dr. Josselyn's Army Corps delineation. (Ex. 472, at 2100256.) Dr.

---

7. The City's unique wetlands definition is generally referred to as its "LCP definition of wetlands." The City's LCP was certified by the Coastal Commission in 1996. (Ex. 204.) However, as noted above, the same definition of wetlands was contained in the City's Land Use Plan, which had been previously certified by the Coastal Commission in 1985. (Lamphier, 616:20–617:25; Gustin, 455:24–456:5; Ex. 136, at HM000905.) Thus, the definition of wetlands employed by the City has not changed since 1985—the definition in its certified Land Use Plan was carried over to its LCP.

Josselyn then examined a series of sample points to determine whether the Study Areas were wetlands. He completed data forms and analyzed each sample point for the presence of wetlands hydrology, hydric soils and hydrophytic vegetation. (Ex. 472, at 2100266–2100281.) Even though he did *not* locate hydric soils at any of the sampled points, Dr. Josselyn nonetheless found certain areas qualified as wetlands under the Army Corps of Engineers' definition because they fell within one of the exceptions to the requirement that all three parameters be present. (Josselyn, 992:10–993:7.) Specifically, Dr. Josselyn followed the 1987 Army Corps of Engineers Wetlands Delineation Manual and its procedures related to "Atypical Situations." The Manual provides in relevant part:

> "*Man–Induced wetlands.* Procedures described in Subsection 4 are for use in delineating wetlands that have been purposely or incidentally created by human activities, but in which wetland indicators of one or more parameters are absent. *For example, road construction may have resulted in impoundment of water in an area that previously was nonwetland, thereby effecting hydrophytic vegetation and wetland hydrology in the area. However, the area may lack hydric soil indicators.*" (Ex. 1383, at p. 74, emphasis added.)

Dr. Josselyn found that this situation applied to the wetland areas on Beachwood outside its southeast corner—they were man-induced wetlands with wetland hydrology and hydrophytic vegetation, but still too young to exhibit hydric soils. (Josselyn, 993:17–994:2.)

151. Under the 1987 Army Corps Manual, not all man-induced wetlands are subject to regulation by the Corps. Specifically, the Manual advises that current Corps regulations must be consulted: "If the type of activity resulting in the area being a potential man-induced wetland is exempted by regulation or policy, no further action is needed." (Ex. 1383, at p. 83.) Dr. Josselyn consulted the applicable Corps regulations and concluded that one exemption (33 CFR § 323.2) was particularly apt to the situation at Beachwood:

> "Water-filled depressions created on dry land incidental to construction activity and pits excavated on dry land for the purpose of obtaining fill, sand, or gravel unless and until construction or excavation operation is abandoned and the resulting body of water meets the definition of waters of the United States." (Ex. 472, at 2100260.)

In Dr. Josselyn's opinion, *all* of the non-southeast corner wetlands on Beachwood in his Study Areas fell within the "water-filled depressions" exemption quoted above and were therefore not subject to regulation by the Army Corps. (Josselyn, 996:14–21.)

152. When delineating wetlands for the Army Corps, the Army Corps must review and approve the suggested delineation which is submitted by a consultant. (Josselyn, 988:5–18.) Thus, Dr. Josselyn's opinions needed to be reviewed by the Army Corps of Engineers. Dr. Josselyn submitted his delineation to the Corps in this case. (Josselyn, 997:11–13.) Significantly, the Army Corps of Engineers reviewed and approved Dr. Josselyn's 1999 delineation—including application of the "water-filled depression" exemption quoted above. On January 10, 2000, the Army Corps responded to Dr. Josselyn's submitted report. (Ex. 168.) It attached a map reflecting that the only Corps jurisdictional wetlands on Beachwood were in the southeast corner, precisely as Dr. Josselyn had found in his report. (Compare Ex. 168 at 1103640 [Army Corps letter] with Ex. 472 at 2100257 [Josselyn map of Corps jurisdictional wetlands].)

153. The Army Corps' review and acceptance of Dr. Josselyn's delineation is significant because the Corps—an independent governmental agency charged with approving wetlands delineations nationally—agreed with Dr. Josselyn that the non-southeast corner wetlands on Beachwood were "waterfilled depressions created in dry land incidental to construction activity." (Josselyn, 998:4–9.) In other words, the wetlands on Beachwood (outside its southeast corner) were man-made wetlands arising from construction—not natural wetlands, the theory espoused by the City in this case.

154. As noted above, once the City learned that the Army Corps had found no jurisdictional wetlands on the areas of Beachwood that were approved for development, the City switched gears and focused on wetlands under its own LCP definition. Dr. Josselyn prepared a separate delineation under the City's LCP definition of wetlands quoted above, including the "vernally wet" exception. (Ex. 473.) He used the same Study Areas that he had used in the delineation submitted to the Army Corps. (Ex. 473, Fig 11 at 2100425; Josselyn, 1000:9–15.) Relying on his interpretation of the vernally wet exception in the City's LCP definition—i e, that hydric soils were *required* in vernally wet areas, or the area would not qualify as a wetland—he found that all of the non-southeast corner Study Areas fell within the vernally wet exception, because they all lacked hydric soils. (Josselyn, 1000:19–1001:16.)

155. As recounted above, the City rejected Dr. Josselyn's delineation under the City's LCP definition of wetlands, concluding in its Hay 2, 2000 resolution that Dr. Josselyn's interpretation of the vernally wet exception was "erroneous." (Ex. 179, at 9277.)

156. In prior litigation between the parties, Yamagiwa sued the City after the City denied the Beachwood CDP in 2000, claiming that the areas that the City had found to constitute new wetlands—those mapped by Foreman of LSA—did not qualify as wetlands under the City's definition. Initially, Yamagiwa was successful in the trial court. In *Yamagiwa v. City of Half Moon Bay*, San Mateo superior court No. 402781 (consolidated with No. 413013), the trial court sided with Yamagiwa and issued a writ of mandate requiring the City to issue the Beachwood CDP, consistent with the 1990 VTM. (Ex. 439, at 9900627.) In accordance with the superior court's order and writ of mandate, the City issued the CDP to Yamagiwa on March 20, 2001, by Res. No. C–21–01. (Ex. 289, at 005861–5862 [the superior court's order and writ of mandate are at 005865–5874].)

157. But the trial court's decision and writ of mandate were reversed on appeal. On July 27, 2005, the California Court of Appeal, First Appellate District, issued its decision in *Yamagiwa v. City of Half Moon Bay*, Nos A105612, A105613. (Ex. 445.) The Court of Appeal framed the issue thusly: "Are vernally wet areas covered with hydrophytic vegetation wetlands under the LCP, or must they also contain hydric soils?" (Ex. 445, at 9900895.) It determined that the City's interpretation of "wetlands" under its LCP was the correct one, contrary to Yamagiwa's position and the trial court's ruling: "[W]e conclude the City rationally interpreted its LCP to treat vernally wet areas covered with hydrophytic vegetation as wetlands, whether or not hydric soils are also present." (Ex. 445, at 9900898.)

158. The effective result of the prior litigation between Yamagiwa was to uphold the City Council's rejection of Dr. Josselyn's interpretation of the "vernally wet" exception in the City's definition of wetlands. Dr. Josselyn re-examined his prior delineation under the City's LCP

definition, with the now-settled legal Question of the proper interpretation of the vernally wet exception. Based on the Court of Appeal's decision, Dr. Josselyn concluded that all of his Study Areas qualified as wetlands, because all of them had hydrophytic vegetation. (Josselyn, 1015:24–1016:15.)

159. Dr. Josselyn visited the Property again in 2006 and concluded that the wetlands on Beachwood are increasing over time. The hydrophytic vegetation on Beachwood belonged in wetter categories than he had observed in 1999, and new areas of hydrophytic vegetation had developed due to ongoing ponding and impoundment of water on the Property. (Josselyn, 1020:4–23.)

### The Cause of Wetlands on Beachwood

160. Both sides agree that there are extensive wetlands on Beachwood. Both sides presented expert testimony on the presence and cause of wetlands on Beachwood. The principal factual dispute in the case is what caused the wetlands to form, and the causation opinions of the respective expert witnesses are diametrically opposed. In Dr. Josselyn's opinion the wetlands on Beachwood were caused by the TAAD construction. (Josselyn, 1041:16–18.) In the opinion of Dr. Huffman, the City's wetlands expert, wetlands existed on Beachwood long before the TAAD project was constructed in 1984 and so were not caused by that project. (Huffman, 1507:13–22.) For the reasons that follow, the court rejects the opinion testimony of Dr. Huffman and accepts Dr. Josselyn's opinion testimony.

### Yamagiwa's Expert Testimony

161. Dr. Josselyn presented a clear and coherent theory of why wetlands developed on Beachwood, relying in part on the hydrologic and topographic testimony of Dr. Weirich: water was impounded in excavations and depressions that did not exist on Beachwood before the TAAD project, and hydrophytic vegetation eventually developed in these areas. (Josselyn, 1029:4–19.)

162. Photographs in evidence depict stormwater standing in the street depressions dug by the City's contractor during TAAD construction. (Ex. 791–5 at 1413140 [top photograph] [shows street depression, looking west, dry]; Ex. 786–8 at 1200808 [bottom photograph] [shows same street depression with substantial ponded water following seven consecutive days of rainfall] [Weirich, 870:1–19]; Ex. 794–3 at 1200874 [top photograph] [shows street depression, looking south toward Terrace Avenue, dry]; Ex. 786–7 [shows same street depression with substantial ponded water, again following seven consecutive day of rainfall]; Ex. 786–11 at 1200814 [shows ponding in cul-de-sac area that had been dug by Bay Cities]; Ex. 810–52 at 9901309 [bottom photo] [shows street depression on Bayview Drive, looking west toward Highway 1]; Ex. 796–9 [shows same street depression with substantial standing water].) Photographs also show water unable to enter the storm stubs that were exposed by the City in its initial effort to facilitate drainage into the Northern Drain. (Ex. 794–7 at 1200883 [bottom photo] [shows City-dug pit to expose storm stub below manhole]; 808–31 [top photo] [shows standing water unable to enter the storm stub].)

163. The street depressions dug by Bay cities during the TAAD project not only acted as collection points for water, they raised the level of the underlying clay layer closer to the ground surface. (Josselyn, 1029:20–1030:14.) Dr. Josselyn determined that the street depressions were dug down to a relatively impermeable clay layer; while the depth to clay layer in non-borrow areas was generally on the order of two feet, the depth to clay layer in the borrow areas was generally 0 to 8 inches.

The effect was that not only were the depressions lower areas into which water would naturally flow, but, once the water got there, there was little or no room for it to infiltrate into the soil due to the reduced depth to clay. This created increased long-term ponding on the surface which led to the growth of a predominance of hydrophytic vegetation. (Josselyn, 1031:24–1032:10; 1033:11–23.)

164. In the area of Bayview Drive, on Beachwood's northern border, Dr. Josselyn encountered compacted soil. This is the compacted soil that was placed in the trench for the Northern Drain during TAAD construction. (Whelen, 65:15–17.) The compacted soil was very difficult for Dr. Josselyn to penetrate with a shovel or a hand auger. (Josselyn, 1035:24–1036:8.) Bayview Drive thus became a compact-filled collector spot for direct rainfall and stormwater run-off. The cross-sections of various locations along Bayview prepared by Dr. Weirich (Exs. 675, 676) show the transformation of this area as a result of the work the City did during the TAAD project. what had pre-TAAD been a gently sloping topography facilitating the flow of stormwater off of Beachwood was transformed into the equivalent of an elongated east/west bathtub. Water attempting to flow northwesterly as it had done pre-TAAD was disrupted by the ridge on the south side of this elongated bathtub. Water that either fell as direct rainfall on Bayview Drive or managed to flow over the southern ridge of the bathtub due to sufficient back-up was trapped inside Bayview Drive and could not get out—it was forced to flow laterally in an east/west direction, rather than northwesterly as it had done pre-TAAD. (Josselyn, 1037:9–1038:6; Weirich, 857:15–24.)

165. The natural flow path for surface water onto and off of Beachwood pre-TAAD was highly disrupted by the TAAD construction. Pre–TAAD flows that had

exited Beachwood at its low point were impounded and trapped on Beachwood post-TAAD, both by the depressions and the barrier across the low spot. (Weirich, 912:20–914:3.) As noted above, the post-TAAD Beachwood topography reflects closed loop depressions in the center of Beachwood that did not exist pre-TAAD. (Compare Ex. 556 [August 1990 post-TAAD topography] with Exs. 122 and 426 [1976 pre-TAAD topography]; the same topographic changes are reflected in Dr. Weirich's digitized topographic maps, Exs. 836, 837, 838 [1976 pre-TAAD topography] and Exs. 844, 845, 846 [1990 post-TAAD topography].) Like the borrow areas, these depressed areas collected and retained stormwater, again leading to the growth of hydrophytic vegetation. (Weirich, 860:2–862:5; Josselyn, 1038:7–1039:15.) Stormwater also collected locally between the large piles of dirt that were stockpiled on Beachwood as part of the TAAD project. (Whelen, 81:5–19; 95:24–96:13; Josselyn, 1039:16–1040:5; Weirich, 862:13–863:10.)

166. The Western Drain, constructed on the inland side of Highway 1, also disrupted the flow of surface water in the area to the west of the ridge approximately 300 feet east of Beachwood's western border. Surface water that pre-TAAD had flowed into the ditch by Highway 1 and then northerly was prevented from getting into the ditch by the Western Drain construction. (Weirich, 816:22–817:12; 852:17–854:6.) Ultimately, hydrophytic vegetation also began to grow and predominate to the east of the Western Drain. (Josselyn, 1020:4–23; Ex. 867.)

167. Dr. Josselyn has at times been called on in his work to create wetlands where wetlands did not previously exist. The technique for this involves excavating to a depth where clay layers are found and allowing water to pond atop the clay layer.

Hydrophytic vegetation will ultimately develop. Dr. Josselyn followed this technique, for example, at a site in Fremont know as Pacific Commons. Dr. Josselyn's method for creating wetlands is essentially the same as what happened on Beachwood. (Josselyn, 1036:9–1037:3.)

168. The City's lack of a plan of maintenance for the Southern Drain caused at least 50% of the surface run-off from Drainage Area B to flow onto Beachwood instead of into the inlet that the City constructed near Beachwood's southeast corner. (Weirich, 911:3–19.) The overflow channel out of the creek was sufficient to form its own wetland area in the southeast corner of Beachwood. (Josselyn, 1040:14–1041:9.) While the 48″ diameter storm drain and inlet and the 4-foot high debris rack cage had the design capacity to handle expected peak flows out of Drainage Area B, the City's lack of a plan of maintenance rendered the system unable to function as designed. The design size of the pipe and inlet were rendered irrelevant. (Weirich, 891:16–892:8.)

169. Similarly, the size of the pipe (i e, 30″ reinforced concrete pipe) constructed by the City as part of the Northern Drain is not relevant. What matters is that the construction of the Northern Drain blocked the flow of surface water that pre-TAAD had flowed northwesterly off of the Property. The Northern Drain acted as a dam; the size of the underground pipe does not matter.[8]

### The City's Expert Witness Testimony

170. Dr. Huffman's theory was that wetlands existed on Beachwood before the TAAD project was constructed and thus were not caused by the project. According to Dr. Huffman, there was a "historic

central depression" on Beachwood that contained wetlands pre-TAAD. (Huffman, 1507:13–22; 1567:24–1568:1) The court concludes, however, that there is no credible evidence that wetlands existed on the Beachwood Property before the TAAD project was constructed by the City.

171. The only witness who testified to the presence of pre-TAAD wetlands on Beachwood was Dr. Huffman. Dr. Huffman purported to review a series of aerial photographs, from which he was able to divine that wetlands existed on Beachwood pre-TAAD. (Huffman, 1455:9–1457:3; 1465:16–1466:16.) The court rejects Dr. Huffman's methods and conclusions as implausible, unsupportable and contrary to the facts.

172. Dr. Huffman did not adequately explain how or why he was able to conclude that dark areas on pre-TAAD aerial photographs showed wetlands. To the contrary, he had no explanation whether other dark areas in the same photographs constituted wetlands, or what types of vegetation were growing in such other dark areas. (Huffman, 1466:17–1468:7; 1471:19–1474:1.) In the end, Dr. Huffman resorted to claiming that his special training allowed him to see things and draw conclusions that others could not. (Huffman, 1474:2–14.) The court is not convinced.

173. Moreover, Dr. Huffman's opinion regarding the presence of pre-TAAD wetlands on Beachwood is contrary to the overwhelming evidence of the *lack* of such pre-TAAD wetlands on Beachwood.

174. In April 1985, the United Stated Fish & Wildlife Service prepared its National Wetlands Inventory Map for the

---

8. Notably, the City's own expert witness agreed with Dr. Josselyn that the City's construction along the north side of Beachwood created a damming effect. (Freyer, 1401:7–10.) Freyer agreed that surface flows would have been impeded and restricted by the damming effect; but he did not know that it was the City's contractor who did the grading and thereby created the damming effect. (Freyer, 1401:11–1402:13.)

Half Moon Bay area. No wetlands are depicted on Beachwood, although wetlands were mapped on the Scopesi Property across Highway 1 from Beachwood and on property north of the Scopesi Property. (Ex. 634; Josselyn, 1024:12–1025:6; 1026:11–14; 1026:23–1028:4.) Dr. Josselyn testified in detail regarding the process and contents of the National Wetlands Inventory Map. Dr. Huffman never explained why, if there truly were wetlands on Beachwood before the TAAD construction during the 1983–1985 time period, no wetlands were mapped on Beachwood by the Fish & Wildlife Service in 1985.

175. Dr. Huffman relied on some pre-TAAD reports by others to support his view. One is the June 1974 report by Harlan Engineers. (Ex. 1384.) But Harlan Engineers was not looking for wetlands on Beachwood and, in fact, its study does not support the presence of wetlands on Beachwood. Harlan Engineers drilled eight borings on Beachwood and did not find water in the upper one foot in any of the borings, a requirement for wetland hydrology. (Exs. 1384–14 through 1384–24; Josselyn, 975:19–976:1.) The highest water found was at approximately 3 feet below the surface in Boring No. 3, the boring which was closest to the historic low point on Beachwood. (Ex. 1384–19.) Notably, the Harlan Engineers study was done in 1974, the fifth highest annual rainfall year ever in Half Moon Bay (Ex. 763, p. 1), when groundwater levels would be expected to be at historic highs.

176. Dr. Huffman also relied on the September 1975 Jones–Tillson Initial Study (Ex. 1114), but that report said nothing about the presence of any wetlands on Beachwood—notwithstanding the fact that the City's policies proposed for its General Plan at the time included "[t]o protect and preserve the existing environmental assets of the area such as its beaches, wetlands, creeks and arroyos

* * *" (Ex. 1114, at COHMB 0099110.) In addition, although Dr. Huffman testified that in his opinion there were arroyo willows on the Beachwood property pre-TAAD, the Jones–Tillson Initial Study includes a Plant Association Hap from the City's then-General Plan, which depicts the location of certain plant species throughout the City. One category of Plant Associations is titled "Stream Bank and Fresh Water Harsh," and includes arroyo willows. No such plants are indicated on the Beachwood Property. (Ex. 1114, at COHMB 0099079.)

177. The lengthy development history of the Beachwood Property further shows that Dr. Huffman's opinion regarding pre-TAAD wetlands is contrary to fact. The development history of this Property has been marked by a long series of approvals by the City, the California Coastal Commission and the California Department of Fish & Game. None of the agencies ever raised any issue regarding wetlands on Beachwood in the pre-TAAD years, and this lack of concern continued well after the construction of TAAD. Remarkably, Dr. Huffman did not consider or rely on any of the historical documents summarized below in reaching his opinion that wetlands existed on Beachwood pre-TAAD.

178. On September 28, 1976, the City's Planning Commission reviewed the Initial Study for subdivision of Beachwood into 97 residential lots and found that "the proposed project will not have a significant adverse effect on the environment and hereby confirms the filing of a negative declaration." (Ex. 598.)

179. On October 1, 1976, then-City Planner Stanley M Walker prepared a staff report memorandum to then-City Manager W. Fred Mortensen regarding subdivision of Beachwood. (Ex. 571.) Walker referenced the Jones–Tillson Ini-

tial Study (Ex. 571 at HM000310, ¶ I(D)). He recommended that the City Council review certain proposed Findings and Determinations, including: "That the proposed subdivision will not cause significant environmental damage and will not substantially injure fish and wildlife resources." (Ex. 571, at HM000311, SE II(a).) City Planner Walker recommended that the City Council adopt a resolution confirming the filing of a negative declaration based on the initial study, which recommendation was approved by City Manager Mortensen. (Ex. 571, at HM000313.)

180. On October 5, 1976, the City Council followed that recommendation, adopting Res. No. 151–76 confirming the filing of a negative declaration for the Beachwood subdivision. (Ex. 659.) At the same time, the City Council adopted Res. No. 152–76, approving the 97–lot subdivision of Beachwood. (Ex. 670.) The 1976 tentative subdivision map, Ex. 121, included development of the entire area designated by Dr. Huffman as the "historic central depression," where, in his opinion, wetlands existed pre-TAAD. The City's 1976 subdivision approvals and environmental review cast considerable doubt on Dr. Huffman's pre-TAAD opinions.

181. The TAAD project itself called for construction of deep trenches and underground storm drain pipes that bisected the area denominated by Dr. Huffman as the wetland-filled "historic central depression." But the TAAD plans were reviewed and approved by the City, the Coastal Commission and the Department of Fish & Game in 1982 and 1983, and none of those agencies mentioned the presence of any wetlands on Beachwood.

182. On September 30, 1982, White of M & S recommended to then-City Planner Lester Clark that the City issue a negative declaration for the TAAD project. (Ex. 76.) The City's October 14, 1982 Environmental Checklist Form for the TAAD pro-

ject found that the TAAD project "could not have a significant effect on the environment, and a negative declaration will be prepared." (Ex. 77, at 666.) The City Council thereafter certified the negative declaration for the TAAD project on February 1, 1983, when it adopted Res. No. 4–83. (Ex. 680.) Engineers White and Braden, who were intimately involved in the planning process for the TAAD project, never heard anyone say there were wetlands on Beachwood before the TAAD project was constructed. (White, 210:25–211:5; 240:6–18; Braden, 400:14–18.)

183. The TAAD project needed the approval of the California Coastal Commission. On February 7, 1983, the City filed an application with the Coastal Commission for a coastal development permit ("CDP") for the TAAD project. (Ex. 80.) White was designated the City's representative in obtaining the CDP application. (White, 243:19–21.) The Coastal Commission approved the CDP for TAAD at its April 13, 1983 meeting and stamped the TAAD plans "approved." (Exs. 644 [staff report], 713 [CDP 3–83–16], 698 [TAAD plans approved by Coastal Commission].) Although the Coastal Commission Staff Report contained a specific discussion about "Wetland Resources," no such wetland resources were identified on the Beachwood Property. (Ex. 644, at 739–740.) And although the TAAD plans showed the trenches that would bisect the "historic central depression," no one at the Coastal Commission voiced any concern about wetlands on Beachwood to White. (White, 246:13–20.)

184. Braden of H & S also forwarded a complete set of the TAAD plans to the California Department of Fish & Game for its review. (Ex. 748.) No one from the Department of Fish & Game voiced any concern to Braden or White regarding

wetlands on Beachwood. (Braden, 400:9–13; White, 247:7–13.)

185. As described above, when the TAAD project ran short of fill in the summer of 1984, the City approved a Change Order to its contract with Bay Cities Paving & Grading, which authorized the borrowing of 13,000 cubic yards of fill from Beachwood. (Exs. 43, 596.) The areas from which the dirt was borrowed on Beachwood are depicted in the April 23, 1985 aerial photograph (Ex. 498), and they included planned streets that were located within the area delineated by Dr. Huffman as the "historic central depression." Yet no one from the City ever voiced any concern that the wholesale rough grading of, inter *alia*, the center portion of Beachwood would disturb any wetlands. (White, 269:14–19.) This lack of concern is further evidence that, contrary to Dr. Huffman's theory, there were no wetlands in the central area of Beachwood as of July 1984.

186. On July 3, 1990, the City Council, by Res. No. 31–90, approved a vesting tentative map for the subdivision of Beachwood into 83 residential lots (the previous 97–lot 1976 tentative map having expired by then). (Exs. 141, 147.) An Initial Study and negative declaration for the 83–lot subdivision was prepared by then-City Planner Todd Graff. (Ex. 187, at 1402144–1402156.) The Environmental Analysis section of the Initial Study included a series of questions. One question was whether the proposed project would or could "[i]nvolve a unique landform or biological area, such as beaches, sand dunes, marshes or tidelands." The City's answer to this question was "No." (Ex. 187, at 1402145, ¶ II(1)(a).) Another question asked whether the proposed project would or could "[i]nfringe on any sensitive habitats." The City's answer to this question was also "No." (Ex. 187, at 1402146, ¶ II(2)(f).) At the time the Initial Study questionnaire was filled out, the City's certified Land Use Plan (which also served as the City's General Plan) provided that "sensitive habitats" *included* wetlands. (Ex. 136, ¶ 3–1(a), at HM000760.) Thus, the City Planner concluded as of December 1988 that the 83–lot subdivision of Beachwood would not infringe on any wetlands.

187. During the CEQA process, the California Department of Fish & Game commented that "approximately 15–20 percent of the project site had riparian wetland vegetation with three small retention ponds." (Ex. 1020.) However, the Department of Fish & Game did not include a map indicating what part of the project site it was referring to. Moreover, its reference to "three small retention ponds" renders it unclear whether the Department of Fish & Game could differentiate, in the field, the boundary line between Beachwood and Glencree. Beachwood contained a large irrigation pond in its southeast corner and one small retention pond on its southern border. (Ex. 122.) Two additional small retention ponds were located on the southern part of Glencree. (Ex. 122; White, 392:16–393:14.) It is unclear whether the Department of Fish & Game's reference to "three small retention ponds" included the two small retention ponds that were actually located on Glencree, not on Beachwood. The City presented no witnesses or evidence to clarify the precise locations where the Department found "approximately 15–20 percent of the project site had riparian wetlands vegetation with three small retention ponds." In addition, it is noteworthy that the Department of Fish & Game's comments were made four years after the construction of the TAAD project was completed in 1985.

188. Dr. Huffman also relied on an April 1990 report by Harding Lawson & Associates, prepared in response to the Department of Fish & Game's CEQA com-

ment. This report was also made five years after TAAD's completion. (Huffman, 1592:9–11.) The Harding Lawson report was not admitted into evidence, as it was never properly authenticated and constituted hearsay.[9] Hence, the report and statements within it cannot be used as substantive evidence. Nonetheless, even though the report itself was not admitted, Dr. Huffman was still entitled to rely on the report as a basis for forming his expert opinions. The problem here, however, is that Dr. Huffman evidently thought little of the Harding Lawson report. For each sampling point studied by Harding Lawson—as to (1) hydrophytic vegetation, (2) hydric soils, and (3) wetland hydrology—*Dr. Huffman concluded that Harding Lawson got each one wrong,* (Huffman, 1590:22–1591:20.) As support for his expert opinion, Dr. Huffman was surely not entitled to place much weight on a report that he concluded was so thoroughly wrong.

189. In any event, notwithstanding the Department of Fish & Game's CEQA comment, the City proceeded to adopt a negative declaration for the 83–lot Beachwood vesting tentative map. On July 3, 1990, when it adopted Res. No. 31–90, the City Council "reviewed the contents of the Initial study and accept[ed] the Negative Declaration as complete." (Ex. 141.) None of the CEQA mitigation measures adopted by the City Council concerned wetlands on Beachwood. (Ex. 187, at 1402159; Ex. 688, at 141822; Gustin, 456:14–457:8.)

190. The City Council also adopted Findings and Conditions of Approval for the 83–lot Beachwood VTM on July 3, 1990. (Exs. 141, 1345.) Among other findings, the City Council found that "the proposed subdivision is consistent with the City of Half Moon Bay Local Coastal Pro-gram, Land Use Plan, and all applicable codes and policies of the City." (Ex. 1345, Finding # 2, at 1971.) The applicable policies of the City included those found in its certified Land Use Plan, including Policy 3–3(a), to "[p]rohibit any land use and/or development which would have significant adverse impacts on sensitive habitat areas," which areas were defined to include wetlands. (Ex. 136, ¶ 3–3(a), at HM000760.)

191. The VTM approved by the City Council on July 3, 1990 was for 85 lots, 83 of which were to be developed residentially. The only two lots which were *not* to be developed residentially were Lots 19A, B and C of Block 3 and Lots 1A and B of Block 3. Lots 19A, B and C were located in the southeast corner of Beachwood, where the old stock pond and creek were situated. Lots 1A and B were located on the east side of the planned extension of Golden Gate Avenue onto Beachwood, at Beachwood's southern border. (Ex. 147; Gustin, 464:14–465:15; White, 274:1–4.) Lots 1A and 19C were to be dedicated to the City for park purposes, while Lots 1B, 19A and 19B were to be dedicated to the City for open space. (Ex. 147.) All other areas of Beachwood were approved for development, either as residential lots or streets, by the City Council on July 3, 1990.

192. The City Council's approval of the VTM, with development on all portions of Beachwood other than the lots mentioned above, in conjunction with the applicable policies of the City, indicates the City Council's view that the only potential wetlands areas on Beachwood as of July 1990 were in the Property's southeast corner.

193. This view was confirmed by the City Council ten years later on May 2,

9. The City did not call any witness from Harding Lawson that could have provided the basis to overcome any objections and have the complete report received in evidence.

2000 when it adopted Res. No. C–26–00, denying the CDP for the Beachwood subdivision. As has been noted, at that time the City Council wrote:

"The owners of a 24.7 acre parcel of land generally known as the Beachwood subdivision sought and obtained approval of a vesting tentative map ("VTM" herein) from the City of Half Moon Bay in 1990. That tentative map approved certain conditions which if satisfied would allow for the subdivision of the parcel into 83 buildable lots. At the time the *VTM was approved, it was determined that wetlands covered a portion of the site, and the map was approved so as to prevent development of that area.*" (Ex. 179, at 9274, emphasis added.)

The City Council thereby confirmed that the only area of wetlands on Beachwood in 1990 was in the property's southeast corner, the open space parcel. Certainly there was no acknowledgment by the City Council as of 2000 that wetlands had previously existed on Beachwood throughout the "historic central depression" area later denominated by Dr. Huffman. The City Council's actions in approving the 1990 vesting tentative map and its 2000 resolution describing its earlier act support the absence of any wetlands on Beachwood even as of 1990 in the central area where Dr. Huffman opined there were wetlands that preceded the construction of the TAAD project.

194. On February 25, 1991, the City approved a grading permit allowing the then-owner of Beachwood to import 1,000 cubic yards of fill onto the Beachwood property. (Ex. 1203.) The City never voiced any concern that the fill importation would impact any wetlands on the Property. (Crowell, 695:18–23.) This is yet further evidence of the absence of wetlands on Beachwood outside its southeast corner as of 1991. The then-owner of Beachwood, PVA, proceeded to import 1,000 cubic yards of fill and placed it in one of the largest depressions that had been dug by the City's contractor, near the eastern Beachwood border. (Ex. 64; Crowell, 694:20–695:15; Weirich, 887:8–24.) The grading application itself, however, did not specify where the 1,000 cubic yards of fill was to be placed; thus, the City approved the permit without restricting the placement of the fill.

195. The most expensive on-site improvement item for PVA in building the 83–lot subdivision was the importation and placement of 48,500 cubic yards of fill. (Ex. 555; Crowell, 690:3–15.) Crowell searched for free fill that might be available from other projects on the coastside that had an excess of fill. In 1991, it appeared that 32,000 cubic yards of fill might be available from two nearby projects. Crowell sought and obtained permits for the importation and stockpiling of the 32,000 cubic yards. (Crowell, 696:4–11; 700:19–22; 701:7–11.)

196. Accordingly, on June 10, 1991, PVA submitted an application for a CDP to the Coastal Commission. (Ex. 582.) An attachment to the application explained that the project proposed the stockpiling of 32,000 cubic yards of fill "in long rows approximately 50′ wide, with heights of approximately five feet." (Ex. 582, at BW003305.) PVA also submitted plans to the Coastal Commission that indicated precisely where this large amount of fill was proposed for stockpiling—directly within the street depressions that had been dug by the City's contractor when it borrowed dirt from Beachwood in order to complete the TAAD improvements in July 1984. (Ex. 650; Crowell, 698:2–25.) As noted above, the street depressions included substantial areas within the "historic central depression" denominated by Dr. Huffman as the wetland-filled pre-TAAD area.

197. On July 17, 1991, the Coastal Commission granted a *de minimis* waiver allowing the importation of 32,000 cubic yards of fill onto Beachwood, for placement in long rows 50 feet and five feet high, within the "historic central depression." (Ex. 159.) The *de minimis* waiver was granted pursuant to 14 CCR 13238. The Coastal Commission may only grant a *de minimis* waiver when the proposed project "involves no potential for any adverse effect, either individually or cumulatively, on coastal resources . . ." (Cal. Pub. Res. Code § 30624.7.) Wetlands constitute a "coastal resource." (Cal. Pub. Res. Code § 30116(a); see also Chapter 3 of the Coastal Act, "Coastal Resources Planning and Management Policies," which contains the prohibition on filling wetlands, Cal. Pub. Res. Code § 30233.) It can be reasonably inferred that, the Coastal Commission found no wetlands existed in the "historic central depression" on Beachwood when it approved the *de minimis* waiver in July 1991. (*Madrigal v. City of Huntington Beach*, 147 Cal.App.4th 1375, 1386–87, 55 Cal.Rptr.3d 209 [2007].)

198. The City likewise granted a grading permit to PVA allowing the importation and stockpiling of 32,000 cubic yards of fill to Beachwood on October 10, 1991. (Ex. 568.) Like the Coastal Commission, the City never voiced any concern that stockpiling such fill throughout the area designated by Dr. Huffman as the "historic central depression" would impact any wetlands on Beachwood. (Crowell, 703:7–14.)

199. It should be noted that the 32,000 cubic yards of fill proposed for importation and stockpiling on Beachwood were never actually imported to the Property, as the free fill was rejected on quality grounds. (Crowell, 702:23–703:6.) Nonetheless, the Coastal Commission's *de minimis* waiver and the City's grading permit allowing the importation and stockpiling show an absence of wetlands on Beachwood outside its southeast corner, as of 1991.

200. The City formed an assessment district under the Municipal Improvement Act of 1913 for Sanitary Sewer Project 1994–1 on July 6, 1994 by Res. No. C–47–94. (Ex. 591.) That project would finance the City's share of the expansion of the local sewage treatment plant. (White, 276:12–14; Yamagiwa, 1187:25–1188:2.) A lien in the principal amount of $962,987.76 was placed on the Beachwood Property on August 5, 1994. (Ex. 446.)

201. The City's method of calculating the $962,987.76 assessment for Beachwood is noteworthy. White assisted the Engineer of Work, John Heindel, in determining the appropriate assessments for undeveloped parcels within the City of Half Moon Bay. To spread the City's total share of the cost–$12,635,327.22–a formula of "benefit units" was established by the City and applied to each undeveloped parcel in the City, including Beachwood. (White, 276:15–277:9.) Parcels that were entirely or partially undevelopable were assigned zero benefit units to reflect that they could not benefit from additional treatment capacity at the sewer plant. (Ex. 87, at HM204022; White, 278:21–279:21.) No one at the City asserted that Beachwood was partially or totally undevelopable. (Crowell, 710:7–12.) To the contrary, Beachwood was assessed based on the approved VTM for 83 residential units *multiplied by two*, because Beachwood had Phase I water connections and hence would be developed *earlier* than other vacant property in Half Moon Bay. (White, 280:19–281:12.) Thus, Beachwood was assigned 166 (83 × 2) benefit units. This was the second highest amount of any undeveloped parcel in the City. (Ex. 87, at HM204003–HM204021.)

202. On June 6, 1996, the City Council by Res. No. C–36–96 approved revised as-

sessments for the sewer treatment expansion project. (Ex. 594.) Again, the Beachwood Property's assessment in the principal amount of $962,987.76 was confirmed, and no code was applied to the Beachwood Property that reflected it was partially or totally undevelopable. (Ex. 594, at HM206310 [Code 3 = properties "partially or totally undevelopable"]; at HM206312 [Beachwood, APN 048–280–020, recorded as "Yes" on water connection, with no code to reduce the assessment; assigned 166 benefit units and a total assessment of $962,987.76].) Again, in 1996 no one at the City asserted Beachwood was partially or totally undevelopable due to wetlands. (White, 283:7–17.)

203. The City Council's actions in calculating the assessment for Beachwood is further recognition by the City that, as of 1994 and 1996, there were no wetlands on Beachwood that would prevent its development in accordance with the 83 lots approved by the 1990 vesting tentative map. These findings by the City are once again contrary to Dr. Huffman's opinion that wetlands existed on Beachwood pre-TAAD in the area he denominated as the "historic central depression."

204. When the City denied the Beachwood CDP application in 2000, its findings further negated the theory of pre-TAAD wetlands. The City Council described the issue in 2000 as "whether the site has seen *an increase* in the presence of wetlands since the 1990 approval of the VTM." (Ex. 179, at 9276, emphasis added.) The City Council further found that "the extent of wetlands on the site is greater than was determined at the time the VTM was approved" and that there were "nine new wetlands areas" on Beachwood. (Ex. 179, at 9282.) The City Council also found that further environmental review was necessary because "although a negative declaration was adopted by the City in 1990 at the time of the approval of the VTM, on the basis of substantial evidence in the light of the whole record new information of substantial importance, *which was not known and could not have been known with the exercise of reasonable diligence at the time the negative declaration was adopted.*" (Ex. 179, at 9283, emphasis added.) All of these findings are inconsistent with Dr. Huffman's views presented at trial that wetlands existed on Beachwood long before the TAAD project was constructed. To the contrary, the City's own findings state something very different: that *new* wetlands had developed on Beachwood since 1990, which were unknown and *unknowable* in 1990.

205. All the foregoing actions by various government entities show an absence of wetlands on Beachwood, outside its southeast corner, into the late 1990s. Also relevant is the fact that, in 1999, when Dr. Josselyn submitted his delineation of wetlands on Beachwood to the Army Corps of Engineers, the Corps agreed with Dr. Josselyn that, except for the southeast corner, all of the other wetlands on Beachwood were exempted from Corps jurisdiction because they were "water-filled depressions created on dry land incidental to construction activity and pits excavated on dry land for the purpose of obtaining fill, sand, or gravel * * *" under 33 CFR § 323.2. The Corps' conclusion—as an independent governmental agency that is required to review wetlands delineations—is wholly contrary to Dr. Huffman's theory that the Beachwood wetlands are naturally occurring phenomena.

206. But perhaps most damaging of all to Dr. Huffman's theory that wetlands preceded TAAD are the observations of and letters written *by Dr. Huffman himself* before he was retained by the City to act as an expert witness in this case.

207. On February 28, 1999, Dr. Huffman visited the Beachwood Property and

made notes regarding observations he made at various locations on the Property, which he recorded on a copy of the 1990 topographic map. (Ex. 97.) Dr. Huffman recorded saturation and species of hydrophytic vegetation within areas that had been graded by the City's contractor during construction of the TAAD project back in 1983 and 1984. *Critically, however, at the time of Dr. Huffman's February 28, 1999 site visit, he was unaware of who had done the grading that he observed.* (Huffman, 1519:11–25; 1520:18–21; 1529:16–18.) When he was *unaware* that the grading had been done by the City's contractor, he carefully recorded indicators of wetlands in the graded areas. His February 28, 1999 notes variously record: "graded depression" (Area 1); "depression" (Area 2); "between dirt piles" (Area 4)[10]; "disked and graded roadway" (Area 5A); "ditch that leads to drainage culvert" (Area 9)[11]; "roadway depression lacks positive drainage" (Area 11); "graded roadway" (Area 12); "water ponded can't drain due to graded roadway" (Area 13); "graded roadway ponded" (Area 14); "water can't flow out" (Area 15). (Ex. 97)

208. Following his February 28, 1999 site visit, Dr. Huffman wrote an initial letter report to Joan Laznphier, the City's contract planner, on March 4, 1999. (Ex. 109.) Dr. Huffman referred to "man-made depressional areas" that were "the result of past grading and filling activities" on the Property. Dr. Huffman also wrote:

"It should also be noted that even though the *wetlands are man-made,* they are nevertheless potentially subject to regulation by the Corps of Engineers (Corps) under Section 404 of the Clean

Water Act. It also appears that the depressional areas are potentially subject to regulation under the LCP." (Emphasis added.)

What he meant by this was that the wetlands he observed on Beachwood were made by earth-moving equipment—though, again, at the time of his observations, he did not know whose earth-moving equipment was involved. (Huffman, 1518:14–1519:25.)

209. Dr. Huffman made a subtle change in his letter a week later, on March 11, 1999. (Ex. 91.) The text of the letter was revised from the above sentence to a more conditional sentence:

"It should also be noted that *even if the wetlands are man-made,* they are nevertheless potentially subject to regulation by the Corps of Engineers (Corps) under Section 404 of the Clean Water Act. It also appears that the depressional areas are potentially subject to regulation under the LCP." (Emphasis added.)

210. Notwithstanding the change in text, Dr. Huffman continued to believe when he wrote his March 11, 1999 letter that the wetlands on Beachwood were, in fact, man-made. (Huffman, 1542:13–14.)

211. And Dr. Huffman reiterated this view nearly two years later in his January 29, 2001 letter to Amrit Kulkarni of Meyers Nave, the City's lawyers in this case. (Ex. 116.) Dr. Huffman reviewed the wetland Study Areas identified by Dr. Josselyn in his Fig 12 (Ex. 434; Huffman, 1543:20–22) and concluded that *"although these wetland areas are manmade* the LCP provided no exclusion for these types

---

**10.** It was unknown to Dr. Huffman at the time of his February 28, 1999 site visit that the "dirt piles" had been placed by the City's contractor during construction of TAAD. (Huffman, 1528:20–1529:5; Whelen, 81:5–19; 95:24–96:3.)

**11.** It was unknown to Dr. Huffman at the time of his February 28, 1999 site visit that the City had dug the trench that led to the drainage culvert in an effort to drain standing water on the Beachwood Property in 1984 or 1985. (Huffman, 1527:5–10; Whelen, 123:10–124:5; 128:6–9.)

of areas within the context of the LCP wetlands definition." (Ex. 116, at 5101305, emphasis added; Huffman, 1545:13–17.)

212. Under cross-examination, Dr. Huffman conceded that he continues to believe that the wetlands mapped by Dr. Josselyn *are* man-made wetlands. (Huffman, 1548:7–12.)

213. Dr. Huffman also included the following statement in his January 29, 2001 letter to Kulkarni:

> "Field observations by WRA and LSA [consultants for plaintiff and the City, respectively] indicate that the site has been highly disturbed by grading activities over the past decade. *Prior to this time the site appears to be a well-drained upland area.*" (Ex. 116, at 5101303, emphasis added.)

214. Dr. Huffman's ignorance regarding who had done the grading on Beachwood continued at least through his September 14, 2006 deposition. (Huffman, 1546:1–16.) Thus, all of the observations and opinions expressed by Dr. Huffman in 1999 and 2001 were made at a time when he did not know that it was the City's contractor, Bay Cities Paving & Grading, that had graded the roadways and stockpiled the dirt piles on Beachwood, or that the City had dug the trenches to the storm stubs in an effort to drain standing water on Beachwood. When he was ignorant as to who had done the work on Beachwood that created the "man-made depressional areas," Dr. Huffman concluded that the wetlands were man-made. But once he learned that the depressions and road grading were done *by the City's contractor,* he changed his view, ultimately opining that wetlands existed on the Beachwood Property pre-TAAD. Dr. Huffman never explained why or how he discarded his earlier views.

215. In sum, the evidence is overwhelming that there were no wetlands on Beachwood outside its southeast corner

(the area set aside from development) before the TAAD project was built. Dr. Huffman's interpretation of pre-TAAD aerial photographs is rejected as unconvincing and not credible. The long series of approvals by various governmental entities—including the City itself, the Coastal Commission and the California Department of Fish & Game—also disprove the theory that non-southeast corner wetlands existed on Beachwood pre-TAAD. The Army Corps of Engineers' 2000 delineation supports the view that the wetlands on Beachwood were man-made. Finally, Dr. Huffman's initial observations on February 28, 1999 and his previous opinions that the wetlands on Beachwood were man-made, and his concession that all of the wetlands mapped by Dr. Josselyn were man-made, directly contradict Dr. Huffman's own trial testimony regarding pre-TAAD wetlands on Beachwood. Dr. Huffman effectively impeached himself, and there is no credible support for Dr. Huffman's expert witness trial testimony regarding the presence of pre-TAAD wetlands on Beachwood outside the southeast corner of the Property. Dr. Huffman is the only person who has ever opined that wetlands existed on Beachwood before TAAD. When pressed to support his views, Dr. Huffman retreated to a position that, only he could understand because he is specially trained. (Huffman, 1474:2–14.) The court rejects the opinion testimony of Dr. Huffman and concludes that there were no wetlands on Beachwood outside its southeast corner before the TAAD project was constructed by the City.

### Summary re Cause of Wetlands on Beachwood

216. The wetlands on Beachwood outside its southeast corner were substantially caused by the City's construction of the TAAD improvements, and these wetlands

render residential development of the Property infeasible. (Ex. 867.)

### *Mitigation Efforts by the Property Owner*

217. Shortly after Melanie Mayer Gideon first found potential new wetlands on Beachwood outside of its southeast corner in January 1999, Crowell attempted on February 2, 1999 to pump standing water out of some of the street depressions on Beachwood. Although no one had yet determined that the standing water on Beachwood *did* constitute wetlands, the City responded by putting a rapid stop to the pumping. Then–Planning Director Anthony "Bud" Carney wrote a memorandum to the then-City Manager Blair King outlining the City's rapid response to the report of water pumping on Beachwood. Carney contacted the United States Fish & Wildlife Service, the California Department of Fish & Game and the United States Army Corps of Engineers in an effort to put a stop to the pumping. (Ex. 156; Lamphier, 596:4–21.) Police officers came to the site, and Crowell directed the workers he had hired to stop pumping. (Crowell, 727:19–728:17.)

218. Following the Planning Commission hearing on March 11, 1999, Yamagiwa's counsel, Anne E. Mudge believed that the City might finally come to Beachwood to clean the debris from around the debris rack cage and remove the concrete rubble upstream from the inlet. This presented a slight conundrum for Mudge. On the one hand, any City action finally to maintain its public works would be a positive development. On the other hand, Mudge wanted an opportunity for expert witnesses to review and photograph the condition of the inlet and the creek in order to document their condition for potential litigation in the event the City were to find new wetlands had developed on Beachwood. Accordingly, Mudge wrote a letter to the City's attorney on March 12, 1999 advising him to notify her and obtain permission before undertaking any maintenance efforts. (Ex. 1318.) Mudge's intent was clear: she only wanted to preserve the condition for photographing and viewing by expert witnesses. The City has tried to portray the Mudge letter as unequivocal directions prohibiting the City from maintaining its public works. The Mudge letter says no such thing (nor, legally, could Mudge prohibit the City from using its easement to perform maintenance of its storm drain system).

219. As it turns out, Mudge's concern that the City might actually go to the Beachwood site to perform maintenance of its public works (and destroy the evidence in the process) was unfounded. After March 12, 1999, the City never provided notice or requested permission to perform maintenance activities on Beachwood. (Crowell, 779:24–780:10.)

220. Once it became clear that the City would not be servicing its public works, Yamagiwa undertook to ask the City for permission to allow her to clear the channel and the debris rack. In light of the near-arrest of Crowell some months earlier when he attempted to pump standing water off of Beachwood, seeking permission from the City rather than resorting to self-help was the prudent course. Yamagiwa therefore submitted an application for an exemption from a CDP, or, in the alternative, for a CDP, to allow her to maintain the existing drainage ditch. (Ex. 756.) Mudge's October 22, 1999 cover letter to then-Acting Planning Director Mike Bethky explained Yamagiwa's request: to remove the concrete rubble from the creek channel. Mudge took the position that the owner's proposed work qualified for an exemption from the CDP requirement, but sought a CDP if the City disagreed with her exemption analysis. (Ex. 755.) The City never granted a permit to allow Yam-

agiwa to clean the channel. (Crowell, 728:24–731:7.)

221. Crowell also submitted a Ditch Maintenance Plan dated November 1999 to the City, seeking permission to re-grade the property to fill certain low spots and allow stormwater to drain into the Northern Drain. (Ex. 1161.) The City never granted permission to do this work, either. (Crowell, 731:8–732:5.)

222. It is clear that whatever steps Yamagiwa or Crowell took to try to alleviate conditions on Beachwood that led to standing water or lack of drainage were rejected by the City. The City did not want to allow any action that might reduce the impacts of wetlands on Beachwood.

### Work Done by the Property Owners

223. The City presented testimony from Edward Andreini, who wrote a November 18, 1999 letter about unspecified grading work he had done on Beachwood in 1996 and 1997. Andreini did some cleaning and abatement work on the Property but did not recall doing any "grading per se." (Andreini, 1609:7–21; 1611:3–16.) The City presented no aerial photographs to reflect grading done by Andreini on Beachwood in 1996 or 1997.

224. In any case, whatever work may have been done by Andreini's company on Beachwood did not affect the topography in the areas designated as wetlands by Dr. Josselyn. The City's own expert, Freyer, carefully reviewed the topography as between 1990 (the date of the BKF 1–foot contour interval topographic map) and 2006 (when Freyer had additional survey elevations shot on Beachwood) in all of Dr. Josselyn's wetlands. Freyer concluded that, as to Dr. Josselyn's 15 wetlands outside the southeast corner, there was no change in the topography in 12 of them between 1990 and 2006; that two of them were slightly higher (those were in the areas where Crowell testified that 1,000 cubic yards of fill was imported and placed

in 1991); and only one of the 15 wetlands areas was slightly lower, the one between the dirt piles. (Freyer, 1396:19–1399:23.) To the extent the City tried to suggest that post-TAAD grading work by Beachwood's owners changed the Property's topography and that the owners are therefore responsible for the depressions in which wetlands formed, that theory is baseless.

225. The only other physical work done by the owners on Beachwood since 1990 was annual disking. For many years, the Half Moon Bay Fire Protection District has ordered the owners to disk the Property for fire protection. (Ex. 240 [1991 "Notice to Destroy Weeds"]; Crowell, 703:20–704:1; 704:14–705:6; Ex. 242 [1997 "Notice to Destroy Weeds"]; Ex. 243 [1998 "Notice to Destroy Weeds"]; Yamagiwa, 1189:15–1190:14.) The ordered method of weed abatement was by "disking the earth and weeds under, in such a manner so as to prevent weeds or grass from regrowing." (Ex. 243, at 001521.)

226. The disking process had no significant impact on the topography of the Property or the flow of surface water across it. At most, its impact is on the micro-topography of the disked surface, primarily impacting rain that falls directly onto the disked area. (Weirich, 866:12–867:2.)

227. In disking the Property, the owners were following the orders of the Fire District. But the City also had the ability to control the weed abatement process. In June 2004, after receiving a citizen complaint, the Fire District ordered Yamagiwa to remove weeds from Beachwood, advising her that the Property was in violation of the California Fire Code and must be remedied within 30 days "in order to avoid legal action." (Ex. 252.) The Fire District later advised Yamagiwa's counsel that she needed permission from the City to

abate the weeds because the City claimed the property contained wetlands. (Ex. 251.) The City then took the position that Yamagiwa needed to obtain a coastal *development* permit in order to remove the weeds. (Ex. 253.) The City's actions show that it had the ability to control the Fire District's weed abatement orders, and that the annual orders to disk the weeds from the Property were subject to, and under the control of, the City. While there is no evidence that disking effected any change to the topography or contributed to the formation of wetlands on the Property, the City cannot be heard to so argue because it ultimately controlled the weed abatement process.

### Assessment District Payments

228. The TAAD improvements were financed by an assessment district, and Beachwood was one of the properties included in the assessment district. (White, 196:25–197:2.) Beachwood was assessed the principal amount of $313,588.91. (Ex. 18, at 1103007 [Property No. 2, Assessor's Parcel No. 048–280–020].) After acquiring Beachwood in December 1993, Yamagiwa paid a total of $337,700.72 (principal plus interest) to pay off the TAAD assessments. (Ex. 892–01; Yamagiwa, 1203:15–22.) The TAAD assessments against Beachwood were paid off on March 25, 1998. (Ex. 892–01.)

229. The TAAD improvements have not provided a benefit to Beachwood or to Yamagiwa. Indeed, the TAAD improvements have caused damage to the Property. The TAAD improvements did allow homes to be built in the Highland Park subdivision and on Terrace Avenue. Although it was contemplated at the time the assessment district was formed in 1983 that Beachwood would be residentially developed as well, the emergence of wetlands on Beachwood has made such development infeasible.

230. After the sewer treatment plant expansion project was approved in 1989, the City decided to form an assessment district to pay for the City's share of the cost of the expansion. On July 30, 1990, then-Acting City Engineer Craig Giordano wrote a memo to then-City Manager Mark Weiss that stated:

> "In order to set up the financing mechanism for the City's share of the planned SAM sewage treatment plant expansion, *an assessment district must be formed to distribute the costs to the parcels benefited.*" (Ex. 717, emphasis added.)

The idea of forming the Sewer Assessment District originated with the City, not with the property owners. (Crowell, 707:19–22.)

231. After the City adopted the sewer moratorium on March 28, 1991, Crowell could not proceed with development of Beachwood without sewer capacity. The bureaucratic loop created by the City (no building permit without a CDP, but no CDP without a building permit) has been recounted above. The City made it clear to owners of undeveloped property like Beachwood that no development could proceed without the sewer plant expansion:

> "Without expansion of the existing plant, the City would have no more sewage treatment capacity available for any new buildings requiring a new sewer connection or an expansion of an existing sewer connection. The City of Half Moon Bay has initiated proceedings for the financing and construction of expanded sewage treatment facilities through an assessment district (AD)." (Ex. 348, at 2683.)

The owners of undeveloped property in Half Moon Bay—like Crowell and PVA, as to Beachwood—had no choice. (Crowell, 707:4–6.) Without additional sewer capacity, no development could proceed. And without the assessment district, there

would be no additional sewer capacity. The City effectively forced property owners like Crowell to accede to the assessment district.

232. Before approving the Sewer Assessment District, the City Council, by Res. No. C–46–94 on July 6, 1994, overruled whatever protests had been filed by property owners. (Ex. 590.) That same day, the City Council approved the Sewer Assessment District and ordered the work of improvement, by Res. No. C–47–94. (Ex. 591.) In sum, the City initiated, promoted and induced the formation of the Sewer Assessment District.

233. The total City share for the plant expansion was $12,635,327.22. (Ex. 87, at HM204021; White 281:13–17.) Beachwood was assessed the principal sum of $962,987.76. (Ex. 87, at HM204005; Ex. 446.) Yamagiwa has paid the assessments for 11 years, beginning in 1996; 14 years of payments remain. (Yamagiwa, 1188:11–21.) Through March 30, 2007, the total amount paid by Yamagiwa for the Sewer Assessment District (principal plus interest) is $974,589.90. (Ex. 892–01; Yamagiwa, 1204:2–5.)

234. Because the Beachwood Property has been damaged and rendered undevelopable by wetlands, the sewer treatment plant expansion will provide no benefit to Beachwood. In short, while the City assessed nearly 1/12 of the total principal City share of the sewer treatment plant expansion to Beachwood (i e, $962,987.76 out of a total of $12,635,327.22), Beachwood has received no benefit from the assessment. The City has taken (and continues to take) substantial sums from Yamagiwa to pay for a public project that is of no use to her.

### Damages

235. Both Yamagiwa and the City presented expert opinion testimony by appraisers. Arthur Gimmy, MAI testified for Yamagiwa and Walt Carney, MAI tes-

tified for the City. Both appraisers valued Beachwood in its undamaged condition (i e, suitable for development of 83 residential lots) and in its damaged condition (i e, covered with wetlands) as of March 2000 (when the City Council voted to deny the Beachwood CDP) and as of October 2006 (when expert reports were exchanged). The various opinions of the appraisers are summarized in the following chart:

| Date of Value | Gimmy (for Yamagiwa) | Carney (for City) |
|---|---|---|
| *As of March 2000* | | |
| Before Condition | $20,750,000 | $15,355,000 |
| After Condition | $ 950,000 | $ 3,325,000 |
| Total Damage | $19,800,000 | $12,030,000 |
| *As of Oct 2006* | | |
| Before Condition | $39,000,000 | $34,030,000 |
| After Condition | $ 2,205,000 | $ 7,410,000 |
| Total Damage | $36,795,000 | $26,620,000 |

236. Thus, the range of damages is $12,030,000 to $19,800,000 using the 2000 date of value and $26,620,000 to $36,795,000 using the 2006 date of value.

237. Both Gimmy and Carney agree that, in its undamaged (or "before") condition, Beachwood's value increased substantially between 2000 and 2006. According to Gimmy, the undamaged value of Beachwood appreciated 88% between 2000 and 2006. According to Carney, the undamaged value of Beachwood appreciated 122% between 2000 and 2006. (Carney, 1668:16–1669:14.)

238. The primary differences between Gimmy's and Carney's opinions derive from two factors: (1) Carney's before condition values are roughly $5 million less than Gimmy's on both dates of value; and (2) Carney's damaged (or "after") condition values are about 3½ times Gimmy's after condition values on both dates of value. (Carney, 1669:15–1670:3.)

239. The difference in the after condition values is attributable to the assumed condition of Beachwood. Gimmy adopted Josselyn's opinion that residential development of Beachwood was infeasible (due to wetlands and the City-required 100–foot buffers) both as of 2000 and 2006. This is supported by Josselyn's maps of hydrophytic vegetation locations on Beachwood as of 2000 (Ex. 866) and as of 2006 (Ex. 867). Gimmy therefore valued Beachwood's after condition as open space on both dates of value.

240. Carney, on the other hand, simply assumed that Beachwood could be developed with 19 units in the after condition. Carney made this assumption on direction from the City's counsel without making any investigation. Indeed, Carney has no idea whether the 19–unit assumption is correct or not. (Carney, 1670:4–1671:17.) Carney's assumption was that the 19 units could be built at Beachwood's western border, adjacent to Highway 1. (Carney, 1671:18–23.) But Carney never reviewed the wetlands maps prepared by Dr. Huffman either as of 1999 (Ex. 91, at HM003298) or as of 2006 (Ex. 1464). (Carney, 1672:5–1674:12.) Dr. Huffman's wetlands maps would preclude the development of residential units adjacent to Highway 1 both as of 2000 and 2006. Dr. Josselyn's wetlands maps would likewise preclude the development of residential units adjacent to Highway 1 as of 2000 and 2006. Carney did not adequately explain why he valued the Beachwood Property in its after condition with 19 units; he simply accepted counsel's direction. The court finds no factual basis in the record to support Carney's after condition assumption that 19 units could be built on Beachwood. Gimmy's valuation of Beachwood in the after condition—as open space—is the proper method for valuing Beachwood in its damaged condition. ·

241. Significantly, Carney conceded that, if the highest and best use of Beachwood in the after condition *were* open space, he would *agree with Gimmy's value opinions*—$15,000 per acre as of 2000 and $22,000 per acre as of 2006. (Carney, 1675:14–17; 1676:9–12; 1677:16–20.) Both Gimmy and Carney also gave consideration to the value of the 83 water connections that Yamagiwa possessed. If Beachwood were valued as open space, the 83 water connections would not be needed for the Property and could be sold. As of 2000, both appraisers agreed that there was no market for the water connections. (Gimmy, 1126:9–11; Carney, 1675:22–24.) Gimmy nonetheless assigned the 2000 value of the water connections at their original cost, or $6,970 per water connection. (Ex. 83, at BW001745; Gimmy, 1125:13–1126:24.) Carney opined that the water connections, as of 2000, had "nominal" (i e, zero) value. (Carney, 1675:22–1676:2.) Thus, valuing Beachwood as open space as of 2000 yields the following value calculations by the two appraisers:

*Gimmy 2000:*

| | |
|---|---|
| Land Value @ $15,000/acre | $370,500 |
| *83 water Connections @ $6,970* | $578,500 |
| 2000 After Condition | $949,000 |
| | (rounded to $950,000) |

*Carney 2000:*

| | |
|---|---|
| Land Value @ $15,000/acre | $370,500 |
| *83 water connections @ $0* | 0 |
| 2000 After Condition | $370,500 |

(Gimmy, 1126:3–8; Carney, 1676:9–12.) Thus, adjusting Carney's 2000 after condition per the above, his damage calculation based on open space value for Beachwood in the after condition would be $14,984,500. (Carney, 1676:13–1677:15.)

242. As of 2006, Gimmy valued the 83 water connections at $40,000 per connection. However, while one or two water connections might be sold for that amount per connection, a substantial bulk discount would need to be applied if all 83 water connections were liquidated and sold on the date of value. Gimmy applied a bulk

discount of 50% for the 83 water connections, which equates to a per-connection value of $20,000 per connection. (Gimmy, 1140:25–1141:15.) Carney concluded that the per-connection value of the water connections, even sold in bulk, as of 2006 would be $30,000 per connection. (Carney, 1677:24–1678:2.) Thus, valuing the Beachwood Property as open space as of 2006 yields the following value calculations by the two appraisers:

*Gimmy 2006:*

| | |
|---|---|
| Land Value @ $22,000/acre | $ 543,400 |
| *83 water Connections @ $20,000* | $1,660,000 |
| 2006 After Condition | $2,203,400 |
| | (rounded to $2,205,000) |

*Carney 2006:*

| | |
|---|---|
| Land Value @ $22,000/acre | $ 543,400 |
| *83 water connections @ $30,000* | $2,490.000 |
| 2006 After Condition | $3,033,400 |

(Gimmy, 1141:19–22; Carney 1677:16–1679:4.) Adjusting Carney's 2006 after condition based on the above, his damage calculation based on open space value for Beachwood in the after condition would be $30,996,600. (Carney, 1679:5–11.)

243. Valuing the after condition of Beachwood as open space—the proper assumption based on the evidence—thus narrows the range between the two appraisers as follows:

| | |
|---|---|
| Gimmy 2000 | $19,800,000 |
| Carney 2000 | $14,984,500 |
| Gimmy 2006 | $36,795,000 |
| Carney 2006 | $30,996,600 |

244. The range is explained by the appraisers' different views of the before condition values of Beachwood. Gimmy reached a value of $19–$19.50 per square foot, or $250,000 per lot, as of 2000—a total of $20,750,000 after rounding. (Gimmy, 1115:20–1116:14.) Carney reached a 2000 per lot value of $185,000 or $14.27 per square foot—a total of $15,355,000. (Carney, 1657:9–21; Ex. 1381.) Gimmy reached a value of $35.50–$36.75 per square foot, or $475,000 per lot, as of 2006—a total of $39,000,000 after rounding. (Gimmy, 1135:6–24.) Carney reached a 2006 value of $31.63 per square foot, or $410,000 per lot—a total of

$34,030,000. (Carney, 1665:21–24; Ex. 1502.)

245. The difference in the appraisers' respective before conditions is based on their use of different comparable sales. Gimmy used five comparable sales to reach his 2000 value. (Ex. 873.) All were subdivision sales, located in South San Francisco, Palo Alto and San Jose. (Gimmy gave little weight to the Palo Alto sale because it was in a substantially better location than Beachwood [Gimmy, 1115:20–1116:3].) The median household income for Half Moon Bay exceeded those for South Francisco and San Jose, and the median home values for Half Moon Bay likewise exceeded those for South San Francisco and San Jose. (Ex. 887.) Gimmy visited and photographed each of his comparable sales. (Ex. 872.) He prepared an adjustment grid for the comparable sales that supported his final opinion of value for Beachwood as of 2000. (Ex. 874.)

246. Gimmy used five different comparable sales to reach his 2006 before condition opinion. All were subdivision sales located in San Jose and San Mateo. (Gimmy's 2006 comparable sale # 7 was also used by Carney, as his comparable sale # 2 in valuing the Property as of 2006.) Half Moon Bay's median household income and median home value also exceeded San Mateo's. (Ex. 887.) Gimmy prepared a separate adjustment grid for the 2006 comparable sales to reach his final opinion of value for Beachwood as of 2006. (Ex. 878.)

247. Carney used seven comparable sales to reach his 2000 before condition opinion. One sale was in Half Moon Bay; two were in Santa Cruz; three were in Pacifica; and one was in San Bruno. (Ex. 1368.) Carney was not able to confirm the sales price on the Half Moon Bay sale. He could not determine the actual sales price from either the buyer, the seller, any

sales databases or by the transfer tax stamps which are frequently affixed to grant deeds. (Carney, 1682:9–1683:13.) The best Carney could determine was a "range" between $3.3 and $3.5 million that he learned from the seller—who also told him that the sales price was confidential. (Carney, 1643:12–1644:7; Ex. 1371 at 1371–1.)[12] Carney then used the "average" between this range and decided the sales price was $3.4 million in his adjustment grid. (Ex. 1378 [Sale # 1].) It is somewhat suspect to use a sale when the price cannot be determined and is, in fact, explicitly related to be "confidential."

248. Carney's other comparable sales are very different from Beachwood. The two sales in Santa Cruz are about 1½ hours away from Beachwood (Carney, 1691:13–18; 1692:17–20) and are in a different residential market area (Gimmy, 1101:6–23). The sales in Pacifica were of steeply sloping hillside properties, unlike Beachwood. Photographs of these properties reveal a topography nothing like Beachwood. (Ex. 902–10, 902–11, 902–12 [Carney Sale # 6] [Carney, 1694:2–1695:10]; 902–14, 902–15 [Carney Sale # 7] [Carney 1696:14–1697:9].) The sales prices of such steeply sloping properties would be expected to be far less on a per-lot basis because the per-lot grading costs are far greater than for a relatively flat parcel like Beachwood. (Gimmy, 1180:18–1181:7.) Notwithstanding the dramatic topographic differences between Beachwood and the hillside Pacifica sales, Carney adjudged the properties to be "similar" in infrastructure, the category he used to measure topographic comparability. (Carney, 1698:10–19.)

249. In valuing the before condition as of 2006, Carney used only two sales different from than those he used to value the Property as of 2000. (Carney, 1698:20–1699:6.) He continued to use the steeply sloped Pacifica sales, and continued to adjudge them as topographically "similar" to Beachwood, which they were not.

250. Additionally, Carney did not exercise the degree of care that Gimmy used in putting together his appraisal. Carney misidentified two of his sales on aerial photographs attached to his appraisal report. (Carney 1691:22–1692:9 [Sale # 4]; 1692:21–25 [Sale # 5].) At trial, Carney could not properly identify the location of his Sale # 3, which he testified contained 15 condominium units; he conceded he was "embarrassed" by his inability to identify that property properly. (Carney 1690:17–1691:12.) The court is left to wonder whether Carney actually visited the comparable sales or whether he simply used sales that had been used in previous appraisals. In addition, Carney's failure to photograph any of his comparable sales (Carney, 1681:5–20; 1694:9–10; 1696:22–24; 1700:17–18) is suspect, especially when the ground photographs shown to him on cross-examination revealed properties that looked so different from Beachwood.

251. Evaluating all the evidence, including the comparable sales used by Gimmy and Carney, and the analysis and care reflected in the competing appraisals, the court concludes that Gimmy's before condition values of Beachwood more appropriately reflect the Property's fair market value in its undamaged condition as of 2000 and 2006. Accordingly, the court finds that, using the March 2000 date of value, the total damages are $19,800,000; and using the October 2006 date of value, the total damages are $36,795,000.

252. To the extent that any of these findings of fact should more properly be

---

12. Gimmy was aware of the Half Moon Bay sale but did not use it as a comparable sale because he was unable to determine and confirm the actual sales price. (Gimmy, 1100:11–1101:5, 1180:7–17.)

characterized as conclusions of law, they shall be deemed as such.

## CONCLUSIONS OF LAW

253. This action was filed by Yamagiwa in San Mateo superior court on September 8, 2005. On October 13, 2005, the City removed the action to this court under 28 USC § 1441(b).

### Liability for Inverse Condemnation— The Albers Standard

254. Yamagiwa seeks to recover for inverse condemnation under Art 1 Sec 19 of the California constitution, which provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

■ 255. Inverse condemnation is a constitutional remedy permitting recovery of consequential damages arising from public projects. Foreseeability is not required (*Albers v. County of Los Angeles,* 62 Cal.2d 250, 263–264, 42 Cal.Rptr. 89, 398 P.2d 129 [1965]), and tort concepts like fault or negligence are not applicable; *Bunch v. Coachella Valley Water Dist.,* 15 Cal.4th 432, 436, 63 Cal.Rptr.2d 89, 935 P.2d 796 [1997]; *Marin v. City of San Rafael,* 111 Cal.App.3d 591, 595, 168 Cal. Rptr. 750 [1980]. Instead, the government is *strictly liable* for any physical injury to property substantially caused by a public improvement as deliberately designed and constructed. (*Bunch,* 15 Cal.4th at 440, 63 Cal.Rptr.2d 89, 935 P.2d 796; *Pacific Bell v. City of San Diego,* 81 Cal.App.4th 596, 602, 96 Cal.Rptr.2d 897 [2000]; *Marshall v. Department of Water & Power,* 219 Cal.App.3d 1124, 1139, 268 Cal.Rptr. 559 [1990] ["[A] governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages even if only one of several concurrent causes."].)

■ 256. Yamagiwa must prove four elements to establish liability for inverse condemnation under the *Albers* strict liability standard here: *First,* that she has an interest in real or personal property; *Second,* the City substantially participated in the planning, approval, construction or operation of a public project or public improvement; *Third,* Yamagiwa's property suffered damage; and *Fourth,* the City's project, act or omission was a substantial cause of the damage. (*Imperial Cattle Co. v. Imperial Irrigation Dist.,* 167 Cal. App.3d 263, 269, 213 Cal.Rptr. 622 [1985]; *Wildensten v. East Bay Regional Park Dist.,* 231 Cal.App.3d 976, 979–980, 283 Cal.Rptr. 13 [1991]; *California State Automobile Assoc. Inter–Insurance Bureau v. City of Palo Alto,* 138 Cal.App.4th 474, 480, 41 Cal.Rptr.3d 503 [2006].)

### Ownership

257. As trustee of two family trusts created by Charles J Keenan III and Anne Marie Keenan for their children, Yamagiwa has owned the Beachwood Property since December 10, 1993. (Ex. 567.)

### Public Work

■ 258. For purposes of inverse condemnation, "public use" has been defined broadly as "a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government." (*Frustuck v. City of Fairfax,* 212 Cal.App.2d 345, 358, 28 Cal.Rptr. 357 [1963]; *California State Automobile Assoc.,* 138 Cal.App.4th at 479–80, 41 Cal.Rptr.3d 503.) A drainage system like TAAD meets this test. (*Marin,* 111 Cal.App.3d at 595, 168 Cal.Rptr. 750.)

259. All components of the TAAD project qualify as public works, for multiple reasons.

260. First, the City approved the entire project and ordered that the improvement be done. (Ex. 17.) The City hired

MacKay & Somps ("M & S") to provide engineering services for TAAD on March 16, 1982. (Ex. 69.) Ben White, the Project Engineer for M & S, prepared the plans and specifications for the TAAD project on September 15, 1982 (Ex. 21); the City approved them on June 21, 1983 (Ex. 17, ¶ 6); and its Public Works Director approved and signed the plans (Ex. 21, cover sheet). The City entered into a contract with Bay Cities Paving and Grading to construct the TAAD improvements on August 18, 1983 (Ex. 20).[13] Gary Whelen, the City's Inspection Enforcement Officer, visited the construction site every day during construction and kept a daily construction diary from September 14, 1983 through February 28, 1985. (Exs. 22, 23, and 24.) Finally, the City accepted the TAAD improvements as complete on July 2, 1985. (Ex. 63.)

261. The City also acquired an easement for the storm drain system on Beachwood, including the area of the natural creek 140–150 feet upstream from the 48″ inlet to the southeast corner of the Property. (Ex. 75.) Even a natural creek, when utilized as part of a storm drain system, is a public work. (*Souza v. Silver Development Co.*, 164 Cal.App.3d 165, 170, 210 Cal.Rptr. 146 (1985).) Here, the inlet for the Southern Drain was placed within the flow line of the pre-existing creek, and the creek itself was incorporated into the City's storm drain system. (White, 220:1–13; 222:16–20.) The portion of the creek upstream from the inlet and within the City's easement is therefore a public work.

262. Significantly, the TAAD project was planned and approved pursuant to the Municipal Improvement Act of 1913, Cal Streets & Hwys Code §§ 10000 *et seq.*

(Ex. 14, at 601, ¶ 18; Ex. 17, at HM209807 [2nd "Whereas" clause]; Ex. 20, at HM209357, ¶ 10.) This provides the means to levy an assessment on all properties within the district determined to be especially "benefited" by the project. (Ex. 21, Sheet 1 [Beachwood included in TAAD].) An "improvement" under the Act includes "all work and improvements authorized to be done under this division *which are for a public purpose or which are necessary or incidental to a public purpose.*" (Cal. Streets & Hwys Code § 10002, emphasis added.) Formation of a local assessment district like TAAD *requires* that the work be a public improvement. (*Federal Construction Co. v. Ensign,* 59 Cal.App. 200, 209, 210 P. 536 [1922].)

263. The TAAD project included the grading of both streets and lots in the Highland Park subdivision. (Ex. 21, Sheet 19; Whelen, 90:25–91:16.) The grading of subdivision lots may appropriately be included in a public project under the 1913 Act where "such work is absolutely required in the interest or convenience of the public, *e.g.,* site grading to provide needed fill for construction of public streets, or proper drainage protection for those streets." (39 Atty. Gen. Op. 159 [Opinion 61–90, 1962].) Whelen, on behalf of the City, also spent many days (spread over several months' time) inspecting the contractor's work on the lots. As the City substantially participated in the grading of streets and lots in the Highland Park subdivision, the work qualifies as a public improvement for purposes of inverse condemnation liability.

---

**13.** Any work of improvement contracted for by a public entity is a public work. (Cal. Civ. Code § 3100.) On August 3, 1983 then-City Engineer Ronald Young signed an Extract of Public Works Contract Award, notifying the California Department of Industrial Relations that the TAAD contract constituted a contract to perform public works under Cal. Labor Code § 1777.5. (Ex. 638.)

264. The borrowing of 13,000 cubic yards of dirt from Beachwood also qualifies as a City public work. The City Council approved the borrowing of all 13,000 cubic yards as a Change Order to its contract with Bay Cities. (Ex. 596.) Bay Cities removed the dirt, under its contract with the City. (Whelen, 110:14–18.) When government uses private property to obtain raw materials needed to construct a public project, a sufficient public purpose is shown to justify use of the condemnation power. The public use requirement is satisfied where government is not actually building a public project on the property in question, but is using it to obtain construction materials to build a public project elsewhere. (See, e g, *People ex rel. Dept. of Water Resources v. Andresen*, 193 Cal. App.3d 1144, 238 Cal.Rptr. 826 [1987] [state acquired, by eminent domain, 689–acre parcel for use as a rock quarry in order to obtain raw materials necessary to conduct repairs on nearby dams]; *State of California ex rel. Dept. of Water Resources v. Natomas Company*, 239 Cal. App.2d 547 [1966] [defendant's land—which contained 41 million cubic yards of dredger tailings, suitable for earth fill or making concrete—taken by eminent domain for use in construction of the Oroville Dam elsewhere.]) Here, the borrowing of dirt from Beachwood was likewise part of the City's TAAD public project, as its purpose was to obtain construction materials needed to complete that project.

265. The City substantially participated in the design and construction of the TAAD improvements, and all of the work done by its contractor is a public improvement for purposes of inverse condemnation liability.

### Damage to the Beachwood Property

266. Constitutional damages to property in inverse condemnation cases are damages *"depreciating its market value."* (*Albers*, 62 Cal.2d at 260, 42 Cal. Rptr. 89, 398 P.2d 129, emphasis added.) Both sides' appraisers testified to substantial constitutional damages, concluding that the market value of Beachwood has been massively diminished as a result of the City-caused wetlands. Residential development has been made infeasible; what was once an approved 83–home subdivision is now a wetlands preserve.

267. Any definite physical injury to land or an invasion of it cognizable to the senses, depreciating its market value, is damage in the constitutional sense. (*Albers*, 62 Cal.2d at 260, 42 Cal.Rptr. 89, 398 P.2d 129.) "[D]amage from invasions of water or other liquid effluents often provides the basis for inverse liability." (*Varjabedian v. City of Madera*, 20 Cal.3d 285, 297, 142 Cal.Rptr. 429, 572 P.2d 43 [1977].) The wetlands on Beachwood have clearly damaged Yamagiwa's Property.

268. The City tries to rely on cases where there was no public project. (e.g., *Moerman v. State of California*, 17 Cal.App.4th 452, 21 Cal.Rptr.2d 329 [1993] [no physical taking where roaming tule elk damaged private property].) Without a public improvement or public work, there can be no physical taking or consequent inverse condemnation liability. (*Customer Co. v. City of Sacramento*, 10 Cal.4th 368, 383, 895 P.2d 900 [1995].) Here, of course, there *is a public work*—the TAAD project. Cases in which there was no public project are wholly inapposite.

269. Contrary to the City's contention, the wetlands at issue in this case did not "roam" onto Beachwood and did not—and would not have—grown there on their own. Instead, the City caused the wetlands to develop by its public works project and, as such, is responsible for the ensuing damage.

270. Similarly incorrect is the City's argument that wetland plants on Beachwood have not physically *damaged*

the land because the land just has wetland plants on it. Physical damage to property is not invariably a prerequisite to compensation. (*Varjabedian*, 20 Cal.3d at 296, 142 Cal.Rptr. 429, 572 P.2d 43 [odors emanating from sewage treatment plant sufficient inverse condemnation injury].)

### Substantial Cause

■■■■■ 271. To satisfy the causation requirement, there must be a showing of "a substantial cause-and-effect relationship excluding the possibility that other forces *alone* produced the injury." (*Belair v. Riverside County Flood Control Dist.*, 47 Cal.3d 550, 559, 253 Cal.Rptr. 693, 764 P.2d 1070 [1988]; *California State Automobile Assoc.*, 138 Cal.App.4th at 480–481, 41 Cal.Rptr.3d 503.) Under this standard, the City's public work substantially caused the damage to Beachwood.

■■ 272. The public improvement must be a substantial cause of the damage, not the substantial cause. (*Blau v. City of Los Angeles*, 32 Cal.App.3d 77, 85, 107 Cal.Rptr. 727 [1973].) Thus, "inverse condemnation liability may be established where the public improvement constitutes a substantial *cause of the damage, albeit only one of several concurrent causes.*" (*Belair*, 47 Cal.3d at 559, 253 Cal.Rptr. 693, 764 P.2d 1070 [emphasis added]; *Souza*, 164 Cal.App.3d at 171, 210 Cal.Rptr. 146; *Ingram v. City of Redondo Beach*, 45 Cal.App.3d 628, 633–34, 119 Cal.Rptr. 688 [1975].)

273. As detailed above in the Findings of Fact, the issue of causation was a battle of the experts, primarily Dr. Josselyn and Dr. Huffman. Dr. Josselyn (along with Dr. Weirich) established that the TAAD project caused impoundment of water on Beachwood—both in the street depressions and in "closed-loop" depressions in the center of the Property that did not exist pre-TAAD—which ultimately led to the growth of hydrophytic vegetation.

The TAAD project was a substantial cause of the damage to Yamagiwa's Property.

■■ 274. A public entity that dams the natural surface flows off of private property may be liable in inverse condemnation. (See, e. g., *Conniff v. City and County of San Francisco*, 67 Cal. 45, 49, 7 P. 41 [1885] [embankment restricted surface water flows]; *Weisshand v. City of Petaluma*, 37 Cal.App. 296, 174 P. 955 [1918] [city liable in inverse condemnation for construction of street and supporting embankment which dammed path of surface flow off the property]; *Arreola v. County of Monterey*, 99 Cal.App.4th 722, 753, 122 Cal.Rptr.2d 38 [2002] [State liable in inverse condemnation for Highway 1's role in obstructing the path of floodwaters to the ocean due to undersized culvert under the Highway].)

275. While this case resembles the public entity damming cases, it differs slightly because it involves consequential damage from impounded water, in the form of wetlands that ultimately developed on the Property. Beachwood was vacant *land*, so the occasional ponding of water in depressions on it was neither cause for outrage, nor quantifiable as damages. (*Smart*, 112 Cal.App.3d at 238, 169 Cal. Rptr. 174 [aircraft overflight noise caused no damage to vacant parcel because it did not interfere with owner's actual use of the property until owner attempted to sell it].) Similarly here, standing water on Beachwood did not interfere with Yamagiwa's actual use of the Property.

276. The alternative causes advanced by the City are rejected. The City argued that the damages were caused by everything from disking (as ordered by the Fire District), to unspecified grading by Edward Andreini for the owners (which was shown by the City's own expert David Freyer to have had *no impact* on the areas of Dr. Josselyn's wetlands), to the owner being somehow responsible for not herself

fixing the damage. But there was no proof that any of these proffered alternatives alone produced the injury, which is the applicable causation standard in inverse condemnation. (*Belair*, 47 Cal.3d at 559, 253 Cal.Rptr. 693, 764 P.2d 1070.)

277. The TAAD improvements were clearly a substantial cause of the damage to Beachwood, and Yamagiwa established all elements of her claim for inverse condemnation liability under the *Albers* strict liability standard.

278. Likewise, the City's failure to adopt a plan of maintenance to maintain the storm drain improvements it constructed on Beachwood provides a further basis for imposing inverse condemnation liability. As the owner of an easement over portions of the Beachwood Property, the City (the dominant tenement) had and has the legal duty to maintain and repair the easement to prevent injury to Yamagiwa (the servient tenement). (See, e.g., *McManus v. Sequoyah Land Associates*, 240 Cal.App.2d 348, 356, 49 Cal.Rptr. 592 [1966]; *Colvin v. Southern California Edison Co.*, 194 Cal.App.3d 1306, 1312, 240 Cal.Rptr. 142 [1987]; *Prince v. Pacific Gas & Electric Co.*, 145 Cal.App.4th 289, 297, 51 Cal.Rptr.3d 546 [2006].) Yamagiwa is under no duty to maintain or repair the easement. (*Herzog v. Grosso*, 41 Cal.2d 219, 228, 259 P.2d 429 [1953].)

279. Accordingly, the City had a duty to maintain the Northern, Southern and Western Easements that had been granted to it by Yamagiwa's predecessor. (Ex. 75.) That duty included maintenance of the 140–foot stretch of the Southern Easement upstream from the inlet to the Southern Drain—the area of the creek that was incorporated into the City's storm drain system (White, 220:1–13; 222:16–20), as well as the storm stubs located within the Northern Easement.

280. Here, the Southern Drain *required* a plan of maintenance to function

as designed—i e, to trap debris but still allow stormwater to enter the system. The debris rack cage needed to be cleaned after each storm and even before anticipated heavy storms. (White, 285:3–24.) But the City had *no plan* to maintain the debris rack or the inlet to the 48″ drain, as established by the testimony of Moorhouse (the City's Maintenance Supervisor since 1983 who didn't even know there was a storm drain system on Beachwood) and Nagengast, the City's Public Works Director. (Moorhouse, 187:8–19; Nagengast, 553:24–554:2.). This forms a further basis for inverse condemnation liability insofar as stormwaters that were not able to flow to or into the Southern Drain instead flowed onto the Beachwood Property and collected in the street depressions dug by the City. (*Bauer v. County of Ventura*, 45 Cal.2d 276, 285, 289 P.2d 1 [1955]; *McMahan's of Santa Monica v. City of Santa Monica*, 146 Cal.App.3d 683, 194 Cal.Rptr. 582 [1983].)

### Liability for Inverse Condemnation— The Reasonableness Standard

281. The City has argued that the *Albers* strict liability test should not be applied, but that the court should instead use the "reasonableness" test, which applies in the context of flood control works. The court concludes that the reasonableness test is not the proper test in this case, but even if it were applicable, Yamagiwa has established liability under that standard as well.

282. As determined by the California Supreme Court in *Belair*, 47 Cal.3d at 567, 253 Cal.Rptr. 693, 764 P.2d 1070: "[W]hen a public flood control improvement fails to function as intended, and properties historically subject to flooding are damaged as a proximate result thereof, plaintiff's recovery in inverse condemnation requires proof that the failure was attributable to some unreasonable conduct on the part of the

defendant public entities." The court explained further: "[W]here the public agency's design, construction or maintenance of a flood control project is shown to have posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction or maintenance constituted a substantial cause of the damages, plaintiffs may recover regardless of the fact that the project's purpose is to contain the 'common enemy' of floodwaters." (*Belair*, 47 Cal.3d at 565, 253 Cal.Rptr. 693, 764 P.2d 1070.)

283. In *Locklin v. City of Lafayette*, 7 Cal.4th 327, 345, 27 Cal.Rptr.2d 613, 867 P.2d 724 [1994], the court listed a series of factors to be considered in making the determination of reasonableness:

"(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff." (*Locklin*, 7 Cal.4th at 368–369, 27 Cal.Rptr.2d 613, 867 P.2d 724.)

284. To invoke *Belair's* reasonableness test, three factors must be present: (1) the public work must be a flood control improvement; (2) the flood control improvement must fail to function as intended; and (3) properties historically subject to flooding must be proximately damaged thereby. (*Belair*, 47 Cal.3d at 567, 253 Cal.Rptr. 693, 764 P.2d 1070.) The reasonableness test should not apply in this case for several reasons.

285. First, the TAAD project was not a "flood control improvement." The reasonableness test developed in part to protect government from potentially overwhelming liability that may arise from the failure of a flood control improvement. (*Belair*, 47 Cal.3d at 565, 253 Cal.Rptr. 693, 764 P.2d 1070.) The cases in which the reasonableness test has been applied involved improvements on an entirely different scale from the TAAD project. The flood control work in *Belair* was a levee built to retain the San Jacinto River, with a design capacity of *86,000* cubic feet per second. (*Belair*, 47 Cal.3d at 554, 556, 253 Cal.Rptr. 693, 764 P.2d 1070.) The flood control work in *Arreola v. County of Monterey*, 99 Cal.App.4th 722, 122 Cal.Rptr.2d 38 (2002) was the Pajaro River Levee Project, with a design capacity of *19,000* cubic feet per second. (*Arreola*, 99 Cal.App.4th at 730, 747, 122 Cal.Rptr.2d 38.) The flood control work in *Akins v. State of California*, 61 Cal.App.4th 1, 71 Cal.Rptr.2d 314 (1998) was the Sacramento River Flood Control Project, where the peak flows were measured at *130,000* cubic feet per second at the time of the flood. (*Akins*, 61 Cal. App.4th at 9, 13, 71 Cal.Rptr.2d 314.) By contrast, the peak flow design of the TAAD project was *145 cubic feet per second*, according to White, the project designer. (White, 228:1–23.) The TAAD project is not a "flood control project" at all—it is an ordinary subdivision storm drain system.[14]

---

14. It is true that, pre-TAAD, there was "flooding" in the Grandview Terrace area north of Beachwood. But this was not flooding by the "extraordinary overflow of rivers or streams" (*Locklin*, 7 Cal.4th at 345, 27 Cal.Rptr.2d 613, 867 P.2d 724); it was merely surface run-off that flowed directly to that subdivision. (White, 202:11–203:6.) The fact that a project may alleviate flooding does not necessarily render it a "flood control work." An ordinary curb and gutter in a residential street serves, in part, to collect and carry away

286. Second, the TAAD project was not *functioning* as a flood control work insofar as the damage to Beachwood. The Northern Drain did include an underground storm drain pipe that carried away stormwater from Drainage Area C, the small drainage northeast of Beachwood. But it was the damming effect of the Northern Drain and the fill removed from Bayview Drive that caused water to be impounded on Beachwood. The Northern Drain thus acted as a dam in a similar manner to Highway 1 in *Arreola*. The fact that the flow obstruction here was construction for an underground storm drain pipe rather than a highway is irrelevant: in both cases the flow of water was impounded behind a public work which was not functioning as a flood control work. In both cases, the *Albers* strict liability test should apply, not the reasonableness test.

287. Third, the damage to Beachwood is not flood damage. Rather, it is damage caused by the long-term development of wetlands from impounded direct rainfall and stormwater run-off. The pre-TAAD flows across Beachwood were repeatedly referred to as "surface flows" (White, 202:11–203:6), not "flood waters." Indeed, the City's expert David Freyer made the distinction, testifying that flooding was not involved on Beachwood pre-TAAD, just surface water flows. (Freyer, 1379:11–1380:9.)

288. Fourth, there is no evidence that Beachwood was historically subject to flooding pre-TAAD. To the contrary, the evidence established that surface waters flowed onto *and off of* Beachwood pre-TAAD. Even if the TAAD project were to be construed as a flood control work, the reasonableness test is not properly applied to properties not historically subject to flooding. (*Akins*, 61 Cal.App.4th at 29, 71 Cal.Rptr.2d 314.)

water that would otherwise "flood" the homeowners' yards—but this does not mean that

289. Although the court does not believe that the reasonableness is the proper standard of liability here, it does not change the outcome. Even assuming, *arguendo*, that the reasonableness test applies, the City would still be liable for inverse condemnation.

290. It was unreasonable for the City to:

- place a compacted-fill dam across Beachwood's historic low point, thereby preventing water from exiting Beachwood as it had done pre-TAAD;

- dam the low point without creating a way for surface flows to enter the Northern Drain-such as by the redwood box inlet indicated on Sheet 7 of the TAAD plans;

- prevent surface flows west of the small ridge on Beachwood from reaching the ditch adjacent to Highway 1 where they had been carried away from the Property pre-TAAD;

- dig pits and closed loop depressions on the Property that served as collection points for water—that did not exist pre-TAAD;

- place stockpiled dirt from the TAAD project on Beachwood that caused water to be trapped between and behind the piles;

- borrow dirt from Beachwood by digging down to the clay layer, thereby causing stormwater to stand in the street depressions because it could not infiltrate into the soil regime below;

- dig trenches on Beachwood to drain the standing water and then allowing them to become overgrown with weeds, rendering ineffective;

- fail to have or execute any plan to maintain or keep clear the entrances

every curb and gutter is a "flood control work."

to the storm stubs to the Northern Drain—located within the City's easement area;

- fail to have or execute any plan to maintain the inlet or the debris rack cage within the City's easement near the southeast corner of Beachwood, thereby reducing or eliminating the ability of the inlet to function as designed;

- fail to remove concrete rubble from the creek within the City's easement, which caused stormwater to escape the channel before even reaching the inlet area; and

- refuse to allow Yamagiwa herself to clean out the channel, or clear debris from the inlet, or grade the property to allow more water to reach the storm stubs, when she requested permission to do so.

All of these actions by the City posed an unreasonable risk of harm to Yamagiwa's Property, which ultimately materialized.

291. In contrast, the actions of Yamagiwa and her predecessors were reasonable. There is nothing inherently dangerous about stormwater ponding on vacant undeveloped land that required Yamagiwa to take immediate remedial action. Yamagiwa was forced to await resolution of the sewer capacity shortage before she could develop the Property. (Crowell even tried to obtain approval of a package treatment plant to serve only Beachwood, but the City Council refused.) Yamagiwa proceeded to pay the sewer treatment plant assessments levied by the City, in the principal sum of $962,987.76, beginning in 1996 and continuing through today. Beachwood continued to sit vacant because it could not be developed during the 11 extensions of the sewer moratorium, lasting over seven years. Yamagiwa continued to pay the taxes and insurance on the Property. Yamagiwa disked the Property for weed abatement as ordered by the Fire District.

When the possibility of new wetlands on Beachwood was first raised in 1999, Yamagiwa, with assistance from others, variously attempted to (1) pump standing water off the Property; (2) obtain a permit to clean out the concrete rubble in the channel and the area around the debris rack; and (3) obtain a permit to grade the Property to allow standing water to flow into the Northern Drain. The City stopped the pumping and denied permits for any of the other proposed remedial work.

292. The *Locklin* factors also militate in favor of finding the City liable under the reasonableness test. Those factors are reviewed below.

293. *The overall public purpose being served by the improvement project.* The overall public purpose was to allow for residential development of Highland Park, Beachwood and other adjacent properties. The public purpose was laudable and does not militate in favor of liability.

294. *The degree to which the plaintiff's loss is offset by reciprocal benefits.* Yamagiwa obtained no reciprocal benefits from the TAAD Project. To the contrary, she paid a total of $337,700.72 (principal plus interest) in assessments to pay off the TAAD lien on Beachwood between December 1993 and March 25, 1998. (Ex. 892-01.) She derived no benefit whatsoever from either these payments or the TAAD improvements. This factor militates in favor of liability.

295. *The availability to the public entity of feasible alternatives with lower risks.* Feasible alternatives were available, including: (a) providing temporary drainage to allow water to escape the Property by flowing into the Northern and Western Drains, such as by constructing and maintaining redwood box inlets to the storm stubs; (b) importing dirt from off-site rather than borrowing it from Beachwood when confronted with the dirt shortage in

June 1984; (c) regrading low spots and closed-loop depressions created on Beachwood before accepting the TAAD project as complete; (d) having and following a plan of maintenance for the trenches dug by the City in an effort to allow standing water to flow to the storm stubs; (e) having and following a plan of maintenance to keep the storm stubs within the City's easement open and clear so that stormwater could drain into them; (f) having and following a plan of maintenance to keep the inlet and the debris rack cage atop it near Beachwood's southeast corner free of debris so that it could function as designed; (g) having and following a plan of maintenance to keep the creek channel within the City's easement upstream of the inlet free of debris (such as concrete rubble and logs) so that stormwater could flow to the inlet; and (h) granting permission to the Property owner to pump standing water from the Property, or to clean out the channel and debris rack within the City's easement when the City failed to do so, or to regrade the Property to allow stormwater to flow into the Northern Drain. This factor militates in favor of finding liability.

296. *The severity of the plaintiff's damage in relation to risk-bearing capabilities.* Yamagiwa's damages are severe, as shown by the testimony of both sides' appraisers. If liability is not imposed on the City, Yamagiwa will be required to bear all of the loss herself. Yamagiwa would therefore be called on to contribute more than her proper share to the public undertaking, namely the TAAD project. The City, on the other hand, can spread the risk over all of its residents. It has the ability to raise funds by assessment districts, taxes or bonds. The City also could have obtained liability insurance against the risk of property damage. This factor militates in favor of a finding of liability.

297. *The extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership.* It is not a normal risk of land ownership to acquire land zoned residential and approved with a VTM for 83 residential lots, only thereafter to have wetlands develop throughout the Property, substantially caused by a public project, during a time period when the development could not proceed because of a building moratorium. This factor militates in favor of finding liability.

298. *The degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff.* There is no evidence that any other properties within the Terrace Avenue Assessment District suffered damage similar to the Beachwood Property. To the contrary, residences were constructed throughout the Newport Terrace/Highland Park lots to the south of Beachwood. The damage appears to be peculiar to Yamagiwa. This factor militates in favor of finding liability.

299. On balance, reviewing all of the *Locklin* factors under the evidence adduced at trial clearly militates in favor of imposing liability on the City. Assuming that the reasonableness test is the proper standard here, Yamagiwa has proven that the City's actions were unreasonable were a substantial cause of her damages. The City is therefore liable for inverse condemnation under both the *Belair/Locklin* reasonableness test and the *Albers* strict liability standard.

### Liability for Inverse Condemnation— Federal Takings

300. For substantially the same reasons, Yamagiwa prevails on her federal inverse condemnation claim, under the Fifth Amendment of the United States Constitution, which provides as follows: " * * * nor shall private property be taken

for public use without just compensation." The Takings Clause is applicable to the States through the Fourteenth Amendment. *Dolan v. City of Tigard,* 512 U.S. 374, 383, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). The Takings Clause "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)) (internal quotation marks and brackets omitted).

 301. It is not necessary that the City actually take physical possession of the Property to find a Fifth Amendment taking. "A taking can occur simply when the Government by its action deprives the owner of all or most of his interest in his property. * * * [I]t is the loss to the owner of the property and not the accretion to the Government which is controlling in fifth amendment cases." *Aris Gloves, Inc. v. United States,* 190 Ct.Cl. 367, 420 F.2d 1386, 1391 (1970) (citing *United States v. Causby,* 328 U.S. 256, 261, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)).

302. The Supreme Court, early on, interpreted this constitutional language in *Pumpelly v. Green Bay Co.,* 13 Wall. 166, 80 U.S. 166, 20 L.Ed. 557 (1871), wherein plaintiff's land was inundated after government construction of a dam on the Fox River caused Winnebago Lake to rise and overflow. In rejecting the government's argument that the land had not been "taken," the Supreme Court stated:

> It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the com-

mendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury *178 to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good/ which had no warrant in the laws or practices of our ancestors.

*Pumpelly,* 80 U.S. at 177–78, 80 U.S. 166. The Court concluded:

> [W]here real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution, * * *.

*Pumpelly,* 80 U.S. at 181, 13 Wall. 166.

303. The court notes that the Supreme Court was actually interpreting the takings clause of the Wisconsin Constitution on Pumpelly because the Fifth Amendment had not yet been made applicable to the States. But the Supreme Court stressed that the state constitutional language was practically identical to the Fifth Amendment restriction, and the provision was "so essentially a part of American constitutional law that it is believed that no

state is now without it." *Pumpelly*, at 176–77, 13 Wall. 166. Subsequently, the Supreme Court treated its *Pumpelly* opinion as equally applicable to the Fifth Amendment in. *United States v. Lynah*, 188 U.S. 445, 468–71, 23 S.Ct. 349, 47 L.Ed. 539 (1903), overruled-in-part by *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 312 U.S. 592, 598, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064 (1941).

304. *Lynah* arose after the United States government built a dam across the Savannah River, causing water to back up and flood adjacent property that had been used to grow rice. The flooding turned what had been a valuable rice field into "an irreclaimable bog." *Lynah*, at 469, 23 S.Ct. 349. The Supreme Court found a taking, stating:

> [W]here the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the 5th Amendment. while the government does not directly proceed to appropriate the title, yet it takes away the use and value; when that is done it is of little consequence in whom the fee may be vested. Of course, it results from this that the proceeding must be regarded as an actual appropriation of the land, including the possession, the right of possession, and the fee; and when the amount awarded as compensation is paid, the title, the fee, with whatever rights may attach thereto-in this case those at least which belong to a riparian proprietor-pass to the government and it becomes henceforth the full owner.

*Lynah*, at 470–71, 23 S.Ct. 349.

305. Similarly, in *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), the Supreme Court held that intermittent flooding of private land can constitute a taking of an easement,

stating, "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." *Dickinson*, at 748, 67 S.Ct. 1382.

306. Most of the cases analyzing federal physical takings liability arise under the Tucker Act, 28 USC § 1491(a), which provides for jurisdiction in the Court of Federal Claims for takings actions against the United States. Here, Yamagiwa properly brings her takings claim under the Fifth Amendment of the United States Constitution, not the Tucker Act, because her claim is not against the United States. Nonetheless, given the scarcity of caselaw on Fifth Amendment physical takings claims against the States and state entities, the court looks to the Tucker Act cases for guidance.

307. The Tucker Act cases impose a foreseeability requirement that is not required under Yamagiwa's state inverse condemnation claim. *Albers v. County of Los Angeles*, 62 Cal.2d 250, 263–64, 42 Cal.Rptr. 89, 398 P.2d 129 (1965) (any actual physical injury to real property caused by the public project is compensable "whether foreseeable or not"). The most recent statement of the federal standard for inverse condemnation was stated by the Federal Circuit in *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed.Cir. 2003), wherein plaintiff owned a shopping center adjacent to property on which the United States built a post office. Plaintiff claimed that the government's project caused more surface run-off to flow to plaintiff's property, requiring construction of larger detention facilities. Plaintiff alleged that the government had taken a flowage easement across its property. The Court of Federal Claim rejected plaintiff's claim because there was not "perma-

nent and exclusive occupation" of the property. *Ridge Line,* 346 F.3d at 1352. The Federal Circuit reversed finding that permanent and continuous physical occupation was not required to establish a taking. *Id.*

■ 308. To establish a constitutional taking under the *Ridge Line* test, Yamagiwa must prove two factors, each having two alternatives:

(1) (A) the City intended to invade a protected property interest; *or*

(B) the asserted invasion was the direct, natural or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action;

-AND-

(2) (A) the invasion must appropriate a benefit to the City at the expense of the property owner; *or*

(B) the invasion must at least preempt the owner's right to enjoy the property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Ridge Line, Inc. v. United States,* 346 F.3d 1346, 1355–56 (Fed.Cir.2003). Once a taking is shown, Yamagiwa must prove that the City's actions appropriated a legally protected property interest under state law. *Id.* at 1357–58.

### Prong 1: Foreseeability

309. Yamagiwa does not claim that the City acted with specific intent to create wetlands on Beachwood when it constructed the TAAD project. Accordingly, Prong 1(A) is not applicable.

■ 310. Prong 1(B) does not require such specific intent. Rather, the analysis is based on objective foreseeability, i.e., whether the damage was the "direct, natural, or probable result" of the City's project. *Hansen v. United States,* 65 Fed Cl 76 (Fed Cl 2005).

311. As shown above, the City's TAAD project transformed the topography of Beachwood from a gently sloping property to one that allowed for the collection and retention of water in closed-loop depressions and partially cut streets. See supra ¶¶ 73–80. Additionally, although the City knew in advance that its storm drain systems required a plan of maintenance, the City never developed such a plan for the TAAD improvements. See, supra ¶¶ 81–87. When the City first claimed that there were potential wetlands on the Property, it refused all efforts by the Property owner to mitigate or reduce the wetlands. See supra ¶¶ 217–222. In short, the City's projects set in motion a chain of events that ultimately and foreseeably resulted in the formation of wetlands on Beachwood.

312. In addition, Dr. Josselyn testified that he has created manmade wetlands using exactly the technique used by the City here—excavating down to the clay layer of the soil to prevent infiltration, thereby allowing the development of hydrophytic vegetation. See supra ¶¶ 162–163, 167. "If engineers had studied the question in advance they would, we suppose, have predicted what occurred." *Ridge Line* at 1357 (quoting *Cotton Land Co. v. United States,* 109 Ct.Cl. 816, 75 F.Supp. 232, 233 (Ct.Cl.1948)).

313. Sufficient foreseeability is established under Prong 1(B) of *Ridge Line.*

### Prong 2: Substantial Injury

■ 314. As discussed above, the City-caused wetlands have preempted Yamagiwa's right to enjoy the Property for an extended period of time. Residential development is infeasible, and the Property has been transformed into a wetlands preserve. See supra ¶¶ 159, 216, 266. Accordingly, substantial injury is established under Prong 2(B) of *Ridge Line.*

### Property Interest

315. Under *Ridge Line*, once a taking has been established, the landowner must show appropriation of a legally protected property interest under state law. See also *Northwest Louisiana Fish & Game Preserve Commission v. United States*, 446 F.3d 1285, 1289 (Fed.Cir.2006) ("A taking occurs when governmental action deprives the owner of all or most of its property interest.")

316. Yamagiwa owns the Beachwood Property in fee. See supra SI. 257. Her fee title gives her the right to use the Property (Cal. Civ. Code § 3479), free from uncompensated government-induced damage (Cal. Const. Art. 1, Sec. 19). The City has interfered with Yamagiwa's right to use the Beachwood Property.

### Damages

317. Yamagiwa's damages under her federal inverse condemnation claim are the same as under her state inverse condemnation claim—the difference between the fair market value of the Property before and after the taking. See e g, *Bassett v. United States*, 55 Fed Cl 63, 69 (Fed Cl 2002) ("Restoring the deprived property owner's pre-taking financial position involves compensating the property owner for the fair market value of the property lost as a result of the taking. * * * A property owner is entitled to have the fair market value of his property determined by his property's highest and best use before the taking.")

318. Accordingly, the analysis of damages under Yamagiwa's federal inverse condemnation claim is the same as that under her state claim. See supra ¶¶ 235–251.

319. Finally, the court notes that, even if Yamagiwa had failed to prove her federal takings claim, the court in its discretion could retain supplemental jurisdiction over Yamagiwa's state law claims. See *Albingia Versicherungs AG v. Schenker Intern.,*

*Inc.*, 344 F.3d 931, 938–39 (9th Cir.2003) ("Supplemental jurisdiction is not destroyed by elimination of the basis for original jurisdiction")/ amended on other grounds *Albingia Versicherungs AG v. Schenker Intern., Inc.*, 350 F.3d 916. Here, the case has been fully litigated and proceeded to trial before this court. Accordingly, even if Yamagiwa's federal claim were to drop out—which it does not—the court would not remand the case as urged by the City, Doc. # 207, and the ruling on damages would stand.

### Liability for Nuisance

320. Under Cal. Civil Code § 3479, "Anything which is * * * an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, * * * is a nuisance."

321. Applicable here, the elements of Yamagiwa's claim for nuisance are: (1) Yamagiwa owns the Beachwood Property; (2) the City created a condition that is an obstruction to the free use of the Beachwood Property, so as to interfere with the comfortable enjoyment of that Property; (3) the condition has interfered with Yamagiwa's use or enjoyment of the Beachwood Property; (4) Yamagiwa did not consent to the City's conduct; (5) an ordinary person would be reasonably annoyed or disturbed by the City's conduct; (6) Yamagiwa was harmed; (7) the City's conduct was a substantial factor in causing Yamagiwa's harm; and (8) the seriousness of the harm outweighs the public benefit of the City's conduct. (California Jury Instructions—Civil ["CACI"] 2021.)

322. Elements (1), (2), (3), (6) and (7) have already been sufficiently discussed in the context of Yamagiwa's inverse condemnation claim. Element (4)—consent—is discussed below under the discussion of City defenses; the same analysis applies here.

 323. The law of nuisance does not compensate for every interference with the use of property—the interference must be both substantial (Element (5)) and *unreasonable* (Element (8)). (*San Diego Gas & Electric Co. v. Superior Court*, 13 Cal.4th 893, 938, 55 Cal.Rptr.2d 724, 920 P.2d 669 [1996].)

 324. Yamagiwa has proven Element (5)—that an ordinary person "would be reasonably annoyed or disturbed by the City's conduct." The evidence establishes that Yamagiwa acquired Beachwood after the City had approved a VTM for 83 residential lots. The development could not go forward because the City had adopted a sewer moratorium and refused to reserve sewer connections until the building permit stage. During the lengthy period of forced delay, new wetlands developed on Beachwood that did not exist when the City approved the VTM, which wetlands were substantially caused by the construction of the City's TAAD project. The forced delay was resolved, in part, by an assessment lien of nearly $1 million placed on the Beachwood Property to help pay for the City's share of the sewer treatment plant expansion, which took 10 years from approval to completion. Once the authority to issue CDPs had passed to the City in 1996, the City denied the Beachwood CDP in 2000, based on the presence of new wetlands on the Property that were substantially caused by the City's own conduct. Any ordinary person would be annoyed and disturbed by the City's conduct in this case.

325. Yamagiwa has also proven Element (8). "The standard is objective: the question is not whether the particular plaintiff found the invasion unreasonable, but whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable." (*San Diego Gas & Electric*, 13 Cal.4th at 938, 55 Cal.Rptr.2d 724, 920 P.2d 669.) Applying this standard here shows that the interference with Yamagiwa's free use and enjoyment of her Property was objectively unreasonable. The City had zoned Beachwood for single family residential development since at least 1985. (Ex. 578.) It approved a VTM for 83 residential lots in 1990. Then it forestalled the development by imposing a sewer moratorium which lasted over seven years. Once the moratorium was lifted, the development could not proceed because new wetlands—caused by the City's construction and failure to maintain its own public project—had developed on the Property. In short, the City created a wetlands preserve on Beachwood and then foisted the problem off on Yamagiwa. The invasion and interference with Yamagiwa's use and enjoyment of Beachwood is objectively unreasonable.

326. To the extent the City asserts a statutory defense under Cal. Civ. Code § 3482, it has failed to establish that the defense is applicable here. Section 3482 provides that "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." Section 3482 has been narrowly construed; it only provides a defense when "the acts complained of are authorized by the *express terms* of the statute under which the justification is made." *Varjabedian v. City of Madera*, 20 Cal.3d 285, 291, 142 Cal.Rptr. 429, 572 P.2d 43 (1977). There is no statute that expressly permits the City to create wetlands on private property, so section 3482 provides no defense here.

327. The City is liable for creating a nuisance.

### Liability for Trespass

328. Applicable here, the elements of Yamagiwa's claim for trespass are: (1) Yamagiwa is the current owner of Beachwood; (2) the City intentionally, recklessly

or negligently caused stormwater to enter the Beachwood Property; (3) Yamagiwa did not give permission for the entry; (4) Yamagiwa was harmed; and (5) the City's conduct was a substantial factor in causing Yamagiwa's harm. (CACI 2000.)

329. Elements (1), (4), and (5) are sufficiently discussed above in connection with the inverse condemnation claim, and Element (3) is discussed below under consent.

330. Yamagiwa proved Element (2) by evidence that (a) at least 50% of the stormwater that entered Beachwood's southeast corner from Drainage B did not make its way to or into the inlet to the Southern Drain; and (b) stormwater from the northern end of Golden Gate Avenue flowed directly onto Beachwood from the City's street. (Weirich 911:3–19; 889:11–890:8.) A trespass may be on the surface of the land, above it, or below it (*Martin Marietta Corp. v. Insurance Co. of North America*, 40 Cal.App.4th 1113, 1132, 47 Cal.Rptr.2d 670 [1995]), and trespasses may be committed by consequential and indirect injuries as well as by direct and forcible injuries. (*Gallin v. Poulou*, 140 Cal.App.2d 638, 641, 295 P.2d 958 [1956].)

331. Here, the unwanted stormwater that invaded Beachwood contributed to the formation of unwanted wetlands on the Property. The City is therefore liable for trespass.

### Equitable Relief Under Furey

332. Yamagiwa's Fourth Cause of Action seeks relief from assessments pursuant to the California Supreme Court's decision in *Furey v. City of Sacramento*, 24 Cal.3d 862, 157 Cal.Rptr. 684, 598 P.2d 844 (1979), which created an equitable remedy for taxpayers who are included in a special assessment district but are later prevented by government action from realizing the benefits of their payments. (*Furey*, 24 Cal.3d at 873, 157 Cal.Rptr. 684, 598 P.2d 844.)

333. Yamagiwa has paid a total of $1,681,338.62 for Beachwood's contribution to the special assessment districts for TAAD, for the sewer treatment plant expansion and for the Highway 1 improvements. The breakdown is: $337,700.72 (principal and interest) paid for the TAAD assessments; $974,589.90 (principal and interest) paid for the sewer treatment plant expansion assessment district, through March 30, 2007; and $369,048 paid for the Highway 1 improvements. (Ex. 892–01.) The TAAD assessments were paid off in 1998.

334. The sewer treatment plant expansion assessments, pursuant to Sanitary Sewer Project 1994–1, have been paid since 1996, and 14 years of payments remain. (Yamagiwa, 1188:11–21.) Beachwood was initially assessed nearly 1/12 of the City's share (i e, $962,987.76 out of a total of $12,635,327.22). The sewage treatment plant expansion was completed on November 22, 1999 and provided 1 million gallons per day of additional treatment capacity, thereby benefitting numerous owners of previously undeveloped property in Half Moon Bay. (Ex. 351, at 9500250, ¶ 3; Ex. 663, at 1406379.) But the Beachwood Property has not, and will not, produce any sewage to be treated because, due to the City-caused wetlands, residential development is infeasible. This is precisely the situation faced by the Court in *Furey*.

335. Under *Furey*, Yamagiwa cannot compel the City to provide a refund for assessment payments. (*Furey*, 24 Cal.3d at 874, 157 Cal.Rptr. 684, 598 P.2d 844.) Hence, Yamagiwa is not entitled to a refund of amounts she previously paid on the TAAD assessments, the sewer treatment plant assessments or the Highway 1 improvements. In its prior ruling on summary judgment, the court ruled that Yam-

agiwa was entitled to pursue equitable relief. (Doc. # 101 [MSJ Order], at 33.)

336. Under the gross inequities that appear here, Yamagiwa is entitled to equitable relief in the form of an injunction preventing the City from collecting future installments for the sewer treatment plant expansion. That project provided absolutely no benefit to Yamagiwa, and it is inequitable to require continued payments.

337. Notwithstanding the court's previous ruling on summary judgment, the City continues to argue that Yamagiwa cannot seek equitable relief under *Furey* because: (1) she did not request such relief in her Complaint; (2) she is collaterally estopped from doing so based on the California Court of Appeal's decision; and (3) she failed to exhaust her administrative remedies before seeking this relief. (Doc. # 182 [Motion for Judgment], at 15–16.) None of these arguments has merit.

338. The City stipulated in the Joint Pretrial Conference Statement that one of the issues for trial was whether Yamagiwa is entitled to equitable relief on the claim for refund of assessments. (Doc. # 112, p 2.) Having stipulated that it is an issue for trial, the City cannot now argue that it is not. In addition, the court specifically allowed Yamagiwa to pursue her claim for equitable relief in its March 19, 2007 Order on the cross-motions for summary judgment.

339. The City's collateral estoppel argument is clearly disproven by the California Court of Appeal's decision, which expressly allowed Yamagiwa to pursue her *Furey* claim. (Ex. 445, p. 17, n. 13.)

340. The City's argument that Yamagiwa, by not asking for a refund, failed to exhaust her administrative remedies, is factually and legally flawed. In *Furey*, one of two plaintiffs (Webber) did not submit a written request to the City of Sacramento for a reassessment, but the California Supreme Court allowed Webber's claim to go forward, thereby demonstrating that filing a written request for a reassessment is not required before invoking the equitable remedy of *Furey*. Further, the City Council recognized in its March 21, 2000 agenda report that "[a]ny City action to reduce the number of residential lots which may now be developed could require refunding of the portion of the previous payments made by the applicant for residential development which would no longer be permitted." (Ex. 177, at 6314–6315.) Finally, even if Yamagiwa did have some obligation to exhaust administrative remedies prior to pursuing her *Furey* claim, it is well established that a plaintiff need not exhaust administrative remedies if the effort to do so would be futile. (*Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 [9th Cir.1996]; *Twain Harte Associates, Ltd. v. County of Tuolumne*, 217 Cal.App.3d 71, 89–90, 265 Cal.Rptr. 737 [1990]; *Ogo Associates v. City of Torrance*, 37 Cal.App.3d 830, 834, 112 Cal.Rptr. 761 [1974].) The lengthy litigation history between the parties proves that the City would not have voluntarily granted any injunctive relief under *Furey* if Yamagiwa had merely asked. The court will not deny Yamagiwa injunctive relief simply because she did not take the patently futile step of asking the City to cancel the sewer assessments on Beachwood.

341. Accordingly, Yamagiwa is entitled to issuance of a permanent injunction as follows:

(1) the City (or any other person or entity acting as a collection agent for the City) shall be permanently enjoined from collecting from Yamagiwa any future payments due for Sanitary Sewer Project 1994–1 applicable to Beachwood, San Mateo County Assessor's Parcel No. 048–280–020, beginning with the payment due by December 10, 2007. (Such payments appear on the Beachwood

property tax bills as "HMB Swr Tr. plant B.")

(2) the City (or any other person or entity acting on behalf of the City) shall be permanently enjoined from taking any action against Yamagiwa or the Beachwood Property, including but not limited to initiating collection activities or foreclosure proceedings, for her failure to pay any such future sewer assessments. And,

(3) the City shall advise the San Mateo County Tax Collector in writing (with a copy to Yamagiwa) of the injunctive relief granted herein.

This injunctive relief shall begin with the property tax installment payment due on December 10, 2007, and shall remain in effect until the monetary judgment herein against the City is satisfied in full. Once the monetary judgment is satisfied in full, Yamagiwa shall execute a grant deed for the Beachwood Property to the City, and the City shall accept and record the deed for the Beachwood Property, free of cost to Yamagiwa. Once title to Beachwood has transferred to the City, the injunctive relief to Yamagiwa afforded under *Furey* will no longer be necessary, and shall terminate without further order of the court. The court shall reserve jurisdiction to enforce or handle any issues associated with the injunctive relief granted.

### City Has Failed to Establish Its Defenses

342. The City's primary defense regards the factual question whether wetlands on Beachwood pre-dated TAAD, an issue that favors Yamagiwa, not the City. But the City has also raised a few other matters of a defensive nature that deserve brief consideration.

### Consent

343. The City again argues that "consent" is a defense to Yamagiwa's inverse condemnation and tort claims. Because Yamagiwa and her predecessors never consented to the development and spreading of wetlands over the Beachwood property, this defense fails.

344. The California Supreme Court addressed this precise issue in *Albers,* 62 Cal.2d 250, 264, 42 Cal.Rptr. 89, 398 P.2d 129. The developers there consented to placement of fill within and outside of the easements they voluntarily granted to Los Angeles County to extend Crenshaw Boulevard. The county contended the developers were barred from recovery because they had consented to the public project and, indeed, had donated the property necessary for the road. The California Supreme Court rejected the consent argument. While the developers consented to the construction of a road, they never consented to the massive landslide—which was not a "natural, necessary and reasonable incident" of the road construction. (*Albers,* 62 Cal.2d at 266, 42 Cal.Rptr. 89, 398 P.2d 129.)

345. Similarly here, it may well be that one of Yamagiwa's predecessors (the William Lyon Company) donated the easement to the City in 1982 (Ex. 75) and favored the development of a storm drain system—exactly as the developers in *Albers* donated the easement and favored the extension of the road. But the City presented no evidence that Yamagiwa or her predecessors ever consented to the *development of wetlands on Beachwood* (just as the *Albers* developers did not consent to the creation of the landslide on their property). The "consent" defense therefore fails.

██ 346. The same rule controls on the consent defense as to Yamagiwa's claims for nuisance and trespass. As with the inverse condemnation claim, consent may be a defense to trespass and nuisance, but the applicability of the defense turns

on the consent. See *Mangini v. Aerojet–General Corp.*, 230 Cal.App.3d 1125, 1140–41, 281 Cal.Rptr. 827 (1991). There is no evidence that Yamagiwa or any predecessor owners of Beachwood consented to wetlands being created on the Property by construction of the TAAD improvements. Yamagiwa therefore established that neither she nor any prior owner consented to the nuisance or trespass.

### Statute of Limitations

347. The City contends that Yamagiwa's claim is barred by the 3– or 5–year statute of limitations. (Cal. Code Civ. Proc. §§ 318, 319, 338.) The court previously rejected the City's statute of limitations defense in detail on cross-motions for summary judgment. (Doc. # 101, pp. 15–21.) The evidence adduced at trial does not change the court's prior ruling on this defense.

348. The parties stipulated that any statute of limitations defense would be evaluated as if this action had been filed on May 17, 2000, which was the date Yamagiwa filed her original state court action. That action was dismissed without prejudice on March 27, 2003, with the City's stipulation, due to developments up to that time in the state court litigation. (Ex. 443, p. 2, ¶ 2(a).)

349. Where, as here, alleged damage to private property results from a "continuous process of physical events," rather than a single event, the law provides that a claim accrues when the taking has "stabilized." The stabilization approach derives from *United States v. Dickinson*, 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), and is followed by California courts as well. (*Pierpont Inn, Inc. v. State of California*, 70 Cal.2d 282, 291–293, 74 Cal.Rptr. 521, 449 P.2d 737 [1969].)

350. While a plaintiff cannot wait until *all* damages have been suffered and the progressive loss has ceased, the extent of the damages must still be reasonably foreseeable—meaning that "a little damage" is not enough. (See, e.g., *Forsgren v. United States*, 64 Fed.Cl. 456, 459 [2005] [denying dismissal on statute of limitations grounds: "[S]imply foreseeing the damage is not the test for accrual. Instead, accrual occurs when Plaintiffs should have reasonably foreseen the extent of the damage to their property."].)

351. Here, the City's denial of the CDP was the manifestation of constitutional damages caused by the City's public project. Constitutional damages to property in inverse condemnation are damages "*depreciating its market value.*" (*Albers*, 62 Cal.2d at 260, 42 Cal.Rptr. 89, 398 P.2d 129, emphasis added.) Indeed, up until the time the City denied the CDP on May 2, 2000, any physical taking case brought by Yamagiwa would have been premature, because she had not yet suffered any such damages. Damages are a required element of a physical taking claim. "Actions for the taking and damaging of private property * * * are subject to the rule that proof of damage is an essential part of the plaintiff's case." *Frustuck v. City of Fairfax*, 212 Cal.App.2d 345, 368, 28 Cal.Rptr. 357 [1963]. See also *Blau v. City of Los Angeles*, 32 Cal.App.3d 77, 107 Cal.Rptr. 727 (1973) (public project constructed in 1937 but no damages suffered until 1966); *Smith v. County of Los Angeles*, 214 Cal.App.3d 266, 262 Cal.Rptr. 754 (1989) (County road project constructed in the 1930s, but no damages suffered until 50 years later). Federal courts follow the same rule. (*Northwest Louisiana Fish & Game Preserve Commission v. United States*, 446 F.3d 1285, 1291 [Fed.Cir.2006] ["[A] claim does not accrue until the claimant suffers damage."].) In *Northwest*, the statute of limitations due to damage caused by the growth of hydrilla weeds was not triggered until the Army Corps notified the state that it would not permit

a drawdown of the lake in order for the weeds to be removed. (446 F.3d at 1289, 1291.)

352. Yamagiwa suffered no damages until, at the earliest, May 2, 2000, when governmental action impeded her right to use the Property. Her action for a physical taking was filed just 15 days later, on Hay 17, 2000. Accordingly, the statute of limitations defense fails.

### Mitigation of Damages

353. The City repeatedly tried to suggest throughout trial that Yamagiwa or her predecessors failed to mitigate damages. The evidence does not support this claim.

354. The City has not shown that Yamagiwa failed to take reasonable steps to minimize her loss. To the contrary, every effort undertaken by or on behalf of Yamagiwa was expressly *rejected* by the City. When Crowell attempted to pump standing water from Beachwood shortly after Gideon wrote the first letter report to Lamphier announcing potential new wetlands on Beachwood, the City promptly called the police as well as numerous state and federal agencies to put an immediate halt to the pumping. (Ex. 156; Lamphier, 596:4–21; Crowell, 727:19–728:17.) When Yamagiwa asked the City to issue a permit to allow *her* to conduct maintenance within the City's easement—maintenance which was the *City's* legal obligation, as noted above—the City refused to issue the permit. (Ex. 756; Crowell, 728:24–731:7.) Likewise, when Crowell submitted a Ditch Maintenance Plan to the City, seeking permission to regrade the Property to fill certain low spots and allow stormwater to flow into the Northern Drain, the City refused to permit this work as well. (Ex. 1161; Crowell, 731:8–732:5.)

355. To the extent the City claims that Yamagiwa had a duty to fill the street depressions that had been cut by the City's contractor beginning in July 1984, that is not "mitigation." No case holds that a property owner has the duty to undo a public work, or that the failure to do so eliminates the constitutional protection guaranteed to property owners by Art 1 Sec 19. Indeed, if that were the law, no landowner could ever recover damages for inverse condemnation, as the public entity could simply blame the owner for the owner's failure to fix the mess created by the public project. That is precisely the essence of the City's misguided argument here.

356. There is no evidence that Yamagiwa failed to take reasonable steps to reduce her damages; rather, her attempts to do so were thwarted by the City itself.

### The Bolsa Chica Decision

357. The City has argued in several submissions to the court that the legal framework within which the City was operating was different when it issued the VTM to Beachwood in 1990 than when it denied the CDP to Beachwood in 2000 because of the decision in *Bolsa Chica v. Superior Court of San Diego County*, 71 Cal.App.4th 493, 83 Cal.Rptr.2d 850 (1999). The law and the evidence do not support the City's assertion.

358. First and foremost, the *Bolsa Chica* decision did not "change" the law. The California Coastal Act (Pub Res Code §§ 30000 et seq), enacted in 1976, provides for the protection of wetlands in California's coastal zone. The relevant section of the Coastal Act provides that "[t]he disking, filling, or dredging of * * * wetlands * * * shall be permitted * * * where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize environmental effects * * *."— but *only for a limited set of enumerated activities.* (Cal. Pub. Res. Code § 30233(a).) Notably, the list of permissible uses in wetland areas set forth in

Section 30233(a) *does not* include residential development. This restriction on the residential development on wetlands has existed—and has not changed—since the Coastal Act's adoption in 1976. As such, well before the *Bolsa Chica* decision and well before the City issued the VTM for Beachwood in 1990, section 30233, by its terms, prohibited residential development in wetlands. And the statutory proscription was not unknown to the City; the City's 1985 certified Land Use Plan explicitly quoted section 30233. (Ex. 136, at HM000735.)

359. In *Bolsa Chica*, the California Coastal Commission ("CCC") had approved a Local Coastal Program that included residential development of a wetland area in the Bolsa Chica lowlands in Orange County. In doing so, CCC relied on its "Interpretive Guidelines on Wetlands and Other Environmentally Sensitive Habitat Areas" ("Guidelines") adopted on February 4, 1981. The Court of Appeal upheld the trial court's overturning of the CCC's approval of the residential development. (*Bolsa Chica*, 71 Cal.App.4th at 510–17, 83 Cal.Rptr.2d 850.) The Court of Appeal rejected CCC's reliance on the Guidelines to approve the residential development, finding that it was contrary to the clear mandate of the statute *prohibiting* residential development of wetland areas. (*Bolsa Chica*, 71 Cal.App.4th at 513, 517, 83 Cal.Rptr.2d 850.) The Court of Appeal stated that "by its terms section 30233, subdivision (a), purports to set forth the purposes, in their entirety, for which coastal wetlands can be developed." (*Bolsa Chica*, 71 Cal.App.4th at 512, 83 Cal. Rptr.2d 850.) The Court of Appeal thus concluded that the absolute prohibition against residential development in wetland areas was "supported by the plain language of the statute." (*Bolsa Chica*, 71 Cal.App.4th at 513–14, 83 Cal.Rptr.2d 850.)

360. As such, the *Bolsa Chica* decision did not "change" the law; it simply interpreted and applied the long-existing statutory language in section 30233 restricting residential development in wetland areas. (See, e.g., *Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564, 1570 (Fed.Cir.1993) (discussing Supreme Court's interpretation of a statute, stating "[I]t is fundamental jurisprudence that the Act's *objective* meaning and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the operative effect.") (emphasis in original.))

361. Moreover, the contention that the *Bolsa Chica* case changed the law is contrary to the evidence in this case. Yamagiwa's wetlands expert, Dr. Josselyn, testified on cross-examination that "private developers could never fill wetlands and mitigate for them." (Josselyn, 1047:12–1049:2.) Dr. Huffman, the City's wetlands expert, testified to the contrary-that before *Bolsa Chica* it was possible to get a CDP for residential development if the mitigation was adequate and the impacts were low. (Huffman, 1435:24–1436:25.) Dr. Huffman's testimony is contrary to the CCC's characterizations of its own practices. In a staff memorandum dated April 20, 2000, recommending rescission of the Guidelines, the CCC's general counsel Ralph Faust explained that the Guidelines had not been relied on by the Commission "with the exception of the *Bolsa Chica* case" and that, in the *Bolsa Chica* case, the CCC "departed from its historic and consistent practice by giving an overly expansive interpretation to the Wetland Guidelines with regard to development of the Bolsa Chica lowlands." (Ex. 750 at 6100124.) Thus, the evidence shows that the CCC itself characterized its interpretation of the statute in *Bolsa Chica* as a deviation from its application of the Coastal Act.

362. Further, the evidence establishes that the City's attempt to rely on *Bolsa Chica* is an after-the-fact contrivance. When denying Beachwood the CDP in 2000, the City *never mentioned* in its lengthy resolution that the denial was required by a supposed "change in law" brought by the *Bolsa Chica* decision. Instead, the City found that *new* wetlands had developed on the Property since the approval of the VTM in 1990. (Ex. 179 at 9282 ["the extent of wetlands on the site is greater than was determined at the time the VTM was approved" and there were "nine new wetlands areas" on Beachwood].) The City's after-the-fact attempt to rewrite the reasons for its denial of the Beachwood CDP is rejected.

### Federal Subject Matter Jurisdiction

363. Lastly, over two years after removing the case, and following completion of trial and post-trial briefing, the City argues for the first time that the case should be remanded to state court for lack of federal subject matter jurisdiction. Doc. # # 207, 210. The City argues that remand is compelled by *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), wherein the United States Supreme Court held that a federal claim for inverse condemnation is not ripe for adjudication unless two conditions are satisfied. First, the plaintiff must show that the alleged taking is based on a final decision of the government agency regarding how the property owner will be allowed to develop his property. *Williamson County*, at 190, 105 S.Ct. 3108. Second, the plaintiff must have sought compensation through available state procedures and been denied adequate compensation. *Williamson County*, at 195, 105 S.Ct. 3108. The City admits that "Yamagiwa did appropriately seek compensation in the California Courts by filing the complaint simultaneously alleging inverse condemnation under the state and

federal constitutions." Doc. # 207 at 17. Indeed, it was the City that removed the case, thereby electing to proceed in the federal forum. Doc. # 1. Nonetheless, over two years and what must be millions of dollars in litigation expenses later, the City now argues that, because Yamagiwa was never actually denied compensation by a state court, her federal takings claim is unripe. Doc. # # 207, 210. Furthermore, the City argues that aside from the purportedly unripe federal takings claim, there is no, and there never has been, a federal question before this court, mandating remand. Doc. # # 207, 210. The court disagrees on both points.

364. First, the court interprets the state procedures prong of *Williamson County* to have been drawn from "prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). See also *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733–34, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (describing *Williamson County* as consisting of "prudential hurdles"); *Williamson County*, at 196–97, 105 S.Ct. 3108 (creating exception to state procedures prong where procedure is "unavailable or inadequate"); *Yee v. City of Escondido*, 503 U.S. 519, 533–34, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (creating exception to *Williamson County* exhaustion for takings claim based on facial challenge); *Armendariz v. Penman*, 75 F.3d 1311, 1321 n. 5 (9th Cir.1996) (noting exception to *Williamson County* ripening requirement for "private takings" claims). As Yamagiwa points out, prudential concerns will normally favor avoidance of federal jurisdiction given that federal constitutional questions could be narrowed or mooted by a definitive ruling on state law issues. Here, however, prudence weighs in favor of retaining jurisdiction:

Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Here, the issues in dispute are fit for judicial decision. There will not be a more "concrete" dispute between the parties if the case is remanded to state court—just the same dispute in a different courtroom. Moreover, the "hardship to the parties of withholding court consideration" militates heavily in favor of this court deciding the case. As discussed more below, the parties have litigated the case in this court for two years and have brought this case to the brink of decision. The hardship would of course be compounded by the fact that, as discussed above, Yamagiwa has already pursued her regulatory takings claim to completion in state court, where she was denied relief after five years of litigation. Accordingly, giving due consideration to the prudential aspect of the state procedures prong of *Williamson County*, the court finds it proper to retain jurisdiction.

365. In addition, the court finds that Yamagiwa's fourth and fifth causes of action, seeking recovery of amounts paid to finance public improvements, were pled broadly enough to invoke relief under both federal and state constitutional law. Under *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), challenges to regulatory actions requiring the payment of money are properly analyzed as due process claims, not takings claims. Substantive due process claims need not be ripened by suing on a state remedy. They are immediately cognizable in federal court. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Accordingly, Yamagiwa's fourth and fifth causes of action provided a basis for removal separate from her federal takings claim.

366. The City argues that the fourth and fifth causes of action cannot justify removal because Yamagiwa did not pursue to conclusion her federal claims under the fourth and fifth causes of action. Doc. # 210 at 10–12. This is irrelevant:

> It is well settled that a federal court does have the power to hear claims that would not be independently removable even after the basis for removal jurisdiction is dropped from the proceedings. The district court's decision whether to adjudicate pendent state claims following final disposition of all federal claims is reviewed for abuse of discretion. It is generally within a district court's discretion either to retain jurisdiction to adjudicate the pendent state claims or to remand them to state court.

*Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir.1991) (citations and internal quotes omitted). See also *Albingia Versicherungs A G v. Schenker International, Inc.*, 344 F.3d 931 (9th Cir.2003) (holding that a district court's supplemental jurisdiction over state law claims is not destroyed upon dismissal of federal claims so long as the removable federal questions were presented at the time of removal).

367. The extreme wastefulness and hardship that remanding the case would create at this stage deserve further comment. The parties have incurred enormous time and expense litigating in feder-

al court. The parties took 47 depositions, including the depositions of nine expert witnesses. Twenty-two witnesses testified at trial, including many who were subpoenaed to appear. Nearly 300 exhibits were received into evidence. Additionally, significant judicial resources have been expended, far more than in the typical case given the complexity of the case and its progression to bench trial. And this court is prepared to rule. Retention of the case would promote judicial economy, given that remand would require the case to be re-litigated and possibly re-tried in state court, again at enormous expense to the parties and to that court. And retention is necessary to utilize the investment made by this court. This is because if Yamagiwa prevails in state court, her federal takings claims will become moot under *Williamson County*. Alternatively, if Yamagiwa loses in state court, that decision will become res judicata and binding on this court. See *San Remo Hotel LP v. City and County of San Francisco*, 545 U.S. 323, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005). Indeed, even assuming that Yamagiwa lost on her state takings claim, there would be nothing further to litigate factually on her federal takings claim-as shown here. Accordingly, having to divorce the federal from the state claim would be a useless formality. If there were "an appropriate case" to "reconsider" *Williamson County*—see *San Remo*, 545 U.S. at 352, 125 S.Ct. 2491 (Rehnquist, J, concurring)—this is such a case. But this court does not find that revisiting *Williamson County* is necessary given its finding that removal was proper, as discussed above.

368. Finally, the court emphasizes the inequity of the City's "late hit" remand ploy after trial and most probably millions of dollars spent by both sides. Here, plaintiff filed her state and federal takings claims simultaneously as required to preserve both claims and to avoid piecemeal litigation. See *San Remo*, 545 U.S. 323, 125 S.Ct. 2491, 162 L.Ed.2d 315. And she filed in state court as seemingly required by *Williamson County*. The City removed the case to federal court, where the case proceeded through over two years of litigation and nine days of trial. Only now, having had a front-row seat to plaintiff's presentation at trial and having the opportunity to review plaintiff's post-trial memoranda, does the City seek to remand based on its own purportedly improper removal. "We decline to let [defendant] take its chips off the table because it didn't like the dealer's hand." *Albingia Versicherungs A G v. Schenker International, Inc.*, 344 F.3d 931, 939 (9th Cir.2003). As Yamagiwa puts it "[t]o grant the [remand] request would allow any public entity to remove a case with a federal takings claim to federal court, all the while preserving a secret privilege to spring a claim of lack of subject matter jurisdiction if things don't go so well after removal." Doc. # 209 at 20. In sum, the City having invoked federal jurisdiction, its effort to multiply these proceedings by a remand to state court smacks of bad faith. Fortunately, because that ploy is groundless, the court need not reach the issue of sanctions. See 28 USC § 1927.

### Damages

### The Proper Date of Value Is 2006

369. Both sides' appraisers have valued Yamagiwa's damages as of two dates of value: March 2000 and October 2006. The former is the date the City denied Yamagiwa's CDP application based on the presence of new wetlands on the Property, and the latter is the date the appraisers exchanged their expert reports in this case. The latter date is a proxy for the date of trial, as it was the latest date the appraisers could have used under the federal rules and the court's case management

order, which required expert reports to be exchanged in advance of trial.

■ 370. In an inverse condemnation case, when the value of the landowner's property has appreciated between the date of damage and the date of trial, the proper date of value is the date of trial. (*Pierpont*, 70 Cal.2d at 297–98, 74 Cal.Rptr. 521, 449 P.2d 737; *Mehl v. People ex rel. Dept. Pub. Wks.*, 13 Cal.3d 710, 719–20, 119 Cal. Rptr. 625, 532 P.2d 489 [1975]; *Leaf v. City of San Mateo*, 150 Cal.App.3d 1184, 1191, 198 Cal.Rptr. 447 [1984], disapproved on other grounds in *Trope v. Katz*, 11 Cal.4th 274, 902 P.2d 259 [1995]; *Los Osos Valley Associates v. City of San Luis Obispo*, 30 Cal.App.4th 1670, 1683, 36 Cal. Rptr.2d 758 [1994].) The rationale behind the *Pierpont/Mehl* rule is that the owner of property damaged by a government project should be entitled to enjoy the same real estate appreciation that owners of undamaged properties enjoy.

371. The City's efforts to avoid the *Pierpont/Mehl* rule are rejected.

372. First, the City argues that there is no "hardship" to Yamagiwa here, so the *Pierpont/Mehl* rule should not apply. The City's argument boils down to this: Yamagiwa is claiming $19.8 million in damages under the 2000 date of value, and because that is a lot of money it can't be a hardship to use the earlier date of value. This is erroneous. The "hardship" reference in *Leaf II* has nothing to do with the amount of Yamagiwa's damages using the earlier date of value. Rather, the "hardship" mentioned in *Leaf II* addresses the situation where an earlier date of value is used even though "the *property value has increased over* time." (*Leaf II*, 150 Cal. App.3d at 1191, 198 Cal.Rptr. 447, emphasis added.) Here, the evidence is undisputed *by both side's appraisers* that the value of Beachwood has increased *substantially* between 2000 (when Yamagiwa's Property was damaged) and October 2006 (when the appraisers' reports were exchanged). Gimmy testified that Beachwood's undamaged value increased from $20,750,000 in 2000 to $39,000,000 in 2006—*an increase of 88%.* Carney, the City's appraiser, testified that Beachwood's undamaged value increased from $15,355,000 in 2000 to $34,030,000 in 2006—*an increase of 122%.* If Yamagiwa were compensated pursuant to the 2000 date of value, with interest pursuant to the Surplus Money Investment Fund ("SMIF") rate (Cal. Code Civ. Proc. §§ 1268.311, 1268.350), she would suffer a substantial hardship because interest since 2000 would be nowhere near the rate of real estate appreciation.[15]

373. Nor can any "fault" be ascribed to Yamagiwa that might make the *Pierpont/Mehl* rule inapplicable. In *Mehl*, the Supreme Court said that a landowner is entitled to use the trial date as the date of value unless the landowner is "*at fault in failing to promptly pursue his remedy in inverse condemnation.*" (*Mehl*, 13 Cal.3d at 719–20, 119 Cal.Rptr. 625, 532 P.2d 489, emphasis added.) In *Leaf II*, the California Court of Appeal similarly said that the landowner is entitled to enjoy the increased value to the date of trial "*if no fault is shown in failing to pursue available remedies promptly.*" (*Leaf II*, 150 Cal.App.3d at 1191, 198 Cal.Rptr. 447, emphasis added.) The courts were obviously addressing the situation where an owner of damaged property purposely delays bringing a case to trial in order to saddle the government with increased liability tied to increased real estate appreciation. Such owners should not be entitled to benefit from the *Pierpont/Mehl* rule.

**15.** The SMIF rates are posted and updated by the California State Controller on its website, https://www.sco.ca.gov/ard/surplus/smifrate.pdf.

374. But no one could reasonably accuse Yamagiwa of delay. The litigation history between the parties shows unequivocally that Yamagiwa has *always* pursued her claims promptly. The City denied Yamagiwa's CDP application on March 21, 2000 and adopted its Resolution on May 2, 2000. (Ex. 179.) Yamagiwa sued *15 days* later, on May 17, 2000. (Ex. 443, at p. 1, ¶ (a).) Her physical takings claim was mooted by the trial court's initial ruling that what the City had found to be "wetlands" on Beachwood were not, in fact, "wetlands" under the City's LCP. (Ex. 439, at 9900627.) The City issued her the CDP, as ordered by the trial court, on March 20, 2001. (Ex. 289, at 005861–5862.) The trial court's writ of mandate and the City's issuance of the CDP meant that Yamagiwa had suffered no compensable damages, and she consequently dismissed her physical takings case *without prejudice*, upon a written stipulation with the City. (Ex. 443.) Ultimately, when the trial court's ruling on the wetlands issue was reversed by the Court of Appeal on July 27, 2005, Yamagiwa re-filed her physical takings case promptly, on September 8, 2005—precisely in accordance with the parties' previous stipulation. Yamagiwa has always "promptly pursue[d] her remedies." She has litigated her claims vigorously before the San Mateo superior court, the California Court of Appeal, and this court for many years.

375. The proper date of value, determined under the *Pierpont/Mehl* rule, is therefore October 2006, not March 2000.

### Amount of Damages

376. In direct and inverse condemnation cases, the award of damages must be within the range of the appraisal testimony. (*People ex rel. Dept. Pub. Wks. v. McCullough*, 100 Cal.App.2d 101, 105, 223 P.2d 37 [1950] [direct condemnation—award higher than the highest appraisal improper]; *Redevelopment Agency of the City of Sacramento v. Modell*, 177 Cal.App.2d 321, 326–27, 2 Cal.Rptr. 245 [1960] [direct condemnation-award lower than the lowest appraisal improper]; *Aetna Life & Casualty Co. v. City of Los Angeles*, 170 Cal.App.3d 865, 877, 216 Cal. Rptr. 831 [1985] [inverse condemnation—where only the property owners presented appraisal testimony, $10.7 million directed verdict consistent with that testimony was proper due to lack of competent opposing evidence]; Cal. Evid. Code § 813(a); CACI 3515.)

377. Here, the range of appraisal testimony using the proper October 2006 date of value is between $26,620,000 (Carney's appraisal, for the City) and $36,795,000 (Gimmy's appraisal, for Yamagiwa). There being no other evidence of damages, the award must be within this range.

378. As described above, based on Carney's unsupported after-condition appraisal, the court further narrowed the range of supportable opinion testimony to between $30,996,600 (Carney) and $36,795,000 (Gimmy).

379. Based on a careful review of the appraisals of Gimmy and Carney, as described in the Findings of Fact above, the court concludes that the proper amount of damages using the October 2006 date of value is $36,795,000.

### Conclusion

380. Accordingly, judgment shall be entered in favor of plaintiff Yamagiwa and against defendant City of Half Moon Bay in the amount of $36,795,000.

381. In addition, the judgment shall include a permanent injunction in favor of plaintiff Yamagiwa as follows:

(1) the City (or any other person or entity acting as a collection agent for the City) shall be permanently enjoined from collecting from Yamagiwa any future payments due for Sanitary Sewer

Project 1994–1 applicable to Beachwood, San Mateo County Assessor's Parcel No. 048–280–020, beginning with the payment due by December 10, 2007. (Such payments appear on the Beachwood property tax bills as "HMB Swr Tr. Plant B.")

(2) the City (or any other person or entity acting on behalf of the City) shall be permanently enjoined from taking any action against Yamagiwa or the Beachwood Property, including but not limited to initiating collection activities or foreclosure proceedings, for her failure to pay any such future sewer assessments. And,

(3) the City shall advise the San Mateo County Tax Collector in writing (with a copy to Yamagiwa) of the injunctive relief granted herein.

This injunctive relief shall begin with the property tax installment payment due on December 10, 2007, and shall remain in effect until the monetary judgment herein against the City is satisfied in full. Once the monetary judgment is satisfied in full, Yamagiwa shall execute a grant deed for the Beachwood Property to the City, and the City shall accept and record the deed for the Beachwood Property, free of cost to Yamagiwa. Once title to Beachwood has transferred to the City, the injunctive relief to Yamagiwa afforded under *Furey* will no longer be necessary, and shall terminate without further order of the court. The court shall reserve jurisdiction to enforce or handle any issues associated with the injunctive relief granted.

382. To the extent that any of the foregoing conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

383. The issues of Yamagiwa's entitlement to interest and attorney fees and expenses under Cal. Code Civ. Proc. § 1036 are reserved for determination based on future briefing. If she intends to seek such further relief, Yamagiwa shall file her motion for determination of interest, attorney fees and expenses within 30 days of the date of these Findings of Fact and Conclusions of Law. This request should be supported by a declaration containing a detailed billing record and in accordance with the principles set forth in *In re HPL Technologies, Inc., Securities Litigation,* 366 F.Supp.2d 912 (N.D.Cal. 2005) (Walker, J).

384. Yamagiwa shall prepare a proposed judgment consistent with these Findings of Fact and Conclusions of Law and submit it within 15 days of the date of these Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.